UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| L.H., a Minor Student, | ) | |
| by and through his parents G.H. and | ) | |
| D.H.and G.H. and D.H., individually, | ) | |
| | ) | |
| Plaintiffs | ) | Case No. 1:14-cv-00126 |
| | ) | |
| vs. | ) | Judge Curtis L. Collier |
| | ) | |
| HAMILTON COUNTY DEPARTMENT | ) | JURY DEMAND |
| OF EDUCATION, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| EDUCATION | ) | |
| | ) | |
| Defendant | ) | |

---

## FIRST AMENDED COMPLAINT

---

**COME NOW, THE PLAINTIFFS,** by and through counsel, and file this

Complaint and Petition for Judicial Review. They respectfully show:

## I.     INTRODUCTION

1.     This case involves the illegal segregation of a high functioning child with

Down syndrome from his regular classroom and neighborhood school (Normal Park

Museum Magnet) to a vastly inferior and educationally inappropriate environment

(a "Comprehensive Development Class" also known as "CDC" at Red Bank

1

Elementary).  Whereas the former is a nationally touted public school where the parents built a home, the CDC environment at Red Bank does not utilize report cards, does not require homework, and its mission is to help children "function when they age out of the system."

2.    L.H. is the first (and only) child with Down syndrome, an Intellectual Disability,[1] to seek inclusion in the regular education classroom at Hamilton County's Normal Park Museum Magnet ("NPMM") school in Chattanooga, Tennessee.  NPMM advertises itself as being "America's #1 Magnet School" and it features enriching activities that are particularly beneficial to a child with Down syndrome such as L.H. *See http://normalpark.com.*

3.    L.H.'s disability notwithstanding, psychological testing confirmed L.H. scored:  in Reading, a 96 out of a mean of 100; in broad reading composite, an 82 of a mean of 100; in spelling, a 75 of a mean of 100; in writing, a 78 of a mean of 100; and, in academic skills, a 76 of a mean of 100.  By comparison, in Hamilton County elementary schools, only 48.4% of students are reading at or above grade level and approximately 37.7% of students are proficient or advanced in mathematics. http://www.hcde.org/inside-hcde.  Thus, L.H. is a high functioning child with an intellectual disability who can, and must, be included in regular education.

4.    Unfortunately, Hamilton County Schools places students with Intellectual Disabilities in segregated settings outside the regular classroom at almost twice the national average (81% of students in HCS versus 48.2% of students nationally).  It

---

[1]    "Intellectual Disability" was formerly referenced as "Mental Retardation."

2

attempted to do this with L.H., rather than provide him an education in his Least Restrictive Environment at NPMM which met his unique educational needs.

5.     Only 12% of students (a total of 36 students) with Intellectual Disabilities in Hamilton County are in the regular education classroom more than 40% (3+ hours) of the day.  By comparison, an average of 44.1% of students with Intellectual Disabilities are in the regular education classroom more than 40% of the time nationally (36.5% in the state of Tennessee).

6.     This is a necessary action to address the denial of a free appropriate public education by the Hamilton County Department of Education ("HCDE"), as it demanded the unnecessary segregation of L.H. from his non-disabled peers at NPMM to a CDC located at Red Bank Elementary in Chattanooga, Tennessee.

7.     L.H. enjoys a legal right to be educated with his non-disabled peers—known as "inclusion"—through supplemental aids, supports, and modifications _instead of_ being segregated to a different school, in a _more_ restrictive environment, in a setting known as a Comprehensive Development Class ("CDC").

8.     This case also involves the failure by the Tennessee Department of Education (the State Educational Agency, or SEA) to (a) properly establish a procedure _directly with the state_ to resolve complaints, instead forcing adversarial due process as the only means for resolution; (b) monitor, oversee, and train the LEA with respect to illegal segregation and denial of FAPE under IDEA; and (c) ensure that L.H. is entitled access to the general educational curriculum, with appropriate

modifications and supports, aids, and services under the Americans with Disabilities Act, with Amendments, and Section 504.

## II.   PARTIES, JURISDICTION, VENUE

9.   L.H.  is a 10 year old little boy who resides with his parents in Hamilton County, Tennessee.  He is a citizen of the United States.  L.H. is used for reasons of privacy, being that L.H. is a minor.

10.   D.H. and G.H. are the parents of L.H.  They reside in Hamilton County, Tennessee.  They are citizens of the United States.

11.   The Hamilton County Department of Education is a governmental subdivision of the State of Tennessee, duly authorized to administer public schools within Hamilton County, including Normal Park Museum Magnet.  It receives federal financial assistance and is a public entity as defined in Title II of the Americans with Disabilities Act, and is obligated under Federal and Tennessee law to comply with special education laws, which include identifying students eligible for special education, providing notices of procedural safeguards, and providing them with a free and appropriate public education.

12.   The Tennessee Department of Education is the "State Education Agency" (SEA) which is legally responsible for ensuring that a free appropriate education (FAPE) is provided to all students in the state of Tennessee.  An "SEA" includes a public board of education or other public authority legally constituted within a State for either administrative control or direction of , or to perform a service function for, public elementary or secondary schools in a city, township, school district, or other

political subdivision of a State [.]" 20 U.S.C. §1412(a)(1). Additionally, the Tennessee Department of Education is subject to Title II of the Americans with Disabilities Act, with Amendments (ADAAA) and Section 504 of the Rehabilitation Act.

13.    This action is an action for Judicial Review pursuant to Tennessee Code Annotated §4-5-322 which states that review of special education deprivation, under Tenn. Code Ann. §49-10-101 *et. seq.*, is instituted by filing a petition for review in the chancery court of Davidson County. Additionally, this is a Complaint under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1415(e)(2), and its state counterpart, Tenn Comp. R. & Reg § 0520-01-09; Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

14.    Venue is proper under Tennessee Code Annotated §4-5-322 because judicial review must be filed in Davidson County.

### III.    ADMINISTRATIVE EXHAUSTION AND FAILURES OF DUE PROCESS

15.    On October 29-31, 2013, Plaintiffs[2] completed an administrative due process hearing in the state of Tennessee challenging HCDE's decision to remove their child, L.H., from inclusion in his neighborhood school at NPMM to a segregated CDC at Red Bank Elementary.

---

[2]    The parents, D.H. and G.H., acted *pro se* in representing L.H.'s interests at the due process level. Their evidence was inappropriately limited by the hearing officer and, in any event, additional evidence may be obtained and presented post-due process which Plaintiffs anticipate doing.

16.     During the due process hearing, the hearing officer correctly observed that L.H. has Down syndrome, that his IQ of "somewhere around 60" is not necessarily reflective of his abilities.

17.     The hearing officer also correctly observed the strength of L.H.'s social skills and that he is "very social, and social interactions are important to him, as are friendships," that he "has good social awareness, acting appropriately in social situations."

18.     The hearing officer also observed that L.H. "has good language skills for interaction with others," that his "peers enjoy his company, accept him, and provide help at times when it is necessary." The hearing officer correctly found that L.H.'s "social skills are well-developed and an asset to him."

19.     Additionally, the hearing officer observed that, per a child development expert, L.H. is very advanced compared to other children with intellectual disabilities.

20.     Moreover, the hearing officer correctly found that L.H. "has good memory skills which have helped him with reading, particularly with recognizing words."

21.     Unfortunately, while the hearing officer had an appreciation for L.H.'s abilities, the hearing officer plainly did not understand critical legal issues of inclusion goals or placement.

22.     HCDE mistakenly believed, and did submit sworn testimony, that its goal was to make L.H., who has an intellectual disability, perform equivalently to a non-disabled second grader, as opposed to making meaningful progress toward goals

outlined in his IEP. Indeed, HCDE submitted sworn testimony from its educators that it was trying to "close the gap between L.H.'s level of performance and <u>the rigorous expectations of the second grade regular education curriculum in the inclusion setting.</u>" Thus, by using an impermissibly high standard, HCDE impermissibly concluded: "Until L.H. masters these prerequisite skills, expecting him to perform at a level of a typical second grader will be futile."

23. By contrast, HCDE did not acknowledge to the hearing officer its own standards and in-service training on "Inclusive Education." HCDE's Inclusive Education training includes the following statements of principle which simply were not observed in this case:

    a. "Every child is welcomed and valued regardless of ability or disability."

    b. "Inclusive Education is an attitude—it means the doors to schools, classrooms and school activities are open to every child and they are afforded every opportunity to be <u>included</u> with their non-disabled peers. The focus is on giving every child the help s/he needs to learn."

    c. "**Special Education is NOT a place**."

    d. "**Students can't learn general curriculum unless they are in the room where it is being taught**."

    e. The IEP team "**must decide which and how many general curriculum objectives are to be taught**."

    f. The IEP team "must make general curriculum objectives functional and meaningful for this student."

g. "Goals may be different [for the disabled student with an IEP] but need to be related (like learning to recognize a triangle when others are learning the angles in a triangle)"

h. "It's not about the place!!! All students must have access to general curriculum."

i. The "least restrictive environment" … "should put the fewest possible restrictions on how much time is spent with kids without disabilities."

j. Least Restrictive Environment: "Starts with the assumption the student will be in the general classroom, with supports as needed. If that won't work full time, pull the child out of the general classroom for part of the day for therapies or resources. **This should be done as seldom as possible**. Only if all other options fail should the child be separated from the general classroom."

24. Instead of appreciating that goals under an IEP may be different, the hearing officer assumed that L.H., who has Down syndrome, must keep pace with his non-disabled peers in order to remain at NPMM. This fundamentally misunderstands the law, as persons with Down syndrome will necessarily learn differently than persons without an Intellectual Disability.

25. Alarmingly, the hearing officer also believed that, if kept at NPMM, L.H. must be "isolate[ed] in the back of the class where he would work on material that none of the other children are working on [which] could work as a sort of exclusion within the class." By describing L.H.'s inclusion in the regular classroom as a

8

quasi- "exclusion," the hearing officer errantly compared the outcome of a highly segregated CDC classroom at Red Bank Elementary to "the back of the room in a one student population," neither of which is accurate.

26.     Indeed, the hearing officer observed that, in a CDC class, there was very little interaction between students; the students sit at separate tables from non-disabled peers; and L.H. would experience frustration. Analyzing what he believed were two poor choices, the hearing officer actually chose the <u>more</u> restrictive one, the CDC, and not the less restrictive one, NPMM.

27.     Nor did the hearing officer appreciate that a segregated environment of the CDC is not an appropriate default where the regular education program has proved difficult. To the contrary, a "continuum" of placements must be considered with the goal of maximizing the interaction of disabled children with non-disabled. *See, e.g., Oberti v. Bd of Educ.*, 995 F.2d 1204 (3rd Cir. 1993) (segregating child with Down syndrome from non-disabled peers not appropriate).

28.     Additionally, the hearing officer relied for his decision upon an unreported case outside of Tennessee and the Sixth Circuit, *J.H. v. Fort Bend Indep. Sch. Dist.*, 482 Fed. Appx. 915 (5th Cir. 2013). In *J.H.,* the Court specifically stated: "This opinion should not be published."[3]

29.     In sum, the hearing officer failed to apply the appropriate legal standards for segregating a child with disabilities from the regular classroom. Thus, the hearing

---

[3]     Even so, in J.H., a 14 year old child with an IQ of 48, and functioning below L.H., was actually <u>included</u> in the regular education classroom and received pull-out instruction where needed—an "incremental approach."

officer erroneously determined that removing L.H. from his neighborhood school (NPMM) and placing him in a Comprehensive Development Classroom (CDC) at Red Bank Elementary was appropriate when, in fact, and by law, it is not.

30.     The hearing officer's order was entered December 20, 2013.  Accordingly, Plaintiffs have exhausted administrative prerequisites and this legal action is both necessary and ripe.

## IV.    FACTS

### Down Syndrome and Learning

31.     Children with Down syndrome learn differently.  The development of children with Down syndrome is characterized by several alternating periods of advances, followed by periods of plateau.  For this reason, then, HCDE should not have expected a single growth curve that is characteristic of typically developing children.

32.     With a proper understanding of Down syndrome, which L.H.'s parents attempted to provide HCDE through a child development expert, L.H. is actually a capable and high functioning child with an Intellectual Disability.

33.     For example, in terms of his IQ, L.H. has been classified as having "mild intellectual disability," e.g. "mild mental retardation" which is defined as IQ scores in the range of 50-69.

34.     Psychological testing also reveals that L.H. scored near the mean (mean being 100) in these areas:   Reading (96) and broad reading composite (82).  Additionally, L.H.'s scores in spelling (75), writing (78) and academic skills (76)

were tested to be between one and two standard deviations from the mean. Thus, these tests demonstrate *achievement above* what would be expected for someone with his intellectual disability.

35. Additionally, L.H. benefits greatly from social interaction and modeling from his non-disabled peers.

<u>Inclusion of L.H. at NPMMA—His Neighborhood School</u>

36. L.H.'s home, zoned, neighborhood school is Normal Park Museum Magnet (NPMM). In fact, L.H.'s parents had built a home in the NPMM jurisdiction just so that he could be educated there.

37. HCDE accepts federal money under IDEA. As a condition to receiving such money, the Individuals with Disabilities Education Act (IDEA) requires each school district and state agency to restrict the use of "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment." "Unless the IEP of a child with a disability <u>requires</u> some other arrangement, the child is educated in the school that he or she would attend if nondisabled." *34 C.F.R. §§ 300.114-16.* In other words, L.H. is presumptively entitled to school in his neighborhood school of NPMMA.

38. Local Education Agencies must also insure that a continuum of alternative placements is available to meet the needs of students with disabilities for special education and related services. The continuum required must include the alternative of instruction <u>in regular classes</u> and must make provision for

supplementary services to be provided in conjunction with regular classroom placement. *34 C.F.R. §300.115.*

39.    A child with a disability is not to be removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum. *34 C.F.R. § 300.116.*

40.    Additionally, and importantly, under the IDEA, 20 U.S.C. §§ 1414(a)(1)(C)(i), 1413(a)(3) and 34 C.F.R. § 300.156, state and local education agencies have a duty to ensure that their personnel are appropriately and adequately prepared and trained for serving children with disabilities.

41.    L.H.'s social interactions are important to him, as are friendships.  He has good social awareness, acting appropriately in social situations.  He enjoyed dozens of friends at NPMM.

42.    L.H. also has good language skills for interaction with others.  His peers at NPMM enjoyed his company, accepted him, and provided help at times when it is necessary.

43.    As a child development expert explained, L.H. is very advanced compared to other children with intellectual disabilities.

44.    L.H. attended NPMM in Hamilton County (2009-2013) for kindergarten and first grade. He repeated first grade.

45.    In 2011-2012, L.H. enjoyed an experienced professionally-licensed teacher and an experienced special educational assistant (paraprofessional) who provided him with an appropriate education that resulted in L.H.'s progression through four

reading levels. By the end of the school year, L.H. could add and subtract to 20 with manipulatives. He showed satisfactory progress in Science, Social Studies and Related Arts (Art, Music and Gym).

46. After the 2011-2012 school year, L.H.'s IEP for the 2012 – 2013 school year was developed and signed by eight HCS employees who agreed (checked "Yes" on the IEP) that he was academically prepared to enter second grade.

47. In sum, L.H. is a child with an intellectual disability, who can, and should, be educated in his regular, neighborhood school with non-disabled peers, along with appropriate supports and pull-outs where necessary.

48. As L.H. entered second grade for the 2012 – 2013 school year, NPMM assigned L.H. a second-grade regular education teacher who, unfortunately, simply lacked experience providing educational programming to a child with Down syndrome. Unfortunately, this teacher mistakenly believed that L.H. must perform at the level of a "typical second grader" in order to receive a meaningful benefit and to pass the grade. As a result, she governed L.H. by an impermissibly high standard in order for L.H. to remain in the regular classroom at NPMM.

49. The regular education teacher needed the assistance of a resource, or special education teacher, who actually had experience with Down syndrome and its unique learning profile. However, NPMM assigned L.H. a special education teacher who lacked any experience with Down syndrome either.

50. Upon information and belief, L.H. was actually the first child with Down syndrome to be educated at NPMM. As a result, his learning profile was not only misunderstood but their beliefs were actually harmful to L.H.

51. NPMM had constructed a formal discipline chart of L.H. through a seven-factor behavior chart.[4] But this chart actually showed that L.H. remained "following rules and on task" 87% of the time, as documented by HCDE.

52. The special education teacher, too, harbored a misunderstanding that her job was to "close the gap between L.H.'s levels of performance and the rigorous expectations of the second grade regular education curriculum...." With such a goal, she came to the conclusion that inclusion was "futile."

53. HCDE does provide its teachers training on the proper goals of "inclusion." This training, which included PowerPoint slides, makes plain that the focus must be *individualized*, not based upon the performance of a "typical second grader":

    a. The IEP team "**must decide which and how many general curriculum objectives are to be taught**."

    b. The IEP team "must make general curriculum objectives functional and meaningful for this student."

    c. "**Goals may be different [for the disabled student with an IEP] but need to be related (like learning to recognize a triangle when others are learning the angles in a triangle)**"

---

[4] Upon information and belief, such a behavior chart was not used with any other student at NPMM.

d. Least Restrictive Environment: "Starts with the assumption the student will be in the general classroom, with supports as needed. If that won't work full time, pull the child out of the general classroom for part of the day for therapies or resources. **This should be done as seldom as possible**. Only if all other options fail should the child be separated from the general classroom."

54. Not only did L.H. have regular and special education teachers unfamiliar with Down syndrome, NPMM removed L.H.'s "special education assistant" (paraprofessional) and provided him a revolving door of three "ancillary attendants."

55. In 2013, without the parents' knowledge or approval, and without convening an IEP meeting, L.H.'s teacher and special education teacher disregarded some of the goals set forth in L.H.'s IEP and began instructing him differently than his IEP was written and intended.

56. While limited teacher modification to assignments was contemplated, the actions of the Defendant were to teach a different curriculum and to disregard the IEP in a broad fashion. This action constitutes a procedural violation of the IDEA (and related state standards) in that Defendant "began using a kindergarten level curriculum" without first using the IEP Team process for such a significant change.

57. Additional procedural violations occurred, in 2013, when NPMM conducted private pre-IEP meetings which excluded the parents and pre-determined the outcome of IEP meetings.

## Segregation Away from Regular Education

58.     At a mid-year IEP review in February of 2013, requested by L.H.'s parents, HCDE advised L.H.'s parents that, in its opinion, L.H. needed to be removed from the regular classroom at NPMM and segregated to a CDC program located at Red Bank Elementary, a Title I school which was neither his neighborhood school nor the school he would attend had he lacked a disability.

59.     L.H. has the great fortune of having a Cub Scout den leader and coach of his little league baseball team, Darrell Meece, who also has a Ph.D. in child development from Auburn University.

60.     Dr. Meece, a professor in the School of Education at the University of Tennessee at Chattanooga (UTC), teaches courses on child development and has worked with children with Down syndrome.  Therefore, L.H.'s parents arranged for Dr. Meece to assist HCDE in understanding Down syndrome—particularly since NPMM had never, to their knowledge, previously educated a child with Down syndrome and, certainly, L.H.'s teachers had not.

61.     Dr. Meece attended multiple IEP team meetings, up through May of 2013, with the hope of providing the input and education about Down syndrome.

62.     For example, Dr. Meece advanced studies showing that children with Down syndrome, particularly with mild intellectual disabilities like L.H., perform better in integrated environments, not segregated environments.  Moreover, Dr. Meece attempted to explain that placement of children with Down syndrome in segregated

environments is actually harmful to their development, as children, in terms of communication, literacy, and social skills.

63.     However, HCDE, and NPMM in particular, deliberately chose to ignore these studies and evidence at its own peril.

64.     Instead, believing that L.H. must "perform[] at a level of a typical second grader," and not as a child with an Intellectual Disability with a unique learning profile who is attempting to meet IEP goals, HCDE contended that L.H.'s continuation in the regular education classroom was "futile."

65.     This conclusion contradicts the professional literature, the profile of Down syndrome, and the high functioning abilities of L.H.  It suggests NPMM has deemed itself incapable—and/or unwilling—to perform the sometimes-difficult but necessary work of inclusion in a least restrictive environment with appropriate supports.

66.     In fact, L.H. remained capable of receiving educational benefit at NPMM— his IQ showed it, his psychological tests showed it, and his behavior showed it. And, by contrast, he would receive a loss of educational benefit by being segregated at Red Bank.

67.     On or about May 10, 2013, HCDE gave notice to L.H.'s parents that L.H. should be placed in an "alternative setting" with an "alternative curriculum" and a "highly structured setting."

68.     According to HCDE, it was no longer even possible to educate L.H. at NPMM.

69.    In May of 2013, HCDE proposed an IEP for L.H. which concluded that "[L.H.'s] IEP can't be implemented in his home-zoned school."

70.    The IEP, which NPMM intended to be implemented at Red Bank, would remove L.H. from his zoned school, from his peers and friends (dozens developed over four years), and place him in a segregated special education classroom at Red Bank Elementary.

71.    Red Bank Elementary had failed to meet No Child Left Behind standards for three consecutive years.

72.    The IEP for Red Bank Elementary, proposed by HCDE, was not tied to a general education curriculum for any particular grade.  In fact, the proposed IEP would reduce L.H.'s minutes of academic instruction from 5.5 hours per day to 3. This 3 hours of instruction is less than what the State of Tennessee recommends even for non-disabled students who are experiencing academic difficulties.

73.    Additionally, the proposed IEP contained <u>no</u> goals for Science or for Social Studies even though L.H. had received "satisfactory" on both subjects.   The proposed IEP included 3 hours of "Related Arts," but that consisted of 30 minutes of lunch, 30 minutes of recess, and two hours per day of art, music, and gym. This IEP reduced L.H.'s instruction in English Language Arts by 60 minutes to give him a second hour each day of art, music and gym. (Students without disabilities generally receive one hour per day of such Related Arts.  And upon information and belief, non-disabled students at Red Bank Elementary and elsewhere simply do not receive 2 hours per day of art, music and gym.)

Case 1:14-cv-00126-CLC-SKL   Document 16-1   Filed 10/22/14   Page 18 of 35   PageID #: 111

74.    Instead of general education curriculum, as at NPMM, the proposed IEP required "alternative curriculum." However, this alternative curriculum, the on-line "Unique Learning System," has never been peer-reviewed. See § 300.320(a)(4)

75.    As a student in the CDC setting, L.H. would no longer receive a Report Card that tracked his progress to any state educational standard.

76.    In addition, adherence to the proposed IEP at Red Bank's "alternative curriculum" would mean that L.H. would not receive the appropriate level of interaction with non-disabled cohorts, but instead would receive interaction with approximately nine (9) other students with disabilities in the CDC setting.  The proposed IEP at Red Bank would have resulted in L.H. having only 1.5 hours per day of exposure to his non-disabled peers compared to the 6.0 hours per day he enjoyed at NPMM.

77.    Moreover, the CDC class for 3rd – 5th-grade students at Red Bank does not require homework of its students while students in the regular education setting have homework assignments beginning in Kindergarten.

78.    The principle purpose of CDC at Red Bank, according to its special education teacher, is to help children "function when they age out of the system."  In fact, HCDE's proffered expert stated of the CDC curriculum:  "[it is] an alternative curriculum, and there is not a diploma available in that curriculum."

79.    Accordingly, the CDC is not designed to provide an education that allows for the possibility of children, including children with Down syndrome, to graduate

with a regular high school diploma. In fact, academic progress is not even formally measured or analyzed.

80. Additionally, the proposed IEP for L.H. did not include any goals for progression in Reading or Math, it included no goals for Science and Social Studies, and no documented link to a curriculum.

81. L.H.'s parents refused the school's ultimatum of CDC at Red Bank.[5] Because the placement in a CDC classroom was inappropriate, L.H.'s parents had to seek, at their own expense, an alternative placement at the Montessori School of Chattanooga where he now enjoys a regular education setting following a defined general education curriculum with non-disabled peers for 7 hours per day and is receiving FAPE. Accordingly, costs and expenses for educating L.H. have been at the parents' own expense, for which they must seek reimbursement.

82. L.H. can receive (and for a time did receive) a meaningful educational benefit through inclusion at NPMM. By contrast, Defendant's refusal to continue this placement and, instead, place him in a CDC environment, a most restrictive environment, would be harmful and regressive to L.H.

83. While a CDC environment is appropriate for some students, it is *not* appropriate for L.H. Indeed, it is regressive to L.H. because it denies him the appropriate inclusion, it denies him appropriate association with non-disabled peers, denies him his friends developed over the years, and it denies him important

---

[5] "Ultimatum" because HCDE informed the parents that an IEP could not be implemented at NPMM and the IEP it proposed was for <u>Red Bank</u> and an alternative curriculum.

expressive language skills. The CDC setting does not allow for the formation and maintenance of relationships with children without disabilities, nor does it provide any benefit to non-disabled children in being exposed to students with intellectual disabilities such as Down syndrome.

### Statistical Failure of *Inclusion* in Hamilton County Tennessee

84. Unfortunately, there is a strong discrepancy between the placement of children with intellectual disabilities outside the regular education classroom in Hamilton County, Tennessee schools in comparison to the rest of the United States.

85. Open records requests revealed that Hamilton County has approximately 42,000 students in its schools. Of those, 285 are classified as having an "intellectual disability." Of those, only 15 students with intellectual disabilities, which represent 5%, are placed in the regular classroom at least 80% of the time. L.H. was one of those fifteen until HCDE planned his removal. By contrast, nationally, 17.4% of students with Intellectual Disabilities are placed in the regular classroom at least 80% of the time.

86. Similarly, only 12% of students with Intellectual Disabilities in Hamilton County (a total of 36 students) are in the regular education classroom more than 40% (3+ hours) of the day. By comparison, an average of 44.1% of students with Intellectual Disabilities are in the regular education classroom more than 40% of the time nationally.

87. Plaintiffs made known this discrepancy to HCDE which ignored the statistics.

88. HCDE subjected L.H. to what amounts to a consistent exclusion of children with intellectual disabilities from regular education classrooms with appropriate accommodations and modifications and adequate supplemental aids and services, instead insisting that he be placed in a most restrictive environment with no homework, no report cards, and no academic accountability.

## V. FAILURES BY THE SEA, THE TENNESSEE DEPARTMENT OF EDUCATION

89. The foregoing facts are incorporated herein.

90. Under the IDEA, the Tennessee Department of Education, the "State Educational Agency (SEA)," has general supervisory responsibility for the overall provision of special education services within the state. 20 U.S.C. §§1412(a)(11)(A); 1401(32). The IDEA envisions that each state will devise its own system for providing special education services through "Local Education Agencies" (LEAs). 20 U.S.C. §1401(19).

91. Tennessee elected to participate in IDEA by adopting a state plan and statutes and accepting federal funds.

92. Similarly, Tennessee has accepted federal funds under Section 504 (thus waiving any claim of sovereign immunity, 42 U.S.C. §2000d-7).

93. **SEA's Denial of Resolution Opportunity**. Under the IDEA and regulations from the United States Department of Education, the SEA must afford *two* opportunities for challenges to the identification, evaluation, provision of FAPE, or placement of a child with a disability: a state "due process hearing," 20

U.S.C.§1415(b)(6)(A); and a less formal and less adversarial proceeding directly through the SEA. 24 C.F.R. §§300.151-153. Both opportunities are to be available to claimants to obtain compliance with the IDEA. In fact, the SEA must make an "independent determination" as to whether the public agency is violating a requirement of the IDEA. 34 C.F.R. §300.152(a)(4).

94. However, the SEA maintains that due process hearings before an administrative hearing officer are the sole avenue available for redress through the state. Absent success with the LEA in a "resolution meeting" (which failed in this case), this necessarily results in an expensive, adversarial process with the LEA . The SEA was required to afford L.H. and his parents the opportunity for less expensive and adversarial avenue, involving the SEA, to address issues of inclusion, least restrictive environment, placement and programming and it did not do so. As a result, L.H. and his parents were required to undergo, at significant expense, a lengthy and adversarial due process hearing and, now, to retain legal counsel to challenge that hearing in this federal court.

95. The SEA has recently taken the (illegal) position, in writing, that it "cannot examine the substantive aspects of [an] IEP as it relates to the provision of a FAPE, as the IDEA specifically assigns resolution of disputed issues regarding identification, evaluation, educational placement or the provision of FAPE *to the due process hearing procedures* at 34 CFR 300.507." Accordingly, declarative and injunctive relief is necessary to force the SEA to abide by federal law with respect to Complaint resolution opportunities.

96. **SEA's Systemic and Individual Failure to Monitor FAPE.** Upon information and belief, more than 60% of students with intellectual disabilities in Tennessee, spend more than 60% of each day in an alternative, segregated setting of special education (at least 4,446 of 7,312 students). The LEA unilaterally intended this result for L.H. too.

97. When this occurs, these students are denied access to, and instruction in, the state-approved general education curriculum. In the present case, the decision to segregate L.H. was being made *as early as second grade*.

98. A "CDC" environment in Hamilton County, where L.H. was to be unilaterally placed by NPMM, has hardly ever, if ever at all, resulted in a regular high school diploma when the student spends more than 50% of his/her day in the CDC classroom. Thus, such placements—which are not the least restrictive environment—have a significant future impact on the child's educational outcome.

99. Students in segregated environments like CDC, do not receive report cards or grades that measure progress toward a state standard. Indeed, the Response to Intervention and Instruction (RTI2) is a "general education framework" that is not made available to students who fall outside the regular education setting. Moreover, these students are denied accommodations and modifications that would allow them to be successful in the general education curricula, and denied access to progress-monitoring toward grade level progression.

100. Additionally, the "Tennessee Promise" grants full tuition to a community college for high school graduates in Tennessee. The proposed actions by NPMM of placing L.H. in a CDC, and the failure to take any action by the SEA, would have in all likelihood denied him the opportunity to graduate, given that he would not be receiving report cards, taking tests, or placed on track to graduate with a diploma.

101. The alternative *curriculum* in the segregated setting of CDC, as proposed for L.H., is known as the "Unique Learning System," which, upon information and belief, has never been peer reviewed, as required by law. The SEA has stated, in writing, that it "does not have a list of alternative curriculum programs nor do we evaluate the alternative curricula." It further states that "[l]ocal agencies have discretion and local control regarding curriculum decisions." In other words, the State has taken a hands-off approach to oversight of alternative curriculum in derogation of its responsibility.

102. As a result of this approach, there is substantial inconsistency in segregation rates of children with intellectual disabilities among Tennessee counties, rates which reflect the aforementioned lack of oversight, monitoring, and instruction by the SEA. In short, the statistical probability of a child with an intellectual disability, like L.H., of receiving inclusion in regular education is wildly inconsistent within Tennessee Counties.

103. The SEA has also failed to monitor, and prevent, the LEA from succumbing to a conflict of interest between federal "Race to the Top" (RTT) and No Child

Left Behind, on the one hand, with their heavy focus on standardized testing, and inclusion of children, like L.H., with intellectual disabilities, on the other hand. With emphasis on meritocratic testing of RTT, LEAs such as NPMM face a monetary disincentive to include children with intellectual disabilities. RTT, for example, focuses heavily upon the results of standardized testing of students in order to receiving funding, while persons with a high-needs intellectual disability will *adversely* affect such scores. Thus, schools are monetarily incentivized with excluding high-need students with intellectual disabilities, such as L.H., in order to achieve higher scores and, thus, more funding—a conflict and reality the SEA has simply not monitored and policed. Recent statistics from the Tennessee Department of Education show a *substantial* trend of declining enrollment of students with disabilities under IDEA at NPPM. Indeed, in the present case, the LEA demanded L.H.'s performance be on par with second graders who lacked intellectual disabilities in order to remain included and, when the LEA, NPPM, believed he could not make that level, it determined he should be removed to CDC.

## VI.    LEGAL CLAIMS AGAINST HCDE

### COUNT ONE:      TENNESSEE CODE VIOLATIONS:

104.   The foregoing facts are incorporated herein and restated.

105.   In Tennessee, under Tenn. Code Ann. 49-10-101: "It is the policy of this state to provide, and to require school districts to provide, as an integral part of free public education, special education services sufficient to meet the needs and

26

maximize the capabilities of children with disabilities." *Tenn. Code Ann. § 49-10-101.*

106. Moreover, "to the maximum extent practicable, children with disabilities shall be educated along with children who do not have disabilities and shall attend regular class." *Tenn. Code Ann. § 49-10-103(c)(1).*

107. "An assurance that to the maximum extent appropriate, children with disabilities, including children in public and private facilities, are educated with children without disabilities. Special classes, separate schooling or other removal of children with disabilities from the general educational environment occurs only if the nature or severity of the disability is such that education in the general education classes with the use of supplementary aids and services cannot be achieved satisfactorily." Chapter 0520-01-09-.09(l)(5) Special Education Programs & Services, TN Rules of State Board of Education.

108. HCDE violated state law by refusing to educate L.H. in his least restrictive environment, by changing his curriculum without parental notice, predetermining placement, and demanding the <u>most</u> restrictive environment of the CDC away from his zoned school. HCDE ignored its own training on inclusion and least restrictive environment. The parents are entitled to a FAPE in an inclusive setting and/or payment of his appropriate education the parents have been forced to obtain at their own costs. They also seek all expenses and their reasonable attorneys fees.

## COUNT TWO: VIOLATION OF IDEA

109. The foregoing facts are incorporated herein and restated.

110. L.H. needs special education ("specially designed instruction," per 34 C.F.R. § 300.39) and related services either inside or outside the classroom including "supplemental aids and services." *34 C.F.R. § 300.42* ("supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate"); *see also 34 C.F.R. § 34(a).*

111. L.H. has a right to an Individualized Education Plan (IEP) and an educational setting to "meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum (i.e., the same curriculum as for nondisabled children)." *34 C.F.R. § 300.320(a)(2)(i)(B).*

112. The actions of HCDE unnecessarily denied L.H. his right to special education, in an inclusive environment, with non-disabled peers, and with appropriate supplemental aids and supports.

113. HCDE committed procedural violations including: (a) altering an IEP without an IEP meeting, (b) holding meetings on education and placement without the parents, and (c) predetermining alternative placement.

114. HCDE's demand for CDC placement in a non-peer reviewed program was not appropriate. Special education services and supports can be provided in an integrated setting at L.H.'s zoned school of NPMM. *See, e.g., Roncker v. Walter*, 700

F.2d 1058 (6th Cir. 1983)(involving mental retardation); *Oberti v. Bd of Ed.*, 995 F.2d 1204 (3d Cir. 1993)(involving Down syndrome).

115.   HCDE's IEP for Red Bank Elementary was not appropriate or necessary.  It was not appropriate because it removed academic instruction and substituted too heavily the "related arts" of lunch, gym, music and art.   It was not necessary because NPMM is legally incorrect in insisting that L.H. <u>could not be educated</u> at NPMM and that he <u>must</u> be transferred to Red Bank Elementary's CDC.

116.   Accordingly, Defendant must be ordered to provide FAPE in the least restrictive environment and to reimburse Plaintiffs for their appropriate private placement of L.H., necessitated by Defendant's actions, along with their costs, and attorneys fees.

## COUNT THREE:  VIOLATION OF TITLE II OF THE ADA

117.   The foregoing facts are incorporated herein and restated.

118.   Plaintiffs reallege and incorporate by reference the foregoing facts.

119.   Title II of the ADA covers programs, activities, and services of public entities.

120.   Hamilton County Department of Education is a public entity because it is a state or local government or a department or instrumentality of a State or local government.

121.   Title II of the ADA prohibits discrimination against any "qualified individual with a disability."

122. A public entity is required to "make *reasonable modifications* in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *28 C.F.R. § 35.130(b)(7) (emphasis added)*.

123. Refusing to educate L.H. in his least restrictive environment, and stating that his "IEP can't be implemented in his home-zoned school," with reasonable modifications, was undertaken in deliberate indifference to his rights under the ADA.

124. Placement of L.H. in a CDC setting where access to the general education curriculum is denied, where educational progress towards graduation is not even a possibility, violates the ADA. *See. e.g.,* 28 U.S.C. § 35.130(b)(iii) which prohibits discrimination by any public entity that "provide(s) a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."

125. With HCDE insisting that it cannot educate L.H. in his home school, and insisting upon an alternative placement at Red Bank, Plaintiffs have been forced to list and sell their home in order to pay and fund L.H.'s educational needs.

126. Plaintiffs seek monetary damages against HCDE to include the emotional distress, humiliation, embarrassment suffered by L.H., and his parents, due to the

Defendants' deliberate actions and inactions. They seek reasonable attorneys' fees for due process and this suit.

**COUNT FOUR: VIOLATIONS OF 504**

127. The foregoing facts are incorporated herein and restated.

128. HCDE receives federal funding assistance and is therefore also covered by 504.

129. Under a regulatory provision implementing Title II of the ADA, and similar to "reasonable accommodations," [a] public entity <u>shall</u> make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. *28 C.F.R. § 35.130(b)(7)* (2001)(emphasis added).

130. Moreover, public schools must design programs for students with disabilities to meet their "individual educational needs . . . as adequately as the needs of non[-disabled] persons are met." *34 C.F.R. § 104.33(b)(1)(i).*

131. Defendants acted with deliberate indifference, bad faith, gross misjudgment and/or with intentional discrimination to L.H.'s rights under 504 by insisting upon segregation of L.H. and by providing him separate or different schooling than his zoned neighborhood school with appropriate modifications.

132. Plaintiffs seek FAPE, along with monetary damages from Defendant to include out-of-pocket expenses for the private tuition, damages suffered, out-of-

pocket expenses, and damages for the emotional distress, humiliation, and embarrassment suffered by L.H., and his parents, due to the Defendant's deliberate actions and inactions. They seek attorneys' fees and costs.

## VII. CLAIMS AGAINST DEPARTMENT OF EDUCATION

## COUNT ONE: IDEA

133. The SEA, Tennessee Department of Education, has failed to monitor and assure compliance of the LEA with the IDEA as set forth more fully hereinabove. 20 U.S.C. §1415(f); §1412(a)(11).

## COUNT TWO: ADAAA

134. The ADAAA is a comprehensive civil rights and *equal opportunity* statute. Congressional findings indicate that the area of education is within its scope— "discrimination against individuals with disabilities persist in such critical areas as … education…" 42 U.S.C. 12101(a)(3). The SEA has failed to ensure that L.H. remained entitled to an education at his home-zoned school, with appropriate reasonable modifications, in order to avoid discrimination based upon his intellectual disability, in violation of the Americans with Disabilities Act, with Amendments (ADAAA). L.H. is entitled to have access to the general education curriculum, so he has the opportunity to make progress toward a diploma and not be denied access to programs like Tennessee Promise through a CDC placement. See, e.g. 28 U.S.C. §35.130(b)(iii). The educational programming which NPPM planned to deliver solely through the CDC environment is separate, unnecessary, and discriminatory to L.H. Such segregation to an inferior facility, without equal access to education, clearly

32

violates the ADAAA. Accordingly, Plaintiff seeks appropriate *injunctive* relief under the ADAAA.

## COUNT III:  SECTION 504

135.   Similarly, [a] public entity <u>shall</u> make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. *28 C.F.R. § 35.130(b)(7) (2001)(emphasis added).* The educational programming which NPPM planned to deliver solely through the CDC environment is separate, unnecessary, and discriminatory to L.H.   Accordingly, Plaintiffs seek appropriate injunctive relief and damages under Section 504.

**WHEREFORE, premises considered,**

136.     Plaintiffs request process be served, that Defendant be compelled to timely answer, that Plaintiffs be awarded the legal and injunctive relief set forth hereinabove, its attorneys' fees, and costs.

137.     Plaintiffs also request a jury where available.


Respectfully Submitted,

**GILBERT RUSSELL McWHERTER
SCOTT BOBBITT, PLC**

 /s Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 504 Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and exact copy of the foregoing has been mailed electronically via the Court's electronic filing system, to all counsel of record on this the 22nd day of October, 2014.

D. Scott Bennett
Leitner, Williams, Dooley & Napolitan, PLLC
801 Broad Street, Third Floor
Chattanooga, Tennessee 37402

/s/ Justin S. Gilbert