# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| **L.H., a Minor Student,** | ) | |
| **by and through his parents G.H. and** | ) | |
| **D.H.and G.H. and D.H., individually,** | ) | |
| | ) | |
| **Plaintiffs** | ) | **Case No. 1:14-cv-00126** |
| | ) | |
| **vs.** | ) | **Judge Curtis L. Collier** |
| | ) | |
| **HAMILTON COUNTY DEPARTMENT** | ) | **JURY DEMAND** |
| **OF EDUCATION,** | ) | |
| | ) | |
| **and,** | ) | |
| | ) | |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **EDUCATION** | ) | |
| | ) | |
| **Defendant** | ) | |

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON IDEA CLAIMS AND PARTIAL SUMMARY JUDGMENT ON TITLE II AND SECTION 504 CLAIMS

---

**COME NOW, THE PLAINTIFFS,** by and through counsel, and file this Memorandum in Support of Motion for Judgment under IDEA and partial summary judgment under Title II of the ADA and Section 504. They respectfully show:

# TABLE OF CONTENTS

I.      Summary and Introduction ........................................................................1
II.     Brief Facts ...........................................................................................2
III.    Standard of Review ................................................................................4
IV.     The IDEA: "*Least* is Best" .....................................................................6
        A.      The ALJ Did Not Conduct a Least Restrictive Analysis ....................6
        B.      LRE is the Law, Not a Suggestion ..........................................8
        C.      Achieving "Maximum Extent" Integration Through Supplemental Aids and
                Services ...................................................................9
        D.      The *Oberti* and *Greer* Solutions for Elementary School Children with Down
                Syndrome ...................................................................9
V.      Applying the *Roncker* Factors .............................................................13
        A. Could L.H. Benefit from Regular Education ...........................................14
                1.      The Reasons L.H. Did, Can, and Still *Does* Benefit from
                        Regular Education ..........................................................14
                        a.      High Functioning ...........................................14
                        b.      Importance of Modeling in Regular Education ...........15
                        c.      First Grade Evidence .......................................16
                        d.      Second Grade Evidence (First Two Quarters) ............18
                        e.      Second Grade Evidence (Last Two Quarters) .............19
                        f.      Third Grade Evidence .......................................19
                        g.      Fourth Grade Evidence .....................................20
                2.      HCDE's Conclusions Rely on Outdated Beliefs About Down
                        Syndrome and Incorrect Standards for LRE .............................21
                        a.      "Hit a Wall" In Second Grade is a Scientifically
                                Invalid Proposition ....................................21
                        b.      "On Par" or "Rigorous" Standard to Remain in General
                                Education Classroom is Incorrect ......................25
                        c.      Dropping L.H. Two Grade Levels Without Informing Parents ....33
                        d.      Closed Door IEP Meetings Without Informing Parents ..............34
                B1. Is Segregated Facility "Considered Superior?" ....................................35
                        1.      CDC is Vastly Inferior ............................................35
                                a.      Unequal, Unmonitored, Separate Schooling ...............35
                                b.      Not Appropriate for Child with Down Syndrome .............36
                                c.      Insufficient Interaction with Non-Disabled Peers ..........37
                                d.      The Gym Teacher Does Not Teach Handwriting .............38
                                e.      CDC is Not Peer Reviewed ....................................39
                B2. Could Any Desirable Services Be Provided in General Education? .................42
                        3.      Was L.H. <u>Too</u> Disruptive for Regular Education? ...................44
V.      Reimbursement for Regular Education Placement at Montessori with Supports is
        Appropriate ..........................................................................47
VI.     The ADA: Unequal Access to Education .......................................................51
        A.      Undisputed Facts ...........................................................52
        B.      Summary ...................................................................53

Case 1:14-cv-00126-CLC-SKL   Document 74   Filed 09/17/15   Page 2 of 62   PageID #: 1078

C.    The Non-Discrimination Provisions Require Equal Treatment and Access to
      Reasonable Modifications ..................................................................................53
      1.    Title II of the ADA ...............................................................................54
      2.    Section 504 ............................................................................................55

VII.  Conclusion ........................................................................................................58

Case 1:14-cv-00126-CLC-SKL   Document 74   Filed 09/17/15   Page 3 of 62   PageID #: 1079

# I.    SUMMARY AND INTRODUCTION

Society has come a long way since the 1970s in its understanding of the capabilities of children with Down syndrome. Once viewed as "mentally retarded," low expectations and "minding their day" was the standard—often in institutions and very segregated settings. Today, though, students with Down syndrome can, and frequently do, graduate from high school and even attend college.[1] But to do this, much is required: Supplemental Aids and services, trained teachers, paraprofessionals, committed parents, and, perhaps most importantly, *attitudinal* change. Attitudinal change can be slow, and must sometimes come through the law—just like, in the 1950s, much of the white citizenry genuinely believed it was "best" for black children to go to separate schools, as if this were doing them a good service. *See Oberti v. Board of Educ. of Clementon School Dist.*, 801 F. Supp. 1392, 1405, n. 20 (D.N.J. 1992) (noting that non-integration of people with disabilities has been linked to segregation found illegal under *Brown v. Board of Ed.*, 347 U.S. 483 (1954)); *see also Sweatt v. Painter*, 339 U.S. 629, 631 (U.S. 1950) (a separate Texas law school for "negroes" is unequal and the plaintiff must be admitted to the University of Texas law school).[2]

Chattanooga has proved wonderful for high functioning children; but its public school system lags for children with intellectual disabilities. The pre-1970s attitude of segregation of intellectually disabled—or remove and remediate—is particularly pronounced here, making the challenge all-the-more important. Perhaps that old attitude is due, in part, to local institutions like Orange Grove which, with all its successes, generally does rely upon a "separation" model,

---

[1]    One of Plaintiffs' experts for the ADA and 504 claims is Megan Bomgaars, a high school graduate, college student, and business person who, on this 25th anniversary of the ADA, was recognized by the White House. She has Down syndrome.

[2]    *Painter,* of course, was a precursor to *Brown v. Board,* and it was also argued by Thurgood Marshall.

1

not integration with non-disabled peers in the public school system. As a result, often kids with Down syndrome are not viewed as *capable* of integration and, like the 1950s, it is "best" for them to be separated.

Regardless of the reason for these attitudes, the IDEA makes it *illegal* to unnecessarily segregate a second grade boy, L.H., to one of the most restrictive settings on the educational continuum—a separate school (Red Bank) away from his neighborhood school (Normal Park), in a class with children who do not receive report cards, grades, progress monitoring, and any opportunity to even *pursue* a diploma. It cuts him off at the knees, so to speak, as only a second grader—dooming him to a lesser quality of life.

This case seeks to change that, using some of the most knowledgeable experts on Down syndrome in the United States and, even, the world.

## II.    BRIEF FACTS

Down syndrome is a *genetic* abnormality. (D.E. 45, Entry 45, Meece Affidavit, p. 2). It is not a "spectrum" of unknown neurological etiology, like autism. Down syndrome is a consistent, known characteristic where extra genetic material is replicated on the 21st chromosome (thus, it is also called "Trisome 21"). (*Id.*). This results in learning characteristics for these children which require strategies common to students with Down syndrome. (Meece Aff., p. 2; Buckley Affidavit[3], p. 9, attached hereto as **Ex. A**). Critically, these children simply do not—and L.H. *did not*—"hit a wall," "top out," "reach the ceiling," or "pleateau" in his learning in second grade. That notion is scientifically invalid, a reflection on poor adult understanding (or *refusal* to learn), not L.H.'s own learning capacity. (Buckley Aff., pp. 3-5).

L.H. has the great fortune of having a UTC professor of Early Childhood Development, Dr. Meece, as his baseball coach and cub scout den leader—he attended his IEP meetings too.

---

[3]    Dr. Buckley has submitted a Rule 26(f) Expert Report and Affidavit in this matter.

Yet HCDE has not, still to this day, utilized any expert in *Down syndrome*, preferring instead an autism expert named Dr. Sue Kabot whose last experience providing educational programming to a child with Down syndrome was approximately 25 years ago. (Kabot, Trans. 790-91).[4] Its principal, teachers, and aids received no training at all about Down syndrome and learning. (Levine depo., relevant parts attached hereto as **Ex. B**).

Below, Plaintiffs undertake a review of all three of the "least restrictive environment" factors from the Sixth Circuit's case of *Roncker on behalf of Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir. Ohio 1983). Rather than write the facts twice, the seminal facts are listed under each *Roncker* factor below. Briefly, though, L.H. was highly successful in his first grade regular education class at Normal Park Elementary, as indicated by teacher comments, progress reports, and his entire IEP team passing him to second grade. Second grade at Normal Park is the crux of this case: After two quarters, in February of 2013, HCDE contends he "hit a wall" so thick and impenetrable that he must be sent to a separate school (Red Bank Elementary); placed in a separate class with disabled children ("Comprehensive Development Class, or CDC); and given non-peer reviewed curriculum (Unique Learning System) which affords him no grades, no homework, and keeps him "until he ages out of the system." (Knight, Trans. 596-599; 602).

At due process, L.H.'s second grade teacher acknowledged that she had been teaching him at kindergarten level—moving him back two entire grade levels—without advising the parents or conducting an IEP meeting to adjust goals, or to consider supplements like "Resource Room," or Itinerant teaching. (Hope, Trans. 97; 116). Facing a "choice" of Normal Park's *refusal* to "mainstream" L.H. in regular education or sending L.H. to Red Bank Elementary to

---

[4] All citations to the actual transcript of the due process hearing have been identified by Individual, Trans., page number/(s) of testimony. The due process hearing transcript was manually filed with this Court by the State of Tennessee at Docket Entry 45.

"age out," L.H.'s parents exercised their right to private placement at the Montessori School of Chattanooga. There, at the parents' own cost for tuition and an aid, L.H. has excelled in his academic and social progress in the regular classroom during third grade and fourth grade too. (3rd & 4th grade report cards, Hyde 00616-618; 001984-1987 attached hereto as Collective Ex. C). Accordingly, L.H. is seeking the reimbursement allowed by law.

## III.    STANDARD OF REVIEW

**IDEA.** A party that is aggrieved by the findings and decision made by a state educational agency regarding an IDEA claim has the right to bring a civil action in a district court of the United States. *See* 20 U.S.C. § 1415(i)(2)(A). The district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Plaintiffs proceeded *pro se* at due process. Since that time, they have submitted expert testimony of Dr. Sue Buckley from the United Kingdom, Dr. Kathleen Whitbread from St. Joseph's in Connecticut, the full affidavit of Dr. Darrell Meece from University of Tennessee at Chattanooga;[5] and Ms. Megan and Kris Bomgaars from Colorado. Additionally, Plaintiffs have taken three discovery depositions: Janin Brock from TDOE; Jill Levine, the principal at Normal Park Museum Magnet school; and Mary Ann Voss, a special educator with Hamilton County Department of Education. Plaintiffs have moved the court to hear such evidence.

For the IDEA, this is not summary judgment, where the Court's task would be to determine the existence of factual disputes. *Doe ex rel. Doe v. Metro. Nashville Pub. Schs.,* 133 F.3d 384, 387 n.2 (6th Cir. 1998); *Elida Local Sch. Dist. Bd. Of Ed. V. Erickson*, 252 F.Supp. 2d

---

[5]    Dr. Meece testified, but there is additional information in his well-written affidavit that should be considered.

4

476, 481 (N.D. Ohio 2003).[6]  Instead, this is a motion for the Court to consider the administrative record plus the additional evidence.  In its review, the district court "should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (citing B*d. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)).

In applying this "modified de novo" standard of review, district courts may not "simply adopt the state administrative findings without an independent re-examination of the evidence," nor may they "substitute their own notions of sound educational policy for those of the school authorities which they review." *Doe ex rel. Doe v. Metro. Nashville Pub. Schs*., 133 F.3d 384, 387 (6th Cir. 1998) and *Thomas v. Cincinnati Bd. of Educ*., 918 F.2d 618, 624 (6th Cir. 1990)). The amount of "due weight" afforded to the administrative findings varies depending on whether such findings are based on educational expertise. *McLaughlin v. Holt Pub. Schs. Bd. of Educ*., 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant.... More weight is due to an agency's

---

[6]     This is in accord with other jurisdictions.  For example:

> When deciding a summary judgment motion in the IDEA context, a court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.  Therefore, it matters not, in the context, who initiates the motion.

> Therefore in reviewing the Plaintiff's claims that arise under the IDEA, the Court is not focusing on the presence or absence of issues of material fact, but instead contemplates whether the record establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.

*A.P. v. Woodstock Bd. of Educ.*, 370 Fed. Appx. 202, n. 3 (2d Cir. 2010)

determinations on matters for which educational expertise is relevant." *Id*; *Bd. of Educ. of Fayette Cnty., Ky. v. L.M*., 478 F.3d 307, 312-13 (6th Cir. 2007). Moreover, a court is less likely to give deference to the administrative findings when the new evidence it has received conflicts with evidence in the administrative record. *School Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671 (7th Cir. 2002).

**Title II of the ADA and Section 504**. For these claims, Plaintiffs are moving for traditional summary judgment, arguing the lack of any disputed fact about unequal treatment. Summary judgment is appropriate where "the pleadings, the discovery and disclosure of materials on file, and any Declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). When the record "taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corat,* 475 U.S. 574, 587 (1986).

## IV.    THE IDEA: *"LEAST* IS BEST"

### A.    THE ALJ DID NOT CONDUCT A LEAST RESTRICTIVE ANALYSIS

In this case, the ALJ did not conduct a Least Restrictive Environment (LRE) analysis required by law. Mostly, the ALJ considered free appropriate public education ("FAPE")—that is, whether the proposed IEP for 2012-2013 at Red Bank Elementary in a CDC class "was reasonably calculated to provide FAPE." (See D.E. 45, Entry 1, Final Order, Conclusions of Law, p. 19). In its conclusions of law, the ALJ found that HCDE provided FAPE; the Red Bank IEP provided FAPE; and procedural safeguards were met. (*Id.*).

That misses the crucial point, and the three-factor weighing analysis of LRE. While the provision of FAPE is always releveant, a FAPE analysis is *not* the equivalent of an LRE analysis

6

when determining whether a child should remain in the general education classroom. *Roncker on behalf of Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir. Ohio 1983) (explaining how a FAPE analysis under *Rowley* case is not proper for a "mainstreaming" case). Rather, a child's *least* restrictive environment has its own legal test requiring weighing of factors under *Roncker*—and asking whether the services in the more restrictive environment can be ported to the least restrictive one.

The distinction matters. By asking whether L.H. might "make progress" in a CDC class at Red Bank Elementary, the issue of whether CDC is the *least* restrictive environment is not scrutinized. And it allows school personnel to substitute their own perception of what is "good," or "best," for the demands of LRE analysis. *Roncker* explained this:

> The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate.

*Id.* at 1063.

Whether L.H. would "make progress" in CDC at Red Bank is really not the issue—if it were, it could return Chattanooga to pre-1972 when children with intellectual disabilities and, indeed, "a majority of handicapped children in the United States 'were either *totally excluded* from schools or [were] *sitting idly* in regular classrooms awaiting the time when they were old enough to "drop out."'" *Board of Educ. v. Rowley,* 458 U.S. 176, 179 (1982) (emphasis added) (quoting H.R. Rep. No. 94-332, p. 2 (1975)). In 1972, in *Pennsylvania Ass'n for Retarded Children v. Commonwealth*, 334 F. Supp. 1257 (E.D. Pa 1971) and 34 F. Supp. 279 (1972) ("PARC"), a court ordered school districts to provide educational services to all children with disabilities and to provide them due process hearings. This decision became the catalyst for

7

Congress to pass what is now known as the IDEA—giving rise to the "Least Restrictive Environment" mandate. *Rowley*, 458 U.S. at 180 n. 2.

## B. <u>LRE IS THE LAW, NOT A SUGGESTION</u>

This case involves a separate school (the Title I school of Red Bank). And it involves "special class" (the highly restrictive CDC class). Due to history, since 1975, the IDEA is rightfully wary of such separate schools and classes, giving rise to the LRE provision:

> **To the maximum extent appropriate**, children with disabilities, including children in public and or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. §1412(a)(5); *Bd of Educ v. Rowley*, 102 U.S. 176, n. 24 (1982).

In 2004, thirty years after *PARC* and the passage of the IDEA in the 1970s, Congress returned to the importance of general education for children with disabilities. Writing "Congress finds" into the 2004 Reauthorization of the IDEA, the law now states:

> Congress finds the following:
>
> Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by
>
> (A)           having high expectations for such children and ensuring their **access to the general education curriculum in the regular classroom, to the maximum extent possible**;
>
> (C)           … children [will] benefit from such efforts and that special education can become a **service for such children rather than a place where such children are sent**; and
>
> **(D)           providing appropriate special education and related services, and aids and supports in the regular classroom, to such children, whenever appropriate.**

8

20 U.S.C. §1400(c)(5) (emphases added). Thus Congress has made its mandate for the provision of education of children with disabilities with their non-disabled peers through the full spectrum of services aids and supports.

## C. ACHIEVING "MAXIMUM EXTENT" INTEGRATION THROUGH SUPPLEMENTAL AIDS AND SERVICES (SAS)

"Special education" is not a place apart from the general education classroom. Quite the contrary, through the vehicle of "Supplemental Aids and Services," disabled children are *brought into* the regular education classroom. Appropriate aids and services, then, are the connective tissue to the regular education classroom. Again, the law spells this out:

> Supplementary aids and services. *Supplementary aids and services* means aids, services, and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, **to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with §§ 300.114 through 300.116.**

34 C.F.R. § 300.42; *accord*, 20 U.S.C. §1401(33) (emphasis added).

It is only when the "whole range of Supplementary Aids and Services, including resource rooms and itinerant instruction" (*Greer*, 950 F.2d at 696) are *not effective* in the regular education classroom that a school district can even consider a more restrictive placement like a separate school or separate class. And even then, children should be removed from regular education only to *the minimum extent possible.*

## D. THE *OBERTI* AND *GREER* SOLUTIONS FOR ELEMENTARY SCHOOL CHILDREN WITH DOWN SYNDROME

Sometimes schools still assume that an intellectually disabled child who needs "structure" requires a separate school and/or separate classroom and/or separate curriculum. Normal Park proposed all three: separate school (Red Bank Elementary); separate classroom (CDC); and separate curriculum (alternative curriculum without grades, homework, or progress

monitoring).  That decision—when made in elementary school—is devastating to the future of a child with intellectual capabilities such as L.H.

A better solution to more "structure" or "extra help" or "reinforcement"—choose your nomenclature for outside-the-classroom assistance—is what the law terms a "resource room" or "itinerant instruction."  By definition, these *supplement* regular education and *keep* the child integrated.  And it is the law.  Found in the section on "continuum of placements," the IEP team must "[m]ake provision for supplementary services **(such as resource room or itinerant instruction) to be provided in conjunction with regular class placement."**  34 C.F.R. §300.115(c)(2) (emphasis added).

How does this help elementary school children with Down syndrome?  Here, the court does not write upon a blank slate.  The Third Circuit's *Oberti* case is a bellwether on understanding *how* to allow a child with Down syndrome greater structural support in order to access the general education curriculum—it requires teacher training, and supports like resource room or itinerant teaching. *Oberti v. Board of Educ.,* 995 F.2d 1204 (3rd Cir. 1993).

In *Oberti*, the child, Rafael Oberti, had Down syndrome too.  He, too, was an elementary school student.  His behavior significantly disruptive.  Rafael demonstrated "temper tantrums, crawling and hiding under furniture, and touching, hitting and spitting on other children. On several occasions Rafael struck at and hit the teacher and the teacher's aide." *Oberti*, at p. 1208.  Rafael's IEP team recommended a "segregated special education class" which did not exist in his current elementary school—therefore, like Normal Park did, the school required him to travel to a different school. *Id.*  Like L.H.'s parents, the Oberti parents objected to the different school. *Id.*

10

When the school said Rafael could not "keep up," or that he was on a different learning track, the Obertis responded with the following suggestions to keep him in general education and live out the least restrictive mandate of the IDEA:

(1) modifying some of the curriculum to accommodate Rafael's different level of ability;

(2) modifying only Rafael's program so that he would perform a similar activity or exercise to that performed by the whole class, but at a level appropriate to his ability;

(3) "parallel instruction," i.e., having Rafael work separately within the classroom on an activity beneficial to him while the rest of the class worked on an activity that Rafael could not benefit from; and

(4) removing Rafael from the classroom to receive some special instruction or services in a resource room, completely apart from the class.

*Oberti,* at 1211.

The parents, like L.H.'s parents, did not prevail at due process. But at the District level and in the Court of Appeals, they did prevail. The District Court found that the school did not consider "an itinerant teacher trained in aiding students with mental retardation," "modification of the regular curriculum to accommodate Rafael," and "special education training and consultation for the regular teacher." *Id*. at 1212 (citing *Oberti v. Bd of Educ,* 801 F.Supp. 1392, 1397 (D.N.J. 1992)).

The Court of Appeals agreed, finding the "continuum" is not an "all or nothing educational system." *Id.* at 1218. The Court of Appeals also affirmed the proposition that the school "must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction. *Id*. at 1216. The Court also rejected a modified curriculum as a basis for exclusion. *Id*. at 1222.

*Oberti* relied on an earlier case involving a child with Down syndrome, *Greer v. Rome City Sch. Dist. B,* 950 F.2d 688 (11th Cir. 1991). Christy Greer was a ten year old child with

11

Down syndrome. *Id.* at 690. Like Normal Park, the school system "proposed placing Christy in a self-contained special education class, that is, a class attended only by mentally handicapped children. The self-contained class was located at Southeast Elementary School, which also had classes for non-handicapped children." *Id.* at 691.

In *Greer*, the Court of Appeal simply applied the language of the IDEA regulations to conclude that resource room and itinerant instruction had never been attempted:

> The Act itself mandates that a handicapped child be educated in the regular classroom <u>unless</u> such education cannot be achieved satisfactorily with the use of supplemental aids and services. Thus, before the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations promulgated thereunder to make provision. Only when the handicapped child's education may not be achieved satisfactorily, even with one or more of these supplemental aids and services, may the school board consider placing the child outside of the regular classroom.

*Id.* at 696.

In these cases, the courts reasoned that one-on-one instruction provided in self-contained classrooms also could be provided through "resource rooms" or through "itinerant instruction." Again, by law, these are *supplements* to general education. *See H.L. v. Downingtown Area Sch. Dist.*, 2015 U.S. App. LEXIS 9742, *9 (3rd Cir. June 11, 2015) (citing *Oberti* and explaining that "school districts must make available a 'continuum of placements' to meet disabled children's needs, and in "seeking to accommodate the child in the regular classroom, they must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction."); *see also* 34 C.F.R. §300.550(b)(2) (school is not allowed to remove child from regular education classes unless it establishes that *with supplemental aids and services* her education cannot be achieved satisfactorily).

Now, Plaintiffs turn to the weighing of the *Roncker* elements to show how, and why, L.H. should not be segregated to a separate school (Red Bank), in a separate class (CDC), with a separate curriculum (Unique Learning System).

## V.     APPLYING THE *RONCKER* FACTORS

The various circuit court tests for least restrictive environment are similar, but not exactly the same.  For example, the District Court in *Oberti* reached its conclusion through the Sixth Circuit's *Roncker* test, while the Third Circuit in *Oberti* affirmed that conclusion but preferred a test from the Fifth Circuit. *Oberti,* 801 F. Supp. at 1215.

In the Sixth Circuit, the *Roncker* test is used.  Neill Roncker was nine years old and "severely mentally retarded" to the point of having "a mental age of two to three." *Id.* at 1060. In 1983, the time of *Roncker*, "educable mentally retarded" was still a term, with those persons "generally educated in special classes within the regular public schools." *Id.*  The school proposed placing Neill in a separate school for mentally retarded children. *Id.*  The parents disagreed that it was the "least restrictive environment," giving rise to the Sixth Circuit creating a legal test.

The Sixth Circuit recognized that asking what is "best," or "good," or "superior" risks obfuscating the least restrictive environment concept. "The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept.  Such a disagreement is not, of course, any basis for not following the Act's mandate." *Roncker*, 700 F.2d at 1063.  Instead, the test developed by *Roncker* is to ask whether the segregated facility is better and, if it is, ask whether the services which make it better "could be feasibly provided in a non-segregated setting." *Id.* at 1063.

13

Subsequent cases have broken *Roncker* into three factors: "(1) whether the disabled student would benefit from inclusion from [sic] general education, (2) whether such benefits would be outweighed by benefits that are not provided in an inclusive setting, and (3) whether the disabled child disrupts the general education setting." *Bd. of Educ. of the Toledo City Sch. Dist. v. Horen*, 2011 U.S. App. LEXIS 26644, *15 (6th Cir. Ohio May 26, 2011) (citing *Id.*); *Roncker*, 700 F.2d. at 1063. This is not entirely faithful to *Roncker,* because *Roncker* also demands consideration of portability of any favorable services from the more restrictive to the least restrictive. Accordingly, Plaintiffs now perform the work the ALJ did not, addressing each of the *Roncker* factors.

## A.    COULD L.H. BENEFIT FROM REGULAR EDUCATION?

*Roncker's* first question asks whether L.H. could benefit from being in the general education environment. Presumptively, by law, he could, but the *evidence* squarely affirms this.

### 1.    The Reasons L.H. Did, Can, and Still *Does* Benefit from Regular Education

There are a number of reasons L.H. did benefit, can benefit, and still does benefit (now that he has been privately placed) from general education. Those reasons span the grades.

#### (a)    High Functioning

In one respect, L.H. is very fortunate—his little league baseball coach and Cub Scout den leader is Dr. Darrell Meece, who so happens to be a professor of Early Childhood Development at UTC. So, Dr. Meece has seen L.H. in a number of settings. The ALJ correctly credited Dr. Meece's due process testimony on how L.H. is "very advanced, compared to children with intellectual disabilities." L.H. also "has good memory skills" which assists him with reading. (D.E. 45, Entry 1, Final Order, ¶ 4).

14

Supporting these findings, in spite of Down syndrome, in 2012, L.H.'s three-year psychological testing showed the following scores: in Reading, a 96 out of a mean of 100; in broad reading composite, an 82 out of a mean of 100; in spelling, a 75 out of a mean of 100; , in writing, a 78 out of a mean of 100; and, in academic skills, a 76 out of a mean of 100. (D.E. 45, Ex. 6, 2012 Psychoeducational Testing, Hyde 00618).[7]

### (b)    Importance of Modeling in Regular Education

The opportunities to model non-disabled peers and interact with them socially are important benefits which are not available in a class with significantly disabled students. *See e.g., Oberti*, 801 F. Supp. at 1211; (D.E. 45, Ex. 45, Meece Aff., p. 25) ("Inclusion with typically developing peers clearly enhances the social and communication skills of children with Down syndrome. Moreover, placement of children with Down syndrome in special education classrooms provides no benefit in any other area of academic achievement or adaptive behaviors over placement in a general education classroom.").

At due process, Dr. Meece emphasized that social interaction and friendships are very important to L.H. as L.H. is a child who is very socially aware of his surroundings and is well received by his peers who understand he is different, but accept him for it. (Meece, Trans. 45-46). This is consistent with second grade findings from the teacher: "L.H. is a genuinely friendly, positive person who loves school. He gets along well with everyone. . . L.H. and Jonah have grown closer this year. They work and play together a lot of the time. L.H. gets along well with everybody. He's the life of the party, that's for sure!" (3rd grade 2013-2014 Report Card, Hyde 000616-618, Ex. C).

---

[7]    All notations referencing D.E. 45 with an "Ex." are referring to the actual numbered exhibits submitted at the due process hearing and which were manually filed with this Court by the Tennessee Department of Education as part of D.E. 45.

15

The ALJ, too, made positive findings about importance of peer interaction. The ALJ found that L.H. is "a very personable child," "very social," and that "social interactions are important to him, as are friendships." (D.E. 45, Entry 1, Final Order, ¶ 3). The ALJ found that L.H. has "good social awareness, acting appropriately in social situations." (*Id.*). He also has "good language skills for interaction with others." (*Id.*.) Importantly, too, the ALJ found: "His peers enjoy his company, accept him, and provide help at times when it is necessary." (*Id.*).

### (c)    First Grade Evidence

L.H. repeated first grade, giving him two opportunities. He was in general education with an aid (paraprofessional). In his second year of first grade (2011-2012), there is no reasonable dispute that he was meeting his IEP goals. As school began that year, L.H.'s teacher (Ms. McCoy) reported that L.H. was reading on a level "E"[8] and was making gains in high frequency word recognition. (D.E. 45, Ex. 6, IEP Meeting Minuets, Hyde 00461). L.H.'s special education teacher (Ms. Keith) reported that L.H. was consistently counting to 20 and has a goal to count to 40. (*Id.*).

L.H.'s progress was monitored through the year. His consistent achievement of "5s" on his quarterly progress reports confirmed L.H. had either met or was on target to meet his IEP goals for the school year. (D.E. 45, Ex. 6, IEP Progress Reports, Hyde 00430-437; 00530-538; Hyde 00410-416; Hyde 00360-370). Numerical boxes were not the only indication. L.H.'s teachers wrote of his abilities and achievements: First Quarter: "L.H. continues to amaze me with his capabilities." (*Id.* at 00432); Second Quarter: "L.H. has had a great nine weeks! We have worked on WHY?s as well at assigning attributes to nouns. His memory is remarkable!" (*Id.* at

---

[8]        Reading levels go from Level D through Level I, with Level I being on grade level. (Hope, Trans. 90) ("Level D is what we expect a student - - a level that we would expect a student to begin first grade reading on. So we - - typically a developing student, we would want them to go from Level D to E, F, G, H, and then I by the end of the first grade.").

00533); Third Quarter: "L.H. securely mastered 75% of the reading strategies before moving on to the next reading level." (*Id.* at 00412) and "L.H. is able to count by 2's to 8, 5's to 40 and 10's to 40 or 50. He is able to add and subtract numbers to and from 10 using counting bears with adult assistance. L.H. has mastered measuring non-standard measure and reading time (both digital and analog) to the hour." (*Id.* at 00413); and Fourth Quarter: "L.H. continues to progress." (*Id.* at 00361) and "L.H. has had some Rock Star days at school! I hope this continues in 2nd grade. . ." (*Id.* at 00362).

L.H., as part of the regular class, earned favorable report cards too—based upon his IEP goals. Ms. McCoy wrote on his report card: "L.H. is very close to reaching the end of first grade goal. He is reading more independently and fluently. He has come a long way since the starting of the year. Way to go!" In Writing: "L.H. is writing three sentences on his own that are on topic in his daily journal every day using a graphic organizer. He is doing a great job with this." And in Math, "L.H. is doing well adding and subtracting numbers to 20 while using manipulatives." (D.E. 45, Ex. 17, 1st Grade Report Card).

By the end of first grade, the entire IEP team (11 of them) agreed, on May 12, 2012, that L.H. had completed his first grade goals and was ready for second grade *in the general education curriculum with appropriate supports.* (D.E. 45, Ex. 2, 2012-2013 IEP). The IEP section called "Present Levels of Performance" show the teacher's year-end remark that "L.H. is reading on a Level I[9] in guided reading. He is doing well decoding and retelling stories that he reads during his one-on-one guided reading time." Additionally, the Team agreed that "L.H. can tell time to the hour and half hour. He can count by 2's to 8 consistently, by 5's to 40's consistently, and by 10's

---

[9]     Reading level "I" indicates on grade level. (Hope, Trans. 90).

to 40 or 50 consistently.  L.H. can read any number 1-100.  He understands fractions ½ and ¼." (*Id.* at p. 2).

Additionally, the team developed eleven (11) goals, eight (8) of which were academic goals for second grade; these were tied to second grade general education curriculum standards as indicated by the grade level equivalency at the conclusion of each academic goal.  (D.E. 45, Ex. 2, 2012-2013 IEP).

### (d)     Second Grade Evidence (First Two Quarters)

In 2013, L.H. entered second grade in regular education.  The IEP, which was ironed out at the end of first grade, was in place.  In second grade, L.H. again earned favorable progress reports for the first nine (9) weeks (Quarter 1).  He received all "5s" across 11 goals, showing his teacher anticipated him to meet goals by year end.  (D.E. 45, Ex. 3, First Quarter Progress Report; Hope, Trans. 107-08).

Similarly, the progress reports for the second nine (9) weeks (Quarter 2) of second grade show all scores of "5," with only three exceptions.  (D.E. 45, Ex. 4, Second Quarter Progress Report).  Furthermore, the Status Summary Narrative to his Second Quarter progress report, shared with L.H.'s parents on January 11, 2013, states: "We are so very proud of L.H.'s behavior over the last several weeks.  He has worked hard and is motivated to do his best and make everyone proud.  He is a pleasure to teach."  (*Id.* at p. 11).

Ms. Hope, the special education teacher, would misstate these second quarter results in an affidavit she submitted at due process.  At paragraph 20, she wrote:  "I reported on L.H.'s progress report for the second nine weeks that L.H. lacked the prerequisite skills and was not able to complete IEP goals."  (D.E. 45, Ex. 7, Hope, Aff. ¶ 20).  This statement, nor anything like it, is contained in L.H.'s Second Quarter Progress Report.

**(e)      Second Grade Evidence (Last Two Quarters)**

In February of 2013, the second half of second grade, HCDE abruptly contended that L.H. had "hit a wall" and could no longer progress.  At this point, HCDE abruptly informed the parents that he should go to Red Bank Elementary and be placed in a CDC class.  The motives for this abrupt change are the subject of Plaintiffs' retaliation claims—that Ms. Hyde was advocating for inclusion of L.H. and other children with Down syndrome, prompting a sudden directive to send L.H. elsewhere.  Retaliation under ADA and Section 504 falls outside this motion; however, Plaintiffs address systemic failures in the second half of second grade under Section "2," immediately below.

**(f)      Third Grade Evidence**

With the Red Bank Elementary CDC class as the ultimatum, and the statement that Normal Park was not able to educate L.H., the parents moved L.H. to the private Montessori school in Chattanooga for third grade, again being placed in the general education classroom with his age-appropriate non-disabled peers.  His experience there shows he is, indeed, capable of general education with appropriate supports.

Specifically, in third grade, the 2013-2014 year, L.H. reached the following levels in his academic instruction:  Language Test Level (1 of 5 2nd grade) at the end of the first semester and progressing to Language Test Level (3 of 5 2nd grade) at the end of his third grade year; Math Test Level (2 of 4 1st grade) at the end of the first semester and progressing to Math Test Level (1 of 4 2nd grade) at the end of his third grade year; and Geometry Level (2 of 4 1st grade) at the end of his first semester progressing to Geometry Level (1 of 4 2nd grade) at the end of his third grade

year. (3rd Grade Report Card, Hyde 00616-618, Ex C).[10]  L.H. has continued to make real and

significant academic progress in all areas of general education instruction.  (*Id.*); (Watts Trans.

628-630); (Whitbread Aff.[11], p. 11, attached hereto as Ex. D).

L.H.'s third grade teacher stated: "L.H. is a genuinely friendly, positive person who loves

school.  He gets along well with everyone. . . L.H. and Jonah have grown closer this year.  They

work and play together a lot of the time.  L.H. gets along well with everybody.  He's the life of

the party, that's for sure!"  (3rd Grade Report Card, Ex. C).

    **(g)**    **Fourth Grade Evidence**

L.H. progressed to fourth grade for the 2014-2015 school year at Montessori where his

academic progress continued.   He finished the year at the following improved levels in his

academic instruction:  Language Test Level (2 of 4 3rd grade) and Geometry Test Level (3 of 4

2nd grade) (4th Grade Report Card, Hyde 001984-1987, Ex. C).

The positive report card marks continued in fourth grade.  L.H.'s teacher stated: "Luka has

had a great year!  He has made considerable progress, both academically and socially!  He enjoys

school and loves interacting with his classmates.  Each day he works hard and is always so proud

of his accomplishments!  I know that he will continue to make excellent progress in the coming

year!"  (*Id.*).

Moreover, L.H. participated in nationwide standardized testing during April 2015 of his

fourth grade year at the Montessori School.  As shown in the chart below (taken from his actual

scores attached hereto), in his *worst* area of testing, Verbal Reasoning, L.H. had a scaled score of

---

[10]    L.H.'s third and fourth grade report cards are also attached as Exhibit 1 to the Declaration
of D.H., *infra* Ex. J.

[11]    Dr. Kathleen Whitbread has submitted a Rule 26(f) Expert Report and Affidavit in this
matter.

309, which correlates to performing *as well as or better than 39% of all* students nationwide to whom the test was administered.  And in his *best* area of testing, Reading Comprehension, L.H. received a scaled score of 332, which correlates to performing *as well or better than 66% of all* students nationwide to whom the test was administered.

| Norm group: | Scaled Score | National Norm Group | |
|---|---|---|---|
| Test: | | %ile Rank | Stanine |
| Verbal Reasoning | 309 | 39 | 4 |
| Vocabulary | 321 | 53 | 5 |
| Reading Comprehension | 332 | 66 | 6 |
| Writing Mechanics | 329 | 59 | 5 |
| Writing Concepts & Skills | 326 | 45 | 5 |
| Quantitative Reasoning | 321 | 57 | 5 |
| Mathematics 1&2 | 289 | 44 | 5 |

(April 2015 ERB Test Score, attached hereto as **Ex. G**).[12]  It is abundantly apparent then, L.H. derives meaningful educational benefit from his continued inclusion.

> **2.      HCDE's Conclusions Rely On Outdated Beliefs About Down Syndrome and Incorrect Standards for LRE**

In spite of L.H.'s demonstrated success in first grade, the first half of second grade, third grade and, now fourth grade, HCDE still maintains that he was failing in the second half of second grade and requires CDC class at Red Bank as his least restrictive environment.  Importantly, that conclusion relies upon lack of expertise in Down syndrome learning characteristics and misapplication of the law.

> **a.      "Hit a Wall" In Second Grade is a Scientifically Invalid Proposition**

Perhaps the saddest part of this case is the contention by HCDE educators that this little boy somehow "hit a wall" or "topped out" in his learning in second grade.  It is a belief shaped at

---

[12]      These test scores are also attached as Exhibit 2 to the Declaration of D.H., *infra* Ex. J.

least initially by ignorance, but, as time wore on, willful blindness to the research and scholarship available—a complete and continuing indifference to the necessity of obtaining Down syndrome training or consulting with Down syndrome experts.

While L.H. performed well in first grade, HCDE claimed he "hit a wall" with his learning ability after the second quarter of second grade. (See, e.g., D.E. 45, Entry. 1, Final Order, ¶ 10; D.E. 45, Ex. 20-Affidavit of Willeata Kendrick, ¶ 14 ("Jill Levine, the principal of Normal Park, stated frankly, 'I believe L.H. has hit a wall,' meaning that he was not going to make any additional academic progress in the regular education setting."). HCDE relied in part upon an autism expert (Dr. Sue Kabot) whose last hands on experience with delivering educational programming to a child with Down syndrome was approximately 25 years ago in the mid-1990s. (Kabot, Trans. 790-91).

"Hit a wall" bespeaks a sudden, abrupt inability, as if HCDE is rationalizing how L.H. could make progress in both first grade and the first two quarters of second grade, but on February of 2013, was at an impasse. It is as if HCDE says: "We got him as far as his mind could take him—half of second grade."

In response to HCDE's summary judgment at due process, Dr. Meece, Professor of Early Childhood Development, outlined how children with Down syndrome learn. (Meece Aff., p. 21). He cited the works of Dr. Sue Buckley and others. Still, he says, "HCDE staff have failed to show any awareness of the typical profile for children with Down syndrome…" (*Id.*)

HCDE refused to accept Dr. Meece, or obtain a Down syndrome expert. Therefore, Plaintiffs have now hired Dr. Buckley herself, from Great Britain. Dr. Buckley is the Founder and Director of Science and Research at Down Syndrome Education International (DSEI). (Buckley Aff., p. 1, Ex. A). Her research on children with Down syndrome spans from birth to

age 20, she is a leading global authority on the subject with forty (40) years experience, and she founded DSEI. She provides training, assessments and support for schools working with children with Down syndrome, including the United Kingdom and the United States. (Buckley Aff., p. 1).

Dr. Buckley explains that children with Down syndrome do have a "specific developmental profile," with both strengths and weaknesses due to their disability. (Buckley Aff., p. 3). In practical terms, children with Down syndrome are weak "listening learners," but strong "visual learners." (*Id*.) For this reason, *reading* is often a strength, as it is visual, and can be used to teach spoken language. (*Id*.) Language delays, in turn, affect behavior. (*Id*.) Often, these delays suggest to the non-trained person that the child with Down syndrome has **"hit a wall,"** when, in fact, it is "lack of effective teaching and support based on understanding the effects of Down syndrome on development and learning [which] has stalled the child's progress." (*Id*. at 4).

Dr. Buckley was asked to address the following pointed question: "1. Is there any credible scientific research to support the belief that Luka Hyde, completing second grade in elementary school, "hit a wall" or reached a plateau in his learning due to Down syndrome?" (Buckley Aff., p. 2). Dr. Buckley says "no," and that such a belief is "outdated" and inconsistent with "an understanding of brain development and typical learning patterns of children with Down syndrome." (*Id.* at p. 3). As for brain development, it is not fixed at birth— "development in the structure and function of the brain takes place over time and is *strongly* influenced by input in the form of social and learning opportunities….There is simply no ceiling, plateau, wall, or fixed point in elementary school." (*Id*.). Dr. Buckley is familiar with the "hit a wall" or "plateau" description from educators. She says:

This notion is outdated and frequently can be traced to a faulty premise: that having Down syndrome, as opposed to the lack of effective teaching and support based on specific training in the effects of Down syndrome on development and learning for the teacher(s), has stalled the child's educational progress.

(*Id.* at pp. 3-4). Demonstrating how true this is, Dr. Buckley cites to follow up research which reported that children with IQs of 35-50 in mainstream placement made *more* academic progress than children with IQs above 50 in special education settings. (*Id.* at p. 9).

Training is key. Normal Park never had a child with Down syndrome before L.H. (Levine, Trans. 555) (Explaining LH. was the first student to attend NPMM and they discussed that with L.H.'s parents "when you chose to send him there as a kindergartner. He was definitely a first for us."). L.H. was also the first student with an intellectual disability that Ms. Hope, his special education teacher, had *ever* served. (Hope, Trans. 82). Additionally, Ms. Higgs, the general education teacher, was quite new to the field (she had just completed her first year of teaching). (Higgs, Trans. 328). And despite not having any prior experience teaching a child with Down syndrome, NPMM's principal testified that her last training was in 1999 during her own school years. (Levine depo, p. 18, 93, Ex. B).

The ALJ concluded that Ms. Hope must "start with some child." (D.E. 45, Entry 1, Final Order, ¶ 21). But that statement is journeyman-level, at best. As Dr. Buckley explains, regardless of the years (or lack of years) of teaching, L.H.'s teachers are entitled to receive (and they in fact *require*) "specific training in the learning profile associated with Down syndrome and its educational implications [in order] to be effective." (Buckley Aff., p. 10). Thus, the "start with some child" statement by the ALJ, says Dr. Buckley, is "but a truism," and "regardless of when one begins teaching, one must have adequate training about the developmental profile of Down syndrome and how to teach these children effectively." (*Id.*).

To educate effectively, then, one must appreciate *how* L.H. learns. As Dr. Buckley explains, the typical learning profile of a child with Down syndrome is very different from that of a neuro-typical child. Without such training, the result is what is seen in this case: "[T]eachers can become frustrated and fault the child for his/her lack of progress, when better understanding of effective teaching is the key. Reducing L.H. to kindergarten-level curriculum in second grade (after he made good progress in first grade) is such an example." (*Id*. at p. 10)

What does such training look like in practice? Dr. Buckley suggests a teacher and/or psychologist dedicated to supporting children with Down syndrome as a resource for all teachers. (*Id*. at 9-10). Alternatively, an educator receives this expertise but it is not their sole job. (*Id*. at 10). These persons attend trainings specific to Down syndrome, just as some do for autism. (*Id*.)

Dr. Buckley was asked to "address the role and necessity of specialist support for teachers who teach children with Down syndrome." Ideally, there should be a specialist knowledge available to each school district concerning Down syndrome (in the same way as there is for autism). (*Id*. at 9).

### b. "On Par" or "Rigorous" Standard to Remain in General Education Classroom is Incorrect

Normal Park erred by assuming L.H. must meet an equivalency standard to non-disabled peers or, at least, a "rigorous" second grade standard.

The fatal blow comes from its principal, Jill Levine. On direct examination, Ms. Levine testified that L.H. could not receive differentiated instruction at Normal Park. The example she gives is telling. She claims that non-disabled second graders were learning "subtraction with borrowing," which she refers to as a "multi-step math problem." "[B]ut Luka was still working on basic counting skills," she says. She concludes these cannot coexist—"So he would be in a

second grade math class, but the skills that were being taught in that class were not skills that he was *able to access."* (Levine, Trans. 554). To Levine, he must be sent to CDC.

She is manifestly mistaken. If L.H. is working on basic counting, that *is* "tied to" second grade math skills. To do subtraction, a form of counting, one can simply give him blocks ("manipulatives") and have him take them away. It is not supposed to be *the same;* that is what *modification* means. Here is a simple visual:



Levine's rejection of modifications ("unable to access") is rejected by the State of Tennessee's (TDOE's) last Compliance Consultant on LRE, Janin Brock. Ms. Brock testified about how modifications can be "tied" to general curriculum without being the same degree of difficulty. (Brock depo, pp. 10, 54-56, 58, relevant parts attached hereto as **Ex. F**). She used a pizza example: "One student can – figure out the degrees, but I can show Mark the pizza, and he has to be able to tell me if that's a triangle." If recognizing a pizza as a triangle shape is "tied to" measuring degrees of a triangle, then certainly working on counting when other students are "subtracting with borrowing" is too.

Ultimately, even HCDE knows this. The "triangle" example of a modification comes from HCDE's own training materials presented to Middle school teachers by HCDE Special Educator Mary Ann Voss. (Voss Depo, p. 13, relevant portions attached hereto as **Ex. G**). Voss explained that a "modification" is "when you change what is being taught." (Voss Depo, p. 20). The material must only be "aligned" to the general curriculum. (Voss depo, pp. 32-33). An

example from her training, Voss says, is "learning to *recognize* a triangle when others are learning the *angles* in a triangle." (Voss p. 33). Here is the training slide to illustrate this modification:



(Ex. 1 to Voss depo, at p. 11).

Ms. Levine testified that other than a possible discussion in principal meetings, the last training she had on least restrictive environment was in college and graduate school. (Levine depo, p. 18, 93). She is unaware of whether all teachers attend least restrictive training. (*Id.* at p. 19). When shown the triangle example of a reasonable modification, Levine dismissively called it "a very poor example" of a modification and repeated her exclusionary belief that the child working on recognizing a triangle is "not going to derive meaningful educational benefit." (*Id.* at 124). In her mind, Normal Park is *supposed* to be inclusive, to a point—children with "emotional disturbances" or "severe learning disabilities" were "*housed* at other schools." (*Id.* at 100).

Requiring "rigorous" standards excludes kids with Down syndrome. Before the IDEA, it led to them being warehoused and, ultimately, the passage of the IDEA. Today, "on par" or "equivalency" standards are illegal. In *Waukee Cmty. Sch. Dist. v. Douglas L.*, 2008 U.S. Dist. LEXIS 124146, *21-22 (S.D. Iowa Aug. 7, 2008), a second grade child, "Isabel," also had an intellectual disability. Her IQ was assessed between 50 and 60, she utilized a 1:1 aide for assistance in the general education classroom, and tasks were modified to her ability. *Id*. at *21-22.

The Court recognized "[t]here is no dispute in the present case that Isabel was unable to perform academic work at the same level as her peers…" *Id.* However, the school in *Waukee* believed that remaining in general education required Isabel to meet second grade standards *typical* of non-disabled children. Their testimony bore this out:

> Testimony shows that the Appellants did not consider a disabled student's time in the general education setting to be "integration" unless that student could work on the **same activities as his or her non-disabled peers**. Based on the assessment data, the Appellants determined that Isabel's academic discrepancy with her second grade peers was so great that she would not be able to meet this standard of "active participation" or "integration" in the general education setting, and accordingly, proposed that her academic instruction take place in the special education setting to allow her to receive one-on-one instruction and small group instruction at a level which the Appellants felt Isabel could actively participate.

*Id.* at 22-23.

The *Waukee* Court appropriately rejected such an on-par standard:

> The fact that a student is significantly behind her peers does not relieve a school district of its burden to consider ways to allow that student to be included in the general educational setting to the maximum extent appropriate. *See Daniel R.R.*, 874 F.2d at 1047 ("If the child's individual needs make mainstreaming appropriate, we cannot deny the child access to regular education simply because his educational achievement lags behind that of his classmates."). By relying on a standard of "active participation," while failing to first consider what could be done to allow Isabel to be included in the general education setting, the Appellants effectively relied on an "on par" standard of integration, which is prohibited under the IDEA. *See id*. ("[W]e cannot predicate access to regular

28

education on a child's ability to perform on par with nonhandicapped children.").
*Id*. at \*24-25.

*Waukee* is, of course, correct. A district cannot remove a child with a disability from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum. 34 CFR 300.116 (e). Indeed, the IDEA contemplates that children with disabilities may lag behind their peers; for this reason, the IDEA covers these children until they reach age 22, not just 18. 20 U.S.C. § 1412. But that is precisely what occurred to L.H. in second grade too.

Ms. Levine's "rigorous" or "on par" standards have trickled down and through the teachers. Normal Park's teachers' testimonies are replete with a "typical child" equivalency standard. The special education teacher for second grade, Ms. Hope, stated that "L.H. was also unable to function with the independence **expected of a typical second grader**." (D.E. 45, Ex. 7, Hope Aff. ¶ 11). At due process, she held L.H. to typical second grade standards: "There is a **higher expectation** for comprehension in the second grade than just basic who and what of a story. . . We get into more abstract reasoning in the second grade; making predictions, drawing inferences." (Hope, Trans. 93). In other words, if L.H. understood the basics of who and what of a story, but did not "draw inferences," he was not entitled to remain in the class because the typical expectations were "higher." Hope admits these high standards were "the lens through which I was assessing L.H.'s reading ability." (Hope, Trans. 93-94).

The appropriate LRE standard is not equivalency to neuro-typical peers, but whether L.H. is making progress on his own individual IEP goals with the necessary supports. *A.S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 546 (D. Conn. 2002) ("[T]he appropriate yardstick is whether [the child], with appropriate supplemental aids and services, can make progress towards

her IEP goals in the regular education setting.").[13]   Importantly, when asked the legally correct standard of whether L.H. was making progress on his IEP goals, Hope gives a different answer before returning to her own "second grade standards":

> He made progress.   He was not able to meet those second grade standards outlined in his IEP, but he made progress in word work.   He started with his word work level being at an early kindergarten level to toward end of kindergarten level.   He made some progress behaviorally.   He made progress with skip counting.   He made some progress with recognizing a few basic addition facts, and he made some progress behaviorally.   And his stamina for working longer periods of time did progress.   But, unfortunately, he did not get to the **second grade standards** as his IEP was written.

(Hope, Trans. 243).   In other words, Ms. Hope is agreeing L.H. "made progress" to stay in general education, but that she held him to "second grade standards" of typically developing children.   L.H. cannot win—Ms. Hope does not *teach* him the "rigorous" material, or how to draw inferences, nor put it in his IEP goals, but then she holds him to that standard to remain in regular education class.   As Dr. Whitbread puts it, "L.H. was expected to acquire these so-called 'prerequisite skills' on his own." (Whitbread Aff., p. 6).   *There are no goals or objectives in L.H.'s IEP* that require "drawing inferences, forming conclusions, higher order thinking, or answering who, what, where, when, why and how questions." (*Id.*)   Therefore, the lack of such skills cannot be used to demand a more restrictive placement.   (*Id.*)

The regular education teacher, Ms. Higgs, also held L.H. to an impermissibly high standard. "**Until L.H. masters these prerequisite skills, expecting him to perform at a level of a typical second grader will be futile.**" (D.E. 45, Ex. 16, Higgs Aff., ¶ 23) (emphasis added); *see also* (Higgs, Trans. 360-61) (restating same). Higgs claimed:   "I was not able to serve L.H.'s

---

[13] *See e.g., K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795 (8th Cir. 2011) (explaining the key question is whether the student made gains in her areas of need and not comparing the student to her non-disabled peers); *G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 577 (S.D. N.Y. 2010) (same).

needs in a regular education classroom because he lacked the prerequisite skills necessary for him to access the second grade curriculum. **Because he lacked the capacity to answer higher order questions, to form inferences and to reach conclusions, and to process certain abstract mathematical concepts**, he was not going to keep pace with the curriculum no matter the level of support Mrs. Hope and I tried." (D.E. 45, Ex. 16, Higgs Aff., ¶ 21).

Additionally, the "Lead Teacher" who consulted with Hope and Higgs, Ms. Jeanne Manley, explained how L.H. can meet the legally correct standard, just not the "typical" standards of second grade: "I believe L.H. did not make substantial progress because he did not have the present levels of performance to be able **to meet the second grade curriculum standards**." (Jeanne Manley, Trans. 433). Dr. Whitbread is correct—he cannot be held to standards which fall outside the goals of his IEP. (Whitbread Aff., p. 6, Ex. D). As she puts it: "Thus, this 'on par' or equivalency standard is practically impossible to meet and is clearly not appropriate for remaining in the general education classroom with appropriate supports and services." (*Id.*) Such an "equivalency to peers" standard amounts to a "fundamental violation of the IDEA. (*Id.*) And it is impossible to conclude, as the ALJ did, that L.H. cannot make progress in general education. (*Id.*)

Normal Park clearly prides itself on high performance for children who can reach those standards. But the corollary is not accepting modifications and supports for a child with a permanent intellectual disability. Besides requiring typical standards, Ms. Hope's words speak negatively of L.H.'s need for a paraprofessional in general education: "He would still rely on one-on-one assistance to get him through his day and the fast pace of that day. And as the curriculum grows and the academic demands grow, L.H. is going to be left further and further

behind academically. And essentially he will be sitting in a classroom working on his present levels while the rest of the class is just, you know, a satellite around him." (Hope, Trans. 241).

*Of course* a child with Down syndrome is going to need a paraprofessional, that his levels of learning will differ, that his "present levels of performance" will differ, and that "satellites" of learning, to use the analogy, will occur in a single classroom. In *Oberti,* "'parallel instruction,'" i.e., having Rafael work separately within the classroom on an activity beneficial to him while the rest of the class worked on an activity that Rafael could not benefit from" was viewed *positively as a modification*, not negatively. *Oberti,* at 1211.

The ALJ found that L.H. "was not working at a second grade level." (D.E. 45, Entry 1, Final Order, ¶ 9). Instead, the ALJ found, "he worked on, essentially, first grade materials." (*Id.*). Actually, L.H.'s teachers had dropped him two grades—to kindergarten. (Hope Trans. 97). Of course, L.H. worked on whatever was given him; moreover, many *non-disabled* children work at different grade levels, particularly in the early grades—that does not warrant sending them to CDC alternative curriculum. It misunderstands modified ("changed") curriculum.

In summary, L.H. is *not* required to meet an "on par" or "rigorous" or "typical" standard, which is what Defendant did, in fact, require. Working on parallel work, modified work, or coursework "tied to" the general curriculum, but not the same level, is *appropriate*. As the regulations make clear, a district should not remove a child with a disability from education in age-appropriate regular classrooms because of needed modifications in the general curriculum. 34 CFR § 300.116(e).

### c.    Dropping L.H. Two Grade Levels without Informing Parents

After deciding they could not educate L.H. with his second grade goals tied to the second grade curriculum,[14] L.H.'s teachers dropped him back two grades: all the way to kindergarten curriculum.  Ms. Hope admitted she began doing this the first nine weeks and that she never advised L.H.'s parents.   (Hope, Trans. 97, 116).   She argued that an assessment called "Brigance" placed L.H. at the equivalent of 4 years and 8 months, justifying kindergarten curriculum. (D.E. 45, Ex. 7, Hope Aff. ¶ 18).

Brigance is not synonymous with intellectual proficiency but is a "measure of skill development."   Moreover, judgments about a child's program cannot be made based upon a single measure like Brigance.  (Whitbread Aff., pp. 15-16).  But more fundamentally, if L.H.'s present levels really did suffer a precipitous drop as she claims, then an IEP meeting must be called.  At that point, present levels can be considered, goal adjustment can be considered, or extra supports (like Resource Room or Itinerant teaching) can be addressed.  But dropping L.H. two grade levels, after he already completed first grade *twice*, without even informing the parents, is beyond the pale of educational decency.  It is simply not allowed. (Voss depo, pp. 30, 55-57).  As Voss says:

> Q.    What if the teacher decides, say, to change from teaching a second grader second-grade curriculum to kindergarten?  Can a teacher do that without an IEP meeting?
>
> A.    No. No.

(Voss depo, p. 30).

---

[14]    L.H.'s goals in the 2012-2013 IEP were specifically tied to the second grade curriculum standards.  For example, one such academic goal in L.H.'s IEP stated: "Annual Goal: Language—2nd grade: L.H. will develop and maintain phonemic awareness. [GLE 0201.1.3]." (D.E. 45, Ex. 2, 2012-2013 IEP); (Abernathy, Trans. 519-20) (explaining that "GLE" is grade level equivalency on an IEP tying the goal to the grade level curriculum).

33

Dr. Whitbread offers yet another reason this plunge is problematic. On the one hand, L.H.'s teacher was teaching kindergarten-level curriculum with L.H. without informing the parents. But then she blamed L.H. for not being able to perform rigorous second grade standards. As Dr. Whitbread explains it, the teacher was blaming L.H. for not performing standards which were not being taught. That is a teaching problem, not a learning problem. (Whitbread Aff., pp. 6; 15).

### d. Closed Door IEP Meetings Without Informing Parents

The IDEA requires districts to ensure that the parents of each child with a disability are members of any group that makes decisions about their child's educational placement. 34 CFR 300.327 , 34 CFR 300.501 (c)(1). "Predetermination" occurs when district members of the IEP team unilaterally decide a student's placement in advance of an IEP meeting.

For example, in *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004), *cert. denied*, 110 LRP 46999 , 546 U.S. 936 (2005), when parents requested that the district fund an ABA program, the IEP team refused and indicated its policy prevented it from considering a program other than the one in which it had invested. During IEP meetings, the district allowed the parents to voice their opinion and present evidence regarding an appropriate program for their son, but it already had decided on his placement and educational methodology. The court found that the school district had violated the IDEA when it predetermined the child's placement and educational methodology.

Unfortunately, predetermination for CDC at Red Bank is true in this case too. Not only did HCDE drop L.H. two instruction levels to kindergarten *without telling the parents,* the IEP meetings were tainted too. Dr. Meece was an active member of L.H.'s IEP team who attended four the IEP meetings in 2013. He saw that HCDE staff and administration met in the IEP room

34

behind locked doors for 15-20 minutes before letting other IEP members, like himself and L.H.'s parents in. (Meece Aff., p. 5). This taints the process; it is no longer a neutral and free-flowing discussion, but one where decisions are being made *without the parents*. This is consistent with changing L.H. by two grades, again, *without the parents*.

For all these reasons, if L.H. is given proper supports, if HCDE receives training on Down syndrome, and training on LRE standards, there is simply no reason to believe he cannot be educated in the general education setting. Indeed, *he is doing so*.

### B1. Is Segregated Facility "Considered Superior?"

The second *Roncker* query is two-part: It asks whether the segregated facility is "considered superior," and, *if it is*, whether the services which make it superior "could be feasibly provided in a non-segregated setting." *Roncker*, at 1063. In educational parlance, one asks whether the supports are "portable" to regular education. Once again, the ALJ undertook no such analysis.

### 1. CDC is Vastly Inferior

In response to the first part—whether Red Bank's CDC is "better" than in general education—the answer is a resounding "no." In fact, Plaintiffs must list the harms because they are so substantial.

### (a) Unequal, Unmonitored, Separate Schooling

First, the reasons CDC at Red Bank is *not* "better" are fairly obvious and were admitted in HCDE's Answer.[15] First, CDC offers no report cards for L.H. (D.E. 8, Answer to ¶ 73 of Complaint). Second, CDC offers no homework for L.H. (D.E. 8, Answer to ¶ 75 of Complaint). Third, CDC does not allow these children to work toward any diploma. ((D.E. 8, Answer to ¶ 77

---

[15] Defendant has not yet filed its Answer to Plaintiffs' Second Amended Complaint, but statements in any pleading constitute an admission.

of Complaint).  Fourth, CDC does not offer instruction in cursive writing or in computer training.  (Knight Trans. 596-97).  Fifth, there is no separate social studies or science taught at CDC as those subjects are apparently just "embedded" in the reading and math instruction to CDC students.  (Kendrick, Trans. 473).  Instead, CDC operates to keep children until such time as they "age out of the system." (D.E. 8, Answer to ¶ 76 of Complaint).

### (b)  Not Appropriate for child with Down syndrome

Additionally, as Dr. Buckley explains, research proves that placement in a more restrictive CDC setting is *not* more beneficial to children with Down syndrome educated in a mainstream general education classroom.  (Buckley Aff., p. 5, Ex. A).  To demonstrate, Dr. Buckley described research results which compared academic and behavioral outcomes of children with Down syndrome educated in both settings—self-contained special education and mainstream general education through their teen years.  First, the results show that placement in a self-contained setting as opposed to a mainstream general education classroom does not in any way improve the "self-help" skills of children with Down syndrome, as also claimed as justification by HCDE (explaining that the purpose of the CDC classroom is to "teach these children how to function when they age out of the system.").  (*Id.* at p. 6.).  In fact, there was no difference at all.  (*Id.*).

Importantly, however, there were very significant differences in the communication skills of the children with Down syndrome educated in the mainstream classes versus those in the self-contained special education setting:  The mainstream teenagers had expressive language that was on average *two (2) years and six (6) months ahead* of the teenagers that had been educated in the self-contained special education class.  (*Id.* at p. 7.).  Additionally, 78% of teenagers in the mainstream setting had intelligible speech to strangers versus only 56% intelligibility for those

36

children educated in the special education setting. (*Id.*). Finally, the mainstream teenagers had reading and writing levels *more than three (3) years and four (4) months ahead* of the reading and writing levels of the teenagers educated in the special education setting. (*Id.*).

### (c)    Insufficient Interaction with Non-Disabled Peers

Additionally, as Dr. Meece, who has considerable educational expertise and knows L.H. well through Cub Scouts, explains, L.H. surprises him with his abilities in reading, attentiveness, and participation during Cub Scouts similar to that of his non-disabled peers. (Meece, Trans. 44-45). Dr. Meece also emphasizes that social interaction and friendships are very important to L.H. as L.H. is a child who is very socially aware of his surroundings and is well received by his peers who understand he is different, but accept him for it. (Meece, Trans. 45-46).

Dr. Meece was allowed to observe the proposed placement in the CDC classroom at Red Bank Elementary and explains that in his 90 minute observation of the CDC classroom, there was very little interaction with peers—child initiated interaction to another child occurred only 2.3% of the time with child response to that interaction occurring only 1.3% of the time. (Meece, Trans. 56-57; D.E. 45, Ex. 6, Meece Observation).

Furthermore, outside the CDC classroom for lunch and specials, like music, activities in which HCDE claims the special education CDC students get to interact with their non-disabled peers, the CDC students were in the same room or cafeteria as their non-disabled peers, however, they still remained segregated (with the CDC children even made to sit at one segregated CDC lunch table left open for them in the cafeteria) having zero interaction with their non-disabled peers. (Meece, Trans. 59; D.E. 45, Entry 6, Meece Observation).

Obviously, for a "very highly socially motivated child" like L.H., as Dr. Meece and others have described him, placement away from his typical peers in the general education

classroom and into the CDC classroom where there is little peer to peer interaction with non-disabled children, would be frustrating to L.H. as well as disastrous to continued progression in development of his communication skills. (Meece, Trans. 60; D.E. 45, Entry 45, Meece Aff.). In addition, given the wealth of research discussed in small part above showing just how beneficial mainstream general education classrooms are to developing communication skills in children with Down syndrome, and given L.H.'s high social motivation to interact and model his typical peers, the benefit of L.H. remaining in the general education classroom is obvious.

(d)     **The Gym Teacher Does Not Teach Handwriting**

Moreover, the 2013-2014 IEP at Red Bank's CDC could not possibly provide L.H. adequate academic instruction. At Normal Park, L.H. received five hours of academic instruction per day and two hours of related arts—including one hour of lunch and recess with an additional hour of either PE, art, or music. (Higgs, Trans. 334-35). Of that five hours of core academic instruction, the instruction was provided in math, reading, and an hour of either social studies or science. (*Id.*).

The Tennessee Special Education Framework Manual produced for guidance to Tennessee school districts by the Defendant Tennessee Board of Education, specifically states that: "**Schools need to ensure that students with a disability receive at least as much core instruction as their non-disabled peers, if not more.**" (Tennessee Department of Education Special Education Framework 2014, p. 120, relevant portions attached hereto as Ex. H). HCDE violated this command with the proposed Red Bank IEP. That IEP would offer L.H. *three* hours of related arts (non-academic instruction) which includes lunch, recess, art/music, leaving only *four* hours for academic instruction. As explained above, non-disabled children only receive *two*

hours of related arts and *five* hours of academic instruction. (Higgs, Trans. 334-35; Kendrick, Trans. pp. 477-81). The ALJ, too, noted this problem. (Trans. 477-81).

Then the absurd occurred. Instead of recognizing the failure to provide sufficient core academic instruction, HCDE's Director of Special Education, testified that math and handwriting can be taught in gym class. (Abernathy, Trans. 537-39). Willeata Kendrick, the Supervisor of Special Education for HCDE, stated it was not the "quantity of instruction" but the "quality" of instruction that matters in the CDC setting. (Kendrick, Trans., 480-81). Ms. Kendrick also offered that more social time with other kids, like "taking turns," should be considered "educational." (Kendrick, Trans. pp. 475-76). To Kendrick, the plunge in reading instruction from 170 minutes at Normal Park to 90 minutes at Red Bank was a "quality" issue too. (Kendrick, Trans. pp. 467-69). She even argued that the Red Bank IEP's lack of any direct instruction in either social studies or science was not a problem because those subjects are "embedded" in Unique Learning System's subjects of math and reading. (Kendrick, Trans. 473) ("They learn to read and do math as part of learning about science and social studies.").

### e.    CDC is Not Peer Reviewed

In addition, pursuant to the IDEA, every IEP must contain a "statement of the special education and related services and supplementary aids and services, based upon peer-reviewed research to the extent practicable." 20 USC 1414(d)(1)(A)(i)(IV); 34 CFR 300.320(a)(4). The U.S. Department of Education has explained that peer-reviewed research refers to the "research that is reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published." 71 Fed. Reg. 46,664 (2006).

The self-contained CDC classroom at Red Bank proposed by HCDE utilizes the Unique Learning System "ULS" as its "alternative learning curriculum." (Knight, Trans. 589-90; D.E. 8, Answer, para 72). It was HCDE's own autism expert, Sue Kabot, who recommended this program. (Voss depo, p. 24). The ULS is an online system with three differentiated tiers and work is generated online with printouts for the students to complete. (Knight, Trans. 589-90).

There is no evidence ULS is peer reviewed as required by the IDEA. The only research HCDE has regarding the ULS' effectiveness is the students' pre and post-testing data from the past year. (Knight, Trans. 589-90). When asked for any evidence of peer review, HCDE dodged the issue. First, in its Answer, it stated ULS was "approved by the Tennessee Department of Education." (D.E. 8, Answer, ¶ 72). That is a non-answer. Second, in request for admissions, HCDE stated "since a curriculum is nothing but a set of academic standards, a curriculum is not subject to being peer reviewed within the meaning of this regulation." (HCDE Answer to Request for Admission No. 1., attached hereto as **Ex. I**). Again, this is a non-answer.

Third, in Interrogatory Answers, HCDE alleged: "The Unique Learning System is not 'special education' . . . 'a related service' . . . 'or a supplementary service . . . .' The Unique Learning System is an "alternative academic achievement standard" within the meaning of 34 CFR 300.32(a)(2)(ii). Achievement standards are not peer reviewed; they are established by state education agencies pursuant to 34 CFR 200.1(d)." (HCDE Answer to Interrogatory No. 1, attached hereto as **Ex. I**). Once again, this dodged the question.

Finally, Plaintiffs took Mary Ann Voss's deposition, as she is a special education director and liaison when the ULS was chosen by Hamilton County. (Voss depo, p. 24). When asked whether it was "researched-based," Voss stated it had "embedded strategies" like "differentiated instruction." (Voss depo, pp. 27-28). But that is not the issue. The *program itself*, the Unique

Learning System, must be peer reviewed. For example, a "cancer cure" may have ingredients which were researched and accepted in other drugs; but that does not make the "cancer cure" peer reviewed.

Dr. Whitbread addressed the ULS curriculum. Reading their discovery responses, she explains: "HCDE apparently does not dispute the lack of peer review, but rather maintains that a curriculum is not 'special education or related services or supports' and therefore is not capable of being 'peer reviewed.'" This is not so. **There are numerous peer reviewed curriculum programs available for both special and regular education which demonstrate the quality and effectiveness of the curriculum**." (Whitbread Aff., p. 16). Therefore, there is no reason that HCDE should not at least be utilizing a peer reviewed alternative curriculum within the requirements of the federal laws.

Moreover, Dr. Whitbread explains that aside from not being peer-reviewed, the ULS itself is designed for children with "significant disabilities" and is not even appropriate for a child with L.H.'s profile (noting "L.H. is verbal, has tested intellectual ability in the "mild" range, demonstrates literacy skills at or above the third grade level, is responsive to instruction, is sociable, engaging and enjoys learning"), particularly, where, as here, such an alternative curriculum forecloses his ability to ever receive a high school diploma. (Whitbread Aff., pp. 16-17).

For the numerous reasons presented above, it is not even possible for CDC to be a better placement for L.H. This pretermits the second half of the question, though Plaintiffs address it anyway due to caution.

41

## B2.     Could any Desirable Services Be Provided in General Education?

Even if CDC's structure were somehow "better," *Roncker* requires a court to determine whether any services which make it better could be provided in conjunction with general education.  This is the "portability" aspect.

The "better" aspect, HCDE argues, is that CDC offers L.H. "the opportunity to develop the *prerequisite skills that he lacked and to learn at his own pace.*"  (*See e.g.,* D.E. 45, Ex. 7, Hope Aff. ¶ 23).  For the sake of argument, if this were true that L.H. needed help developing prerequisite skills to learn at his own pace, the *Oberti* and *Greer* solutions of Resource Room and Itinerant Teacher allow such structure to assist L.H. *in general education*.  But these were never even considered.

By definition, a resource room or itinerant instruction is designed to be provided "in conjunction with regular class placement," which makes the *Oberti* and *Greer* compromise so well-reasoned:

> The school must **"[m]ake provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.**

34 C.F.R. §300.115 (emphasis added).

But just like in *Oberti* and *Greer,* HCDE did not even *consider* a resource room or itinerant teacher to help L.H. with his general education programming (his "prerequisite skills" and "learning at his own pace").  True, he had a series of (untrained) ancillary attendants in the classroom and an (untrained) special education teacher a single hour per day.  But access to a "Resource Room" to focus on his particular skills, or to an itinerant teacher, are things which are not provided at Normal Park.

Jill Levine, the principal, admits that a Resource Room apart from a special education classroom is not available at Normal Park. (Levine depo, p. 102, 89-90). So, too, does Mary Ann Voss. (Voss depo, p. 41). By law, a Resource Room is *not* a special education classroom, but rather a supplement to general education. So, the compromises in the Down syndrome cases of *Oberti* and *Greer* were never considered. Put differently, Normal Park is not making the full continuum of *supports* available for L.H. That is contrary to the law, e.g. *Oberti, Greer,* as well as guidance from the Department of Education:

> [B]efore a disabled child can be placed outside the regular educational environment, the full range of supplementary aids and services that could be provided to facilitate the student's placement in the regular classroom setting must be considered.

*Letter to Hall*, 30 IDELR 142 (1997). Not only was a Resource Room not provided, but HCDE's own autism expert's (Sue Kabot's) suggestions for supplements were not followed. (Levine, pp. 91-92). Dr. Kabot suggested "EdMark and Touchmath" for I.L. (*Id*.) But Ms. Levine said "I don't believe that Edmark Reading was used because we probably would've had to purchase that." (Levine, p. 92). Nor could she vouch for Touchmath. (*Id*.).

In summary, even if one assumes that "greater structure" to work on baseline skills is desirable for L.H., the choice is not "all or nothing" between the poles of strict second grade standards in general education or no standards in CDC. This is what makes the *Oberti* and *Greer* compromise so attractive: Use of "Resource Room" for greater structure, or an itinerant teacher, for baseline assistance, fills the gap. By definition, these *are* the more structured supports for the *general education* class. And these supports preclude the Hobson's choice of the ALJ—either L.H. is to be in CDC or else "in the back of the room which had a one student population." (D.E. 45, Entry 1, Final Order, ¶ 22). This is true even if HCDE had to "purchase" some helpful materials for L.H.

43

One final note: the ALJ's belief that integration with an aide and modifications to curriculum is a "one student population" is a deeply insensitive statement. L.H. is the *only* student with Down syndrome in his class; his learning differences which require modified material from his classmates are *not* a reason for segregation. With a *trained* paraprofessional and access to a Resource Room or Itinerant teacher, it simply cannot be said that L.H. is not capable to accessing the goals on his second grade IEP. He had friendships in those classes—they liked him, and he liked them. It was mutually beneficial. This is simply not the 1970s and before where a "you can't keep up" attitude results in segregation.

### 3. Was L.H. Too Disruptive for General Education?

The third *Roncker* factor, to be weighed along with the others, is whether L.H. is too disruptive for general education class. Once again, the ALJ did not weigh this evidence in relation to the other *Roncker* factors.

The ALJ did make both positive and negative factual findings on L.H.'s behavior. On the positive side, the ALJ stated L.H. is "a very personable child," "very social," and that "social interactions are important to him, as are friendships." (D.E. 45, Entry 1, Final Order, ¶ 3). The ALJ found that L.H. has "good social awareness, acting appropriately in social situations." (*Id*). He also has "good language skills for interaction with others." (*Id.*) Importantly, the ALJ found: "His peers enjoy his company, accept him, and provide help at times when it is necessary." (*Id.*)

On the negative side, the ALJ noted behavior problems in second grade including invading a peer's space; refusing to come in the room; he ran away down the hall; he hit, touched, and pulled the hair of his classmates, and he threw his eyeglasses in the trash. (D.E. 45, Entry 1, Final Order, ¶¶ 7-8).

These brief positives and negatives simply do not enable segregated education.  Nor do they tell the full story of just how well behaved L.H. actually is.  During L.H.'s first grade year at NPMM (the 2011-2012 school year), L.H.'s progress reports which relayed quarterly progress made towards his behavioral and prevocational goals was exceedingly complimentary of L.H.'s behavior in the general education classroom:

> L.H. has responded well to his behavior chart "L.H. Not Wasting Time."  He is getting busy with work with fewer reminders (using visual prompts) and reinforces in place.  There are still times when L.H. becomes defiant and refuses to do his work but these times are the exception rather than the rule, right now.  YEAH, Luka!!  He is doing wonderful!!

(Ex. 6, First Quarter Progress Report 2011-2012, Hyde 00436).

> L.H. is initiating and maintaining appropriate social interactions on a more consistent basis.  We are still encouraging and reinforcing this.  We would like to see L.H. increase his time on task.  L.H. is completing his assigned work but still needs prompts and assistance.  We are working on reducing these prompts as he responds positively.

(Ex. 6, Third Second Quarter Progress Report, Hyde 00537).

> L.H. has had some Rock Star days at school!!  I hope this continues in 2nd grade.  He still needs reminders to stay out of other people's personal spaces.  We would like to reduce the number of prompts from adults when given directives.  We would also like to see L.H. become more independent during his work tasks.

(Ex. 6, Fourth Quarter Progress Report 2011-2012, Hyde 00362).

Most demonstrably, during L.H.'s second grade year, NPMM actually constructed a seven-factor behavior chart[16] to keep track of L.H.'s behaviors in thirty (30) minute increments which it began using on October 15, 2012 (Hope, Tr. P. 283).  The ALJ omitted any reference to this chart, but it provides the most extensive basis for assessing L.H.'s behavior.

---

[16]     The seven factors are: 1) following rules and staying on task; 2) aggression towards others; 3) out of seat or in seat; 4) redirection needed; 5) verbal aggression; 6) seeking attention; 7) refusal to comply.  (Hope, Tr. 291-92). Hope then would use the "data" from this behavioral chart to calculate into percentages and compare them to his IEP goals, though Hope admits she never informed L.H.'s parents of that.  (Hope, Tr. 307).

L.H.'s teacher checked his behaviors every thirty minutes, resulting in 14 behavioral "data points" per day. Over 147 days, from October 15, 2012 to May, 2013, the teacher checked the chart. In that span of time, 1,793 of the 2,058 check marks were positive. This demonstrates that L.H. was following rules and on task 87% of the day. (D.H. Trans. 861-63); (Hope, Trans. 292-94); (Behavioral Charts, Ex. 6. Bates Nos. 2560-2669); (D.E. 45, Ex. 28, Behavioral Chart Summary). Consequently, it is apparent from HCDE's *own* records from the previous two years that L.H.'s behavior in the classroom (even when tracked in 30 minute increments), could not possibly weigh in favor of his removal from the general education classroom.

Nor has L.H.'s good behavior declined after second grade. L.H.'s third grade Montessori teacher, Jamie Watts, testified at due process that L.H. transitioned fairly typically and got along well with his classmates. (Watts, Trans. 610). While Watts had to go out and encourage L.H. to come into the building on several occasions, Watts has never seen L.H. throw a tantrum like a toddler or shove things up his nose, nor has L.H. ever been sent home for poor or disruptive behavior. (Watts, Trans. 611-12; 666). In fact, L.H. gets along well with his peers and he has real friends in his class with typical social interactions and play. (Watts, Trans. 635) (3rd Grade Report Card, Ex. C). On L.H.'s third grade end-of-year report card, Watts wrote:

> L.H. is such a sweet young man. He is learning how to be courteous and mind his manners, even when he's frustrated or excited. He typically cooperates well with his peers and adults. On the playground, he's a good sport, win or lose. L.H. is a genuinely friendly, positive person who loves school. He gets along well with everyone.

(*Id.*).

Similarly, in fourth grade, L.H.'s teacher wrote: "Luka is considerate, respectful and helpful. He is still learning to control his impulses and behave responsibly, especially when we are transitioning from one activity to another." (4th Grade Report Card, Ex. C). As a result,

L.H.'s behavior, while admittedly not perfect, cannot possibly be a reason to place him in a separate school with no opportunity for grades, homework, or educational monitoring.

### V.  REIMBURSEMENT FOR REGULAR EDUCATION PLACEMENT AT MONTESSORI WITH SUPPORTS IS APPROPRIATE

The IDEA provides that a district court "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).  Two factors determine whether reimbursement for private school is appropriate:

1.      Whether the school's proposed IEP (here, Red Bank) was not appropriate for the child (e.g., not the least restrictive environment with appropriate supports);

2.      Whether the private school is appropriate.

*Sch. Comm. of the Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 369 (1985) *34 CFR 300.148(c).* "[E]quitable considerations are relevant in fashioning relief." *Burlington,* at 374. As to the second factor, the private school, even if it does not meet State standards. *Florence County Sch. Dist Four v. Carter,* 114 S.Ct. 361 (1993).  The *Florence County* decision has been incorporated into the IDEA regulations. 34 C.F.R. §300.148(c) ("parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs."); *C.B. v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 500 (2011) (a private placement may be "appropriate" for reimbursement purposes even if it fails to offer every special service needed to maximize a child's potential and equity does not require a reduction in reimbursement just because a parent or guardian cannot afford to give the child everything (or cannot find a program that does)).

47

In was in February of 2013 that HCDE claimed L.H. "hit a wall" and needed CDC. L.H. remained in school for the next four months, completing the school year. (D.E. 45, Ex. 7, Hope Aff. ¶ 23; D.E. 45, Ex. 6 February 2013 IEP Meeting Minutes, Hyde 00336). In May of 2013, when the formal IEP at Red Bank was proposed by HCDE, L.H.'s parents disagreed. (D.E. 45, Ex. 6, 2013-2014 Proposed IEP, Hyde 00171-00200, at 00199-200). L.H. was then later enrolled in the Montessori School of Chattanooga.

## A. Tuition and Services Reimbursement

Under IDEA a free appropriate public education ("FAPE") consists of "special education and related services." *See* 20 U.S.C. § 1401(8). Thus, to the extent the Court finds Plaintiffs entitled to tuition reimbursement, they are also entitled to reimbursement for L.H.'s paraprofessional and occupational and speech therapy necessarily supplied to meet L.H.'s unique needs. See, e.g., *Deal v. Hamilton County Dep't of Educ.*, 2006 U.S. Dist. LEXIS 76324, *7 (E.D. Tenn. Aug. 1, 2006) ("Thus, to the extent the Deals are entitled to reimbursement, they are entitled to reimbursement for the costs of Zachary's special education and related services relating to his ABA therapy.").

Having shown in great detail above that the self-contained CDC placement offered by HCDE is wholly inappropriate, and in fact harmful to L.H., in that it denies L.H. access to the general education, to homework, to report cards, to a diploma, to equal amounts of academic instruction as his non-disabled peers, and to social interaction with his non-disabled peers, among other things, the next consideration is whether placement at the Montessori School by L.H.'s parents is appropriate for purposes of reimbursement. For the reasons set forth below, it is.

Montessori education is the well-known educational approach developed by Italian physician and educator Maria Montessori and characterized by an emphasis on independence, freedom within limits, and respect for a child's natural psychological, physical, and social development. As the Montessori School's Director, Bobbe Spink, explained, the Montessori approach is premised on mainstreaming regardless of disability, as they try to meet each child's individual needs. (Spink, Trans. 851). In fact, the Montessori approach is based in special education and thus, the Montessori approach uses manipulatives as well as constantly changing the presentation of materials in order to make the individual child learn. (Spink, Trans 856). Spink has a special education degree and has taught Montessori for forty (40) years. (Spink, Trans. 851-53). She was therefore tendered as an expert witness in the due process hearing, and expressed that in her opinion, Montessori is an appropriate placement for L.H. (Sprink, Trans. 852-53).

Dr. Whitbread agrees. Having reviewed all relevant educational documents and having herself assessed L.H., Dr. Whitbread opined: "The decision on the part of L.H.'s parents to unilaterally place him in the Montessori School was not only appropriate, it was necessary to enable L.H. to make academic and social/emotional progress. L.H. is a child with Down syndrome whose intellectual disability would most accurately be classified as 'mild' (APA, 2013). He has no significant health or behavioral factors to warrant a more restrictive placement based on the 'nature or severity of his disability,' as required by the IDEA." (Whitbread Aff, p. 16).

At Montessori, L.H. receives the same general education as his non-disabled peers, just at his own individualized pace. (Watts, Trans. 614). The curriculum tracks common core standards and includes instruction in language, reading, math, writing (including learning cursive), social

studies and science (including a weekly science experiment), Spanish, and computer training. (Watts, Trans. 616-22). Further, L.H. does have homework every night at Montessori—taking home spelling, reading, and flashcards. (Watts, Trans. 630). In addition, L.H. has a daily journal entry to do or a reading comprehension exercise. (Watts, Trans. 630-31). Moreover, L.H. has 13 spelling words per week, which as of last year (his 3rd grade year), were 7, 8, and 9 letters long. (Watts, Trans. 631-32). L.H. does have an assistant with him throughout the day who helps him with his work, usually handwriting and sometimes redirects or encourages him to finish his assignments. (Watts, Trans. 623). While at Montessori, L.H. has made real friends at school and engages in typical social interactions with his non-disabled peers. (Watts Trans. 635). L.H. gets invited to be part of games and sit next to classmates who enjoy working and playing with him. (Watts Trans. 635). And as documented above, L.G. has progressed through many levels of the general curriculum in his two years of Montessori showing that his inclusion is most appropriate to his continued educational progress.

Montessori offers L.H. instruction in the general education curriculum alongside his non-disabled peers; as Dr. Buckley explained above, this is crucial for L.H. to make continued educational and social progress in children with Down syndrome. While the Montessori School cannot possibly duplicate the resources of federal and state government-sponsored public schools—including a paraprofessional and occupational and speech therapy—that fact alone does not make the placement inappropriate. *C.B. v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1160, (9th Cir. Cal. 2011)); *see also Frank G. and Dianne G. v. Board of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006), *cert. denied*, 552 U.S. 985 (2007) (ruling that although the private placement did not provide the student with an individual aide or consulting services, the student received an educational benefit from the small class size and the individualized

instruction).  Moreover, while a paraprofessional is not provided by the Montessori School itself, one is privately by L.H.'s parents so as to adequately address all L.H.'s individualized needs and thus, also requires reimbursement from HCDE.  *Anchorage Sch. Dist. v. M.P.*, 456 Fed. Appx. 706, 708 (9th Cir. Alaska 2011) (finding award of tutoring expenses well-supported for reimbursement by public agency); *Deal v. Hamilton County Dep't of Educ.*, 2006 U.S. Dist. LEXIS 76324, *7 (E.D. Tenn. Aug. 1, 2006).

    **B.**    **Parents' Payments**

The costs of tuition to the Montessori School of Chattanooga and the paraprofessional provided by L.H.'s parents for his third grade (2013-2014), fourth grade (2014-2015) and current fifth grade year (2015-2016) are accurately and truthfully summarized below and are requested as reimbursement from HCDE:

| Date | Amount | Reason |
|---|---|---|
| **Aug. 2013 – May 2014** | **$7,143** | **Tuition at the Montessori School of Chattanooga** |
| **Aug. 2013 – May 2014** | **$ 17,128.61** | **Cost of assistant at the Montessori School of Chattanooga** |
| **Aug. 2014 – May 2015** | **$6,614** | **Tuition at the Montessori School of Chattanooga** |
| **Aug. 2014 – May 2015** | **$15,750** | **Cost of assistant at the Montessori School of Chattanooga** |
| **Aug. 2015 – May 2016** | **$7,514** | **Tuition at the Montessori School of Chattanooga** |
| **Aug. 2015 – May 2016** | **$9,000** | **Cost of assistant at the Montessori School of Chattanooga** |
| **Total Tuition & Assistant Expenses** | **$ 63,149.61** | |

(Declaration of D.H., attached hereto as **Ex. J**).

## VI.   THE ADA:  UNEQUAL ACCESS TO EDUCATION

While Plaintiffs have sought monetary damages for discrimination and retaliation, those

are not the subject of this motion.  Rather, Plaintiffs are seeking injunctive and declaratory relief here: that unequal and unnecessary treatment did occur.

## A.    UNDISPUTED FACTS

HCDE admits it receives federal financial assistance. (D.E. 8, at para. 10).

In paragraph 73 of the original Complaint, Plaintiffs allege:

*"73.    As a student in the CDC setting, L.H. would no longer receive a Report Card that tracked his progress to any state educational standard."*

In response, Defendant answered:

*"73.    This Defendant admits these allegations but denies their materiality."*

In paragraph 75 of the original complaint, Plaintiffs allege the following:

*"75.    Moreover, the CDC class for 3rd – 5th grade students at Red Bank does not require homework of its students while students in the regular education setting have homework assignments beginning in Kindergarten."*

In response, Defendant answered:

*"75.    This Defendant admits these allegations but denies their materiality."*

In paragraph 76 of the original complaint, Plaintiffs allege the following:

*" 76. The principle purpose of CDC at Red Bank, according to its special education teacher, is to help children "function when they age out of the system."  In fact, HCDE's proffered expert stated of the CDC curriculum:  "[it is] an alternative curriculum, and there is not a diploma available in that curriculum."*

In response, Defendant answered:

*"76.    This Defendant admits these allegations."*

(D.E. 8, at ¶¶ 73, 75, 76).

**B.     SUMMARY**

The facts, above, clearly *are* material and they demonstrate unequal treatment.  L.H.'s claims are based on Section 504, 29 U.S.C. 794 and Title II of the ADA,  42 U.S.C. 12131 *et seq.* Section 504, Title II, and their regulations require that students with  disabilities receive an equal opportunity to use any benefit or service provided to  other students, and bar an entity from providing "different or separate aids,  benefits, or services" to students with disabilities "unless  * * *  necessary."  28 C.F.R. 35.130(b)(1)(iv); *see also* 34 C.F.R. 104.4(b)(1)(iv).

Here, it is undisputed that HCDE contends that L.H. was uneducable under his IEP in the regular education setting of his zoned neighborhood school, *Normal Park Museum Magnet*, and, instead, insisted he be sent away from his neighborhood school solely because of his disability. 28 C.F.R. 35.130(b)(1)(ii); 34 C.F.R. 104.4(b)(1)(ii).  This other school, Red Bank Elementary, amounts to a "different or  separate" benefit because it is a different location away from his neighborhood and friends, offers him no homework, offers him no Report Card tracked to any state educational standard, and offers him no opportunity to even pursue a diploma.  However, if provided "reasonable  accommodations" of supplementary aids and services;  modified curriculum (not "on par" standard);  interaction with the parents in an IEP meeting before dropping him to kindergarten curriculum; and opportunity for additional help through a Resource Room or Itinerant Teacher, it cannot be said it was *necessary* to segregate him with unequal education.

**C.     THE NON-DISCRIMINATION PROVISIONS REQUIRE EQUAL
     TREATMENT AND ACCESS TO REASONABLE MODIFICATIONS**

The "main thrust of the ADA and [Rehabilitation Act] is to assure  [individuals with disabilities] receive the same benefits" as those without  disabilities.  *CG* v. *Pennsylvania Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013)  (citation and internal quotation marks omitted).  Title II,

which applies to public entities (including public schools), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 imposes similar requirements: "No otherwise qualified individual with a disability * * * shall, solely by reason of his or her disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

### 1. TITLE II OF THE ADA

Title II regulations require that people with disabilities be provided access to local government programs that is equal to the access people without disabilities have. An entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii). Nor may an entity provide "different or separate" benefits to people with disabilities "unless such action is *necessary* to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 28. C.F.R. § 35.130(b)(1)(iv) (emphasis added); see also 28 C.F.R. § 35.130(b)(1)(vii) (stating an entity may not "limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service"). One of the major purposes of the ADA was to eliminate the unnecessary segregation of individuals with disabilities. See 42 U.S.C. § 12101(a)(5); 135 Cong. Rec. 19,811 (1989).

## 2.  SECTION 504

Section 504 imposes similar requirements:  "No otherwise qualified  individual  with a disability  *  *  *  shall,  solely  by  reason  of  her  or  his  disability,  be  excluded  from  the participation  in, be denied benefits of, or be subjected  to  discrimination  under any program or activity receiving Federal financial  assistance."  29 U.S.C. 794(a); see also *Sandison* v. *Michigan High Sch. Athletic  Ass'n, Inc.*, 64 F.3d 1026, 1035 (6th Cir. 1995) (explaining evaluation of ADA claim "closely tracks" "section 504 analysis").  A covered entity may not provide  "different or separate" services to persons with disabilities unless doing so is  "*necessary*" to provide them with services "that are *as effective* as those provided  to others."  34 C.F.R. 104.4(b)(1)(iv) (emphasis added).

The Department of  Education has stated that, although different or separate services may sometimes  be  justified,  "the  provision  of  *unnecessarily*  separate  or  different  services  is discriminatory."  34 C.F.R. Pt. 104, App. A, Subpt. A, No. 6 at 373 (emphasis  added).  For example, a few months ago, the Department of Justice, which enforces Title II of the ADA, has found separate behavioral schools in Georgia (called "GNET"), away from one's neighborhood school, to violate the ADA because they are "unnecessarily" segregating students with behavioral disabilities  away  from  their  neighborhood peers. United States' Investigation of the Georgia Network for Educational and Therapeutic Support, D.J. No. 169-19-71, attached hereto as **Ex. K** and  *available  at*  http://www.ada.gov/olmstead/documents/gnets_lof.pdf  (last  visited  Sept.  17, 2015).

Normal Park denied L.H. access that was "equal" to the access "afforded others" without disabilities  in  his  neighborhood.  28 C.F.R.  35.130(b)(1)(ii).  HCDE allows students  without disabilities to attend the neighborhood school (Normal Park) with their neighbors and friends

nearby. These kids have homework. These kids have Report Cards. They are progress-monitored according to state standards. They receive an *opportunity* to pursue a diploma. Yet none of these would be afforded to L.H. at Red Bank's CDC classroom where HCDE has undisputedly admitted that children are simply taught how they "are going to function . . . once they age out of the system." (Knight Trans. 599); (D.E. 8, Answer, ¶ 76).

The issue is not *whether* the treatment is separate and unequal. It is. The sole issue is whether such "different or separate aids, benefits, or services" was actually *"necessary."* 28 C.F.R. § 35.130(b)(1)(iv); *see also* 28 C.F.R. 35.130(b)(1)(vii). Unless it is *necessary* to exclude L.H., HCDE *must* permit him to attend his zoned neighborhood school, Normal Park, as well.

One of the goals of the ADA is to permit children with disabilities "to utilize the same * * * schools * * * they would normally utilize, in their communities, if they were not disabled." 135 Cong. Rec. 19,811 (1989) (statement of Sen. Dodd, the ADA's co-sponsor). The convenience of "congregat[ing] services for children with disabilities in a centralized location" will often be "outweighed by the benefits" of educating children "in their neighborhoods with their friends and family around." 135 Cong. Rec. at 19, 811.

In enacting the ADA, Congress recognized that "overprotective rules and policies" had resulted in unnecessary "segregation" of individuals with disabilities. 42 U.S.C. 12101(a)(5). This runs contrary to the integration goal that lies at the heart of the ADA and the *Olmstead* decision. See, *e.g.*, 28 C.F.R. 35.130(b)(1)(ii), (b)(1)(iv), and (b)(2); *see also Olmstead* v. *L.C.*, 527 U.S. 581, 597 (1999).

Plaintiffs have addressed how the LRE provisions of the IDEA have been violated. However, the "IDEA sets only a floor of access to education for children" with disabilities that impede learning. *K.M.* v. *Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1097 (9th Cir. 2013), cert.

denied, 134 S. Ct. 1493, 1494 (2014). Title II of the ADA, in contrast, requires a school "to take steps towards making existing services not just accessible, but *equally* accessible" to students with disabilities. *Ibid*. Similarly, Section 504's nondiscrimination and equal treatment claims are "not precluded by a determination that the student has been provided" a FAPE. *Id*. at 1099.

Being denied the opportunity to attend his neighborhood school, Normal Park, which is viewed in high esteem as to *how* it teaches kids and the opportunities it provides,[17] is a substantial benefit or service provided to non-disabled children. 34 C.F.R. § 104.4(b)(1)(ii), (iv), and (vii). To access it, L.H. is entitled to "reasonable accommodations" or "reasonable modifications."

Title II regulations also require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The reasonable accommodations for L.H. are similar to what the IDEA already requires: (1) modifications to curriculum, instead of insisting upon an "on par" or "rigorous" standard; (2) adherence to the goals agreed upon in his IEP; (3) holding a parent-attended meeting to change his present levels and goals; and (4) if he *needs* more intensive structure, provide him access to a Resource Room or Itinerant Instruction.

These accommodations are already required by the "floor" of the IDEA. They are *per se* reasonable. Thus, without performing them, it simply cannot be said that it was "necessary" to

---

[17] *See e.g.,* "Learning Beyond the Classroom Walls, *available at* http://www.edutopia.org/stw/normalpark-case-study-video (last visited Sept. 17, 2015) ("Collaboration with local museums and community organizations offer Normal Park students real-world connections to the curriculum. . . Since becoming a museum magnet school, Normal Park has been awarded the Magnet School of America Excellence Award and the J.F. Kennedy School of Distinction in Arts Education. "); (D.E. 45, Ex. 45, Meece Aff., Section V, A (explaining the "Normal Park Way" was an appropriate educational setting for L.H.)).

segregate L.H. to a school outside his neighborhood peers, where he would receive no homework, no grades at state standards, and not even the *opportunity* to earn a diploma. *E.g., McPherson* v. *Michigan High Sch. Athletic Ass'n, Inc*., 119 F.3d 453, 460 (6th Cir. 1997) (en banc) (accommodations to student are available under Title II of ADA).

For all the foregoing reasons, Plaintiff requests *declaratory* judgment for unequal treatment and failure to accommodate.

## VII.     CONCLUSION

[E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities …. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown v. Board of Education*, 347 U.S. 483, 493 (1954).

This rings true today too.  Sending L.H. to a different school, one with no grades, no homework, no progress monitoring, and waiting for him to "age out" is illegal.  Judgment should be entered accordingly under the IDEA, Title II, and Section 504.  Plaintiffs pray for appropriate equitable relief including reimbursement for private schooling and aide, appropriate placement, services and supports for L.H., and training in Hamilton County Schools on least restrictive environment.

Respectfully Submitted,

**GILBERT RUSSELL McWHERTER
SCOTT BOBBITT, PLC**

 /s Justin S. Gilbert              
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 504
Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

       I, the undersigned, do hereby certify that a true and exact copy of the foregoing has been mailed electronically via the Court's electronic filing system, to all counsel of record on this the 17th day of September 2015.

D. Scott Bennett
Mary DeCamp
Leitner, Williams, Dooley & Napolitan, PLLC
801 Broad Street, Third Floor
Chattanooga, Tennessee 37402

Tennessee Department of Education--Office of the Attorney General and Reporter
Michael Markham
Cordell Hull Building, Second Floor
P.O. Box 20207
Nashville, Tennessee 37202-0207

             /s/ Justin S. Gilbert           

59