UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| L.H., a Minor Student, | * | |
| by and through his parents G.H. and D.H., | * | |
| and G.H. and D.H., individually, | * | |
| | * | |
| Plaintiffs, | * | No. 1:14-cv-00126-CLC-SKL |
| | * | |
| vs. | * | Judge Curtis L. Collier |
| | * | |
| HAMILTON COUNTY DEPARTMENT | * | JURY DEMAND |
| OF EDUCATION, et al, | * | |
| | * | |
| Defendants. | * | |

## HAMILTON COUNTY DEPARTMENT OF EDUCATION'S RESPONSE TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**NOW COMES** the Hamilton County Department of Education, by and through counsel, and, in response to the Plaintiffs' Motion for Summary Judgment on their claims under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of the American with Disabilities Act (ADA), would show this Court that the Plaintiffs are not entitled any of the relief requested.

## INTRODUCTION

The Plaintiffs' Motion for Summary Judgment, and indeed their entire case, suffers from two significant problems. First, the Plaintiffs' theory is internally inconsistent. On the one hand, the Plaintiffs want L.H. to participate in the general education curriculum and to be held accountable for general education standards. On the other hand, they insist that school officials provide him with modifications that are inconsistent with the pursuit of the general education curriculum in a general education setting.

Second, the Plaintiffs have relied upon experts who have formed their opinions without the benefit of having reviewed L.H.'s entire educational file. As a consequence, these experts have operated from erroneous assumptions of how L.H. was performing in an inclusion setting, the steps that school officials took to educate L.H., and the data upon which school officials relied in drafting the IEP for the 2013-2014 school year.

In view of these two over-arching errors that weave their way through the Plaintiffs' Motion and, indeed, their entire case, there is no basis for this Court to award them the relief they have requested. While this Defendant has reserved the right to introduce additional evidence at the hearing of this matter, the administrative record, including L.H.'s educational records, establishes conclusively that school officials worked *over four years* to educate L.H. using the general education curriculum in the general education setting, making substantial modifications and accommodations along the way. Notwithstanding these efforts, L.H. simply failed to enjoy a meaningful educational benefit during the 2012-2013 school year.

Based upon irrefutable data, school officials developed the 2013-2014 IEP on the assumption that L.H. needed to develop prerequisite skills if he were ever to have a chance to benefit from the general education curriculum. In order to develop these skills, L.H. would need to work at a slower pace on an alternative curriculum that would allow him opportunities for pre-learning and re-learning. Because of the intensity of services L.H. required, school officials reasonably believed that this IEP could not be fully implemented in a general education setting.

Under the circumstances, not only should this Court deny the Plaintiffs' Motion for Summary Judgment but also this Court should instead grant summary judgment to this Defendant. While it is unusual for a court to grant summary judgment in favor of a non-moving party, particularly in a situation such as an IDEA case where a party has the statutory right to

2

introduce additional evidence, this is an unusual case.  <u>See</u> <u>Fed. R. Civ. P.</u> 56(f).  In the case at bar, the Plaintiffs have described unequivocally the evidence that they intend to introduce at the hearing of this matter; there is no genuine dispute, however, that this evidence is predicated upon faulty assumptions such that no trier of fact could find in the Plaintiffs' favor.  Accordingly, in addition to denying the Plaintiffs' Motion for Summary Judgment, this Court should grant this Defendant judgment as a matter of law.

## <u>STATEMENT OF THE CASE</u>

On September 17, 2015, this Defendant moved for partial summary judgment as to the Plaintiffs' claims under Section 504, the ADA, and those IDEA claims that had not been brought as part of the Plaintiffs' complaint for due process.  Additionally, this Defendant moved for summary judgment with regard to the Plaintiffs' claim for reimbursement for expenses associated with enrolling L.H. at The Montessori School.  Because the Plaintiffs have a statutory right to introduce additional evidence at the hearing of this matter, this Defendant did not move for summary judgment with regard to the Plaintiffs' other IDEA claims.  (Doc. 69).

On September 17, 2015, the Plaintiffs filed their own motion for summary judgment and a motion to introduce additional evidence, namely the affidavit and report of Dr. Sue Buckley, the affidavit and report of Dr. Kathleen Whitbread, the affidavit and report of Dr. Darrell Meece, and the affidavit and report of Kris and Meg Bomgaars.  (Doc. 72 and 73).  While this Defendant reserves the right to contest any issues raised by any of these proffered witnesses at the hearing of this matter, this Defendant notes that, assuming their testimony is confined to the affidavits and reports they have prepared, then their testimony at the hearing of this matter would create no genuinely disputed issues of material fact.  Simply stated, these proffered experts have either relied upon incomplete or inaccurate information in the case of Dr. Buckley and Dr. Whitbread,

they are unqualified to render an expert opinion in the case of Dr. Meece, or they have no relevant information regarding L.H. in the case of the Bomgaarses.

Accordingly, based upon the technical record, the transcript of the proceedings, including the exhibits received into evidence, and the Plaintiffs' own representations regarding the evidence that they will introduce at the hearing of this matter, there is no genuine dispute of material fact with regard to any other IDEA claims such that this Defendant is entitled to judgment on each of them as a matter of law.

## STATEMENT OF THE FACTS

During the course of working with L.H. during the 2012-2013 school year, Lisa Hope worked diligently to pursue each of the goals and objectives set forth in L.H.'s IEP. In fact, each day she worked with L.H., she prepared data collection sheets that set forth the specific IEP goal she was pursuing and the work L.H. did in pursuit of each of those goals. These data collection logs are contained within Exhibit 6 of the Transcript of the Proceedings and are marked as HCDE 2314 through 3023. Each of these data entries corresponds to the IEP goals set forth in HCDE 0245 through 0251.

During the course of preparing their reports in this matter, none of the Plaintiffs' experts were aware of Mrs. Hope's data collection logs. Indeed, a common criticism of these experts is that Mrs. Hope failed to collect any data demonstrating L.H.'s work. (Affid. and Report of Whitbread, pp. 3, 6). A brief review of the records that these experts considered in preparation of their reports, however, reveals that they never examined these documents. (Affid. and Report of Buckley, p. 2; Affid. and Report of Whitbread, p. 2).

Additionally, while Mrs. Hope continued to pursue L.H.'s IEP goals, she employed various modifications and accommodations designed to help him meet these goals. For instance,

with regard to spelling assignment, Mrs. Hope would allow L.H. to write the answer, spell the answer aloud, or otherwise demonstrate he knew how to spell the word. Mrs. Hope would score L.H. as having gotten the correct answer regardless of how he might have demonstrated it. In other words, if he wrote it correctly but spelled it aloud incorrectly, she would give him credit for the answer. (T.P., p. 119, lines 6-18). In other situations, if L.H. was having a difficult time understanding a particular concept on the second grade level, Mrs. Hope would modify the lesson, lowering the rigor to make it more easily understood by L.H., perhaps by using first grade material in order to help build L.H.'s understanding of a concept. (T.P., p. 209, lines 11-24; p. 213, line 10 – p. 214, line 16). In doing so, however, she did not abandon the second grade goals; she merely adjusted her instruction to the level where L.H. could access it. (Id).

Because the 2012-2013 IEP presupposed that Mrs. Hope might have to make modifications and accommodations in order to help L.H. pursue his second grade goals, Mrs. Hope was careful to keep L.H.'s parents informed of the steps she was taking to modify her instruction and to accommodate L.H.'s disabilities. Every week, Mrs. Hope sent home her "Week in Review" on which she made notes regarding the modifications she had made to her instruction and the accommodations she had made for L.H. L.H.'s mother signed these notes acknowledging these modifications and accommodations. These records can be found within Exhibit 6 from HCDE 1170 through 2148. As noted in support of this Defendant's Motion for Summary Judgment, the mother sent Mrs. Hope a nice thank you note for her work. (Doc. 69-2).

Once again, the Plaintiffs' experts formed their opinions without having reviewed the work Mrs. Hope sent home with L.H. A common theme throughout the experts' reports is their criticism of school system officials for having held L.H. to a second grade standard without making appropriate modifications or accommodations for his disability. (Affid. and Report of

Whitbread, pp. 6, 11). Based upon the list of documents that these experts considered, however, they were obviously unaware of the specific steps Mrs. Hope made in view of L.H.'s disability. (Affid. and Report of Buckley, p. 2; Affid. and Report of Whitbread, p. 2).

School system officials were concerned about the need to close the gap between L.H.'s performance and second grade standards simply because that is precisely the goal that L.H.'s parents insisted that they pursue during the 2012-2013 school year. (T.R. 12: Affid. of Kendrick, ¶¶ 10-11; T.R. 14: Affid. of Hunt, ¶ 10). While school officials had concerns about the appropriateness of these goals, they agreed to them subject to the understanding that L.H.'s lack of prerequisite skills would necessarily require modification from time to time as well as heavy accommodation. (Affid. of Kendrick, ¶ 12).

While the Plaintiffs have pursued what they believe to be an inclusive education for L.H. at The Montessori School, the undisputed evidence establishes that L.H. is receiving inappropriate instruction in an environment that is only nominally inclusive. The Plaintiffs produced a video of L.H. at The Montessori School from May 2014. In this video, L.H. is seen working on remedial materials that are well below his age and grade level and that demonstrate no progress since his having left Normal Park. (Doc. 69-3: Affid. and Report of Kabot, p. 17). He was isolated from typically developing peers; apart from being in the same room with them, he had essentially no interaction with them, and he sat alone working with his aide. (Affid. and Report of Kabot, pp. 15-17). Neither the aide nor the teacher demonstrated any of the teaching strategies that both the Plaintiffs' experts and school officials agree L.H. needs. (Affid. and Report of Kabot, p. 15).

In September and October 2015, school officials observed L.H. once again in his academic setting at The Montessori School. As before, L.H. was physically isolated from

typically developing peers.  (Ex. 1 to this Response: Second Affid. of Jill Levine, ¶1, Ex. 1: Montessori observation, September 18, 2015; Ex. 2 to this Response: Second Report of Kabot, pp. 8-10).  There was none of the direct, intensive instruction or other strategies everyone agrees L.H. needs.  (Second Affid. of Levine, ¶1, Ex. 1; Second Report of Kabot, pp. 9-10).  Moreover, evaluations in speech and language, literacy and math revealed that L.H. is performing substantially below grade level and chronological age.

Dr. Kabot found that L.H. continues to have a "severe language and communication disorder."  (Second Report of Kabot, p. 10).  Both his receptive language (meaning comprehension) and his expressive language are in the first percentile.  (Id., p. 2).  His overall language skills are in the lowest *one tenth* of the first percentile, placing him at the first grade level.  (Id., pp. 2-3; 10-12).

With regard to literacy, Debbie Rosenow, a literacy expert working with the Hamilton County Schools, concluded that L.H. was probably reading below the level of a beginning second grader; she would recommend starting with material appropriate for the end of first grade and work to build up his skills.  (Ex. 3 to this Response: Affid. of Debbie Rosenow, p. 2).  Notably, Ms. Rosenow found that L.H. did much better with word recognition, performing at a level M, which is the beginning of the third grade.  His comprehension, however, was substantially lower.  (Id.).

With regard to his ability to express his thoughts, L.H. demonstrated kindergarten level work.  When asked to write two sentences about a book he had read regarding an animal's five senses, L.H. produced two scribbled sentences, "A dog can smill (sic) a cat can smill (sic) a dog."  (Affid. of Rosenow, p. 2; Second Affid. of Levine, ¶ 1, Ex. 1A).  In fact, Ms. Levine, the principal at Normal Park, had an opportunity to review L.H.'s work from May 2013, which was

at the end of his second grade year, and compare it to his work on September 18, 2015. In her opinion, L.H.'s work showed marked regression, with less precise handwriting, less use of appropriate mechanics like capitalization and punctuation, and less developed expressive content. (Second Affid. of Levine, ¶ 1, Ex. 1B).

Similarly, Jamelie Johns, a math instruction expert for the Hamilton County Schools, conducted a math assessment of L.H. on October 5, 2015. (Ex. 4 to this Response: Affid. of Jamelie Johns, p. 1). He had significant deficiencies in number and operation skills, which include a student's ability to understand numbers and how to use them in mathematical operations. (Id., pp. 1-2). He also demonstrated inconsistent algebraic thinking, which measures a student's ability to use numbers to solve problems, such as counting by twos and fives. (Id., p. 2). He demonstrated some measurement skills, but he was unable to identify some basic geometric shapes. (Id., pp. 2-3).

Recognizing that L.H. is a visual learner and that he might also have difficulties with expressive language, Mrs. Johns used a test that incorporated visual cues, verbal prompts, and click responses. (Id., pp. 1-3). She also provided her own prompts and supports throughout the test. (Id.). After completing this test, Mrs. Johns asked L.H. some questions that he could answer with pictures so that she could observe his level of understanding outside of his expressive language. Based upon her assessment, she concluded that L.H. is functioning at kindergarten level although he has yet to master certain of those skills. (Id., pp. 1, 3).

Remarkably, records from The Montessori School suggest that L.H. is now functioning on the same level as an average fifth grader. (Doc. 74-5). What is even more surprising, however, is that these test results do not indicate that L.H. required any accommodations from the school such as non-standard administration. Consequently, if their records are accurate, then

L.H. has reading comprehension better than sixty-six percent (66%) of all fourth graders nationally and math skills better than forty-four percent (44%) of all fourth graders nationally.

Both Dr. Kabot and Hamilton County officials state unequivocally, however, that L.H. could not possibly be working at this level.  (Second Report of Kabot, pp. 11-12; Second Affid. of Levine, ¶¶ 3-5; Affid. of Rosenow, p. 2; Affid. of Johns, p. 3).  Even Dr. Whitbread's assistant was unable to capture L.H. working at the same level that Montessori reports; her report indicates that, on Common Core literacy standards, L.H. had mastered most kindergarten level skills, a few first grade skills, and only one second grade skill.  (Affid. and Report of Whitbread, pp. 21-22).  Margaret Abernathy, the Director of the Hamilton County Department of Education's Exceptional Education Department, states that, if the Montessori scores are legitimate, then L.H. is no longer even eligible for special education.  (Ex. 5 to this Response: Second Affid. of Margaret Abernathy at ¶¶ 11-13).  That would be in stark contrast even to the representations of the parents, who agreed in May 2015 that L.H. remains intellectually disabled. (Second Affid. of Abernathy, Ex. 2, pp. 3-4, 23).

## STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact does not exist when "no reasonable jury could return a verdict for the nonmoving party."  Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc., 598 F.3d 257, 264 (6th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the movant meets this burden, the non-movant then bears a burden to demonstrate that a genuine issue of material fact does exist.  See Id.  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251-52.

Under appropriate circumstances, a district court may also exercise its discretion and grant summary judgment in favor of a non-moving party. <u>Fed. R. Civ. P.</u> 56(f); <u>Shaw v. Donahoe</u>, 605 Fed. Appx. 494, 500 (6th Cir. 2015). Where the parties have adequately briefed the issues and come forward with the evidence they intend to introduce on material facts that might not be in dispute, it is proper for the court to consider summary judgment. <u>Id</u>.

In the case at bar, not only should this Court deny the Plaintiffs' Motion for Summary Judgment but also, in the exercise of its sound discretion, this Court should grant the Defendant judgment as a matter of law inasmuch as the undisputed facts of record establish that the Plaintiffs will be unable to carry their burden at any trial or hearing.

## <u>ARGUMENT OF LAW</u>

**I.      PURSUANT TO 20 U.S.C. § 2425(I)(2)(C)(II), THE PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR CLAIMS UNDER THE IDEA.**

In their Motion for Summary Judgment, the Plaintiffs set forth various arguments that the Hamilton County Department of Education denied L.H. a free and appropriate public education. They point to additional evidence they would introduce to the Court. They also assert that Judge Wall applied an incorrect legal standard in dismissing the Plaintiffs' complaint for due process. As a matter of law, however, this Court cannot grant summary judgment against the Defendant on these IDEA claims.

20 U.S.C. § 1415(i)(2)(C)(ii) provides in material part that "in any action brought under this paragraph, the court shall hear additional evidence at the request of a party." In the case at bar, this Defendant's Final Witness List indicates that it intends to rely upon the testimony of

several school system officials and an educational consultant, Dr. Sue Kabot. While some of these officials have testified by affidavit in support of this Defendant's Motion for Summary Judgment, this Defendant intends to call some or all of these witnesses in response to the additional evidence the Plaintiffs may offer at the hearing of this matter. Since this Defendant has the statutory right to introduce additional evidence, it would be inappropriate for this Court to grant summary judgment prior to allowing this Defendant to tender its evidence.

In response, the Plaintiffs would complain that they have already "laid bare" their case in support of their motion for summary judgment and that it would therefore be unfair for the Defendant to be able to adjust its strategy and proof between now and the hearing date on January 11, 2016. (Doc. 83). With respect to counsel, that is precisely the same dilemma that every defense attorney usually faces, and it is not a reason to set aside the clear application of 20 U.S.C. § 1415(i)(2)(C)(ii) or Rule 56. [1] More to the point, inasmuch as expert discovery does not close until October 15, 2015, almost a month after the dispositive motion deadline, this is a risk that both parties have already agreed to bear.

Indeed, in <u>Doe v. Metropolitan Nashville Pub. Sch.</u>, 133 F.3d 384, fn. 2 (6th Cir. 1998), the Sixth Circuit determined that summary judgment is not the appropriate mechanism whereby parties are to bring additional evidence before a district court pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii). Contrary to the assumptions of the Plaintiffs, this is not an ERISA case, and, absent a more specific provision in the scheduling order, the hearing date of January 11, 2016, is the only mechanism whereby the parties have discussed invoking the application of 20 U.S.C. § 1415(i)(2)(C)(ii).

---

[1] The Plaintiffs also complain that they may have to have their retained expert from the United Kingdom attend a hearing in Chattanooga, Tennessee. Again, with respect, that was a choice the Plaintiffs presumably made when they retained this particular expert.

Furthermore, this Defendant would note that this matter is before this Court upon appeal from Judge Wall's Final Order dismissing the Plaintiffs' complaint for due process. In ruling for this Defendant, Judge Wall reviewed thousands of pages of educational records for L.H. and observed witnesses testifying over the course of several days. As a matter of law, this Court must give Judge Wall's findings "due weight," particularly with regard to those matters that involve educational expertise. McLaughlin v. Holt Pub. Sch. Bd., 320 F.3d 663, 669 (6th Cir. 2003). Since Judge Wall had the opportunity to consider evidence that even the Plaintiffs' experts have failed to consider, the Plaintiffs can point to no evidence that would lead this Court to conclude that Judge Wall erred in his findings of fact.

Premises considered, this Court must deny the Plaintiffs' Motion for Summary Judgment with regard to their claims under the IDEA. Not only does this Defendant have the right to introduce additional evidence, if necessary, to rebut the additional evidence the Plaintiffs would introduce, but also the Plaintiffs' additional evidence fails to overcome the presumption that Judge Wall properly dismissed the Plaintiffs' complaint for due process. Indeed, as argued elsewhere in this Memorandum, since the Plaintiffs have laid bare their case, this Court should grant this Defendant judgment as a matter of law.

## II.     THE PLAINTIFFS' MOTIONS ARE PREDICATED UPON SERIOUS MISINTERPRETATIONS OF FACT.

Although the express language of 20 U.S.C. § 1415(i)(2)(C)(ii) is a sufficient basis for this Court to deny the Plaintiffs' Motion for Summary Judgment under the IDEA, inasmuch as the same misinterpretations of fact that support this Motion also provide a basis for the Plaintiffs' Motion for Summary Judgment under Section 504 and the ADA, this Defendant will specifically address some of the most glaring misstatements.

### A.    The Plaintiffs Exaggerate L.H.'s Level of Function.

At the outset, it is undisputed that L.H. is intellectually disabled.  By definition, he has cognitive and adaptive functions that are at least two standard deviations below the mean for those of his age peers.  (T.P., p. 839, lines 9-16).  In L.H.'s case, his IQ is below the first percentile.  (Affid. of Kendrick, ¶ 6).  Because of his intellectual disability, L.H. has certain performance deficits that are part and parcel of who he is.  (Affid. of Kendrick, ¶¶ 4-8).

#### 1.    A "high functioning" intellectually disabled person?

While the Plaintiffs have asserted that L.H. is high functioning for a person with intellectual disabilities, this observation is subject to several qualifiers.  First, because L.H. is intellectually disabled, his cognitive and adaptive functions are, by definition, among the lowest in the population.[2]  (Affid. and Report of Kabot, p. 3).  As Dr. Kabot has explained, it is not particularly helpful to refer to a student with intellectual disabilities as "high functioning" since that phrase overlooks the inherent deficits that render someone intellectually disabled.

Furthermore, in reaching the conclusion that L.H. is relatively high functioning for a person with intellectual disabilities, the Plaintiffs rely upon Dr. Meece, who is not a special educator or anyone else qualified to offer an opinion about L.H.'s level of functioning.  Dr. Meece teaches early childhood development at the University of Tennessee at Chattanooga, and he serves as L.H.'s Cub Scout leader.  Simply put, as outlined in this Defendant's Motion in Limine (T.R. 25), Dr. Meece has no frame of reference for describing L.H. as high functioning.

#### 2.    L.H.'s first grade years.

The Plaintiffs place a great deal of emphasis on the opinions of Beth McCoy, L.H.'s first grade classroom teacher.  They interpret many of Ms. McCoy's encouraging comments

---

[2] The term "intellectually disabled" has replaced the more familiar term "mentally retarded."

regarding L.H. as further proof that L.H. is high functioning.  Ms. McCoy's opinions, however, must be understood in their context.  First, note that first grade teachers are generally more encouraging than critical.  (T.P., p. 573, line 9 – p. 574, line 25).

Second, Ms. McCoy was not primarily responsible for L.H.'s special education.  Lindsey Hunt, L.H.'s special education teacher during his two years as a first grader, was the teacher who provided L.H. with direct services.  (T.P., p. 409, lines 1-23).  Based upon her familiarity with L.H., she had serious concerns regarding his ability to function in a second grade regular education classroom.  (T.R. 14: Affid. of Hunt, ¶¶ 4-8; T.P., p. 399, line 17 – p. 402, line 22).[3] Moreover, she had collected data and prepared graphs supporting her conclusion that the regular education setting was not appropriate for L.H.  (T.P., p. 401, line 25 – p. 402, line 15; HCDE 3024-3036).  The Plaintiffs' experts apparently did not review these records.

For her part, L.H.'s mother conceded during a March 2012 IEP meeting that there might be a time when L.H. would "hit a wall," acknowledging that educators had concerns about keeping L.H. in a general education setting for second grade.  (Doc. 69-1: Affid. of Levine, ¶ 3, Ex. 1).  Thus, L.H.'s parents were well aware of the school system's concerns and recognized that there might indeed be a time when a more restrictive placement would be appropriate.  (Id., Ex. 2).

---

[3] As an aside, Dr. Whitbread takes issue with some of Mrs. Hunt's terminology, e.g., phonics versus phonemic awareness, and suggests that her alleged unfamiliarity with the correct "educational syntax" raises questions regarding whether she understood sound pedagogy.  (Affid. and Report of Whitbread, p. 9).  Even assuming Dr. Whitbread were correct in her use of these terms, by the force of her own argument, Dr. Whitbread's incorrect use of the word "syntax," which refers to word order in a sentence instead of vocabulary, would call into question her expertise in the area of literacy.

### 3.    L.H.'s second grade year.

During the 2012-2013 school year, L.H. continued to have difficulty.  As noted above, Mrs. Hope collected hundreds of pages of data documenting L.H. difficulties and her efforts to assist him meet his IEP goals.  While Mrs. Hope was hopeful that L.H. would be able to meet his IEP goals for the year – and she even recorded on his first quarter progress report that she anticipated doing so – *she recorded on most of his objectives that he either lacked the prerequisite skills or that very little progress was being made*.  (T.P., p. 191, line 15 – p. 196, line 1; p. 218, line 2 – p. 220, line 3; p. 251, line 15 – p. 252, line 15).

Ironically, the Plaintiffs themselves took video of L.H. attempting to read, presumably because they believed that these videos demonstrated that L.H. had made more academic progress during the 2012-2013 school year than the teachers had seen.  School officials explained, however, that these videos actually confirmed their belief that L.H. was not being served in the regular education setting.  (T.R. 13: Affid. of Hope, ¶¶ 38-42).

The Plaintiffs also point to a behavior chart that supposedly shows that L.H. was on task and compliant for most of his time in second grade.  The problem with this chart, however, is that it does not demonstrate the point the Plaintiffs are trying to make.  As Mrs. Hope has explained, this chart demonstrated progress toward IEP goals, not L.H.'s behavior on a day to day basis.  (T.P., p. 303, lines 1-16; p. 307, line 19 – p. 308, line 22).  Furthermore, the Plaintiffs overlook that, until Mrs. Hope moved L.H.'s desk to the back of the class and heavily modified his work, it was impossible for her to begin assessing his academic performance.  (T.P., p. 207, lines 3-22; p. 314, lines 3-5).

### 4. The Montessori School.

In further support of their belief that L.H. is higher functioning than school system officials believed, the Plaintiffs point to his academic record at The Montessori School. Indeed, at face value, the records do seem remarkable. At the end of his fourth grade year, L.H.'s scores on the ERB, a standardized test used by many private schools, suggest that he was functioning between the 44th and 66th percentiles of all fourth grade private students nationally *without modifications or accommodations*.

There are at least two problems with this argument. First, L.H.'s performance subsequent to his withdrawal from Hamilton County Schools is not relevant to the issue of whether this Defendant provided L.H. with a free, appropriate public education. The issue is, based upon the data that existed at the time, whether the proposed IEP was reasonably calculated to provide a meaningful educational benefit. Deal v. Hamilton County Board of Education, 392 F.3d 840, 864-865 (6th Cir. 2004).

Second, there is no way to gauge L.H.'s actual academic performance based upon second hand information from The Montessori School. Indeed, no one from The Montessori School has testified concerning L.H.'s present levels of performance or to interpret its records.

To illustrate this point, in May 2014, the end of his third grade year, the parents took a video of L.H. at The Montessori School. During the video, he is seen working on early childhood/preschool work. He exhibits no academic independence and does not appear to have made any academic advances whatsoever since May 2013 when he left Normal Park. (Affid. and Report of Kabot at pp. 15-17). Notably, none of the Plaintiffs' experts have commented on this video.

L.H.'s fourth grade year at The Montessori School is even more suspect. During that year, L.H. allegedly made remarkable academic gains, even to the point that, according to the ERB, he is supposedly now functioning on par with his classmates and no longer requires modifications and accommodations. The problem with these scores, however, is that no one outside Montessori has been able to validate them. For her part, Dr. Whitbread's assistant could only document L.H. working consistently on a first grade level, and she reached frustration levels with him on the second grade level. (Affid. and Report of Whitbread, pp. 21-22; Affid. of Rosenow, p. 2; Second Report of Kabot, p. 12).

Experts for the Defendant were able to conduct observations and evaluations of L.H. in September and October 2015. While L.H. demonstrated one-word vocabulary on par with a third grader, his reading comprehension was equivalent to a beginning second grader, and even that presented him with difficulty. (Second Affid. of Levine, ¶ 1, Ex.1; Affid. of Rosenow, p. 2). These low literacy scores are not surprising; Dr. Kabot assessed L.H.'s speech and language skills and found that both his receptive and expressive language is in the first percentile and his overall language is in the lowest *one tenth* of the first percentile. (Second Report of Kabot, pp. 2-3). L.H.'s math scores also demonstrate that L.H. has yet to master kindergarten level material; in fact, he is missing prerequisite skills that are necessary to understand basic mathematical concepts. (Affid. of Johns, pp. 1-3).

Thus L.H.'s ERB scores are facially invalid. Not only is there no expert who agrees with these scores but also these scores, on their face, are self-impeaching. They indicate that L.H. achieved these scores with no modifications and accommodations, meaning that *he is no longer intellectually disabled*. (Second Affid. of Margaret Abernathy, ¶ 12). According to Dr. Meece, 99.8% of individuals with Down syndrome are intellectually disabled. (Sworn Affid. of Meece,

p. 2).  Thus, if these ERB scores are valid, then The Montessori School must necessarily have discovered a means of reversing the cognitive effect of Down syndrome.  Otherwise, these scores are literally impossible.

**B.    The Plaintiffs Fail to Acknowledge the Gap between L.H. and the General Education Curriculum and the Efforts Teachers Made to Accommodate L.H.**

Throughout their Memorandum, the Plaintiffs argue that school system officials wrongly attempted to hold L.H. to general education standards without allowing for his disability.  They then argue that school system officials should have made modifications for L.H. and provided additional supports prior to considering a placement in the CDC classroom.  In making each of these arguments, the Plaintiffs fundamentally misrepresent the effort school system officials made to serve L.H. and the context in which these services were offered.

**1.   The preference for mainstreaming versus the directive for achievement.**

Initially, note that school system officials did not arbitrarily decide to pursue second grade standards for L.H.  As school system officials explained in their affidavits and throughout the course of the hearing, L.H.'s parents insisted that the 2012-2013 IEP be written to second grade standards instead of to L.H.'s present levels of performance.  The second grade standards were not the choice of school system officials; to the contrary, both Willeata Kendrick, a special education supervisor, and Lindsey Hunt, L.H.'s special education teacher, were uncomfortable with the second grade goals and objectives.  It was only after the parents agreed to allow L.H.'s teachers to modify instruction to meet L.H.'s levels of performance that the team agreed.  (Affid. of Kendrick, ¶¶ 10-12; Affid. of Hunt, ¶ 10).

Of course, school system officials continued to be concerned about the achievement gap for L.H. and all students with disabilities.  While courts are familiar with the requirements that

18

the IDEA imposes on local boards of education, significantly less attention has been given to an equally significantly federal statute, the No Child Left Behind Act of 2002.  In material part, NCLB requires state education agencies to develop and implement plans designed to guarantee that all students, even students with disabilities, make "adequate yearly progress" toward academic proficiency.  20 U.S.C. § 1611(b)(1) and (2)(C).

In keeping with NCLB's requirement that state education agencies close the achievement gap for all students, including students with disabilities, Tennessee has enacted T.C.A. § 49-1-602 et seq.  Note in particular T.C.A. § 49-1-612, which calls for the development of academic assessment tests for students with disabilities.  Janin Brock, an official with the Tennessee Department of Education called as a witness by the Plaintiffs, explained that, "we wanted to close the gap between students without disabilities and students with disabilities.  It was too far of an academic or a gap in assessment scores, and we wanted to close it.  Those – our kids needed to move up and get closer to where they needed to be."  (Ex. 6 to this Response: Depo. of Janin Brock, p. 112, lines 14-21).

Thus, in the context of providing a student with a meaningful educational benefit, IEP teams must be mindful not only of Congress' *preference* that children with disabilities be mainstreamed "to the maximum extent appropriate" but also its *directive* that school systems pursue measures calculated to provide the child with adequate yearly progress toward proficiency.  Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1983).  No Child Left Behind therefore informs school officials as to what constitutes a "meaningful educational benefit," and only within this context can school officials determine the extent to which it is appropriate to have a child in the regular education environment.  Deal, 392 F.3d at 864-865.

In the case at bar, therefore, both the parents and school officials were ultimately concerned with the same goal – that L.H. achieve academically. As school officials testified, however, L.H. lacked the prerequisite skills necessary to benefit from the second grade curriculum. Accordingly, while Mrs. Hope continued to pursue the second grade goals and objectives outlined in L.H.'s IEP, she also spent her time with L.H. working to build the prerequisite skills so that he could derive a meaningful benefit from the time he was in the general education setting. (T.P., p. 209, lines 11-24; p. 431, lines 2-11; Affid. of Hope, ¶¶32-34). To that end, she made extensive modifications to L.H.'s work with the goal of improving his performance over time. (T.P., p. 112, lines 1-3; p. 433, lines 13-18). School officials did not ignore L.H.'s disability; to the contrary, all of their efforts were focused on helping him to achieve despite that disability.

## 2. Unilateral change of curriculum?

The Plaintiffs repeatedly assert that Mrs. Hope abandoned L.H.'s IEP and unilaterally changed his curriculum to kindergarten standards. Of course, this allegation explicitly contradicts the Plaintiffs' claim that Mrs. Hope failed to make any modifications or accommodations for L.H.

In any case, this allegation has no basis in fact. There is no genuine dispute that Mrs. Hope modified L.H.'s work as appropriate to meet him at his academic level of performance. Furthermore, on October 15, 2012, she met with the parents and explained to them what she was doing and why. (T.P., p. 111, line 24 – p. 114, line 13). Again, the parents understood, and the mother sent Mrs. Hope a thank you note.

Both Mrs. Hope and Ms. Levine have explained how these modifications were not alterations of an IEP. Because the curriculum at the elementary level tends to spiral, that is to

build upon itself in intensity, if a child is having difficulty understanding second grade concepts, a teacher may use more remedial instruction to build the child's level of understanding *so that* the teacher can pursue the second grade goals. (T.P., p. 209, lines 14-24; Ex. 7 to this Response: Depo. of Levine, p. 45, line 2 – p. 47, line 23).

What is more disappointing, however, is that the Plaintiffs quote Mary Ann Voss, another special education supervisor, out of context when she states that a teacher must not unilaterally change the goals and objectives of an IEP. (Ex. 8 to this Response: Depo. of Mary Ann Voss, p. 30, lines 21-25). The Plaintiffs fail to note that Ms. Voss also testified that it is entirely appropriate for a teacher to begin teaching a child at his present levels of performance. (Depo. of Voss, p. 54, line 17 – p. 55, line 10). She agreed that teaching a child at his present levels of performance would not be a unilateral modification of the IEP. (Depo. of Voss, p. 55, lines 11-18).

In fact, what Mrs. Hope did for L.H. is substantially less extreme than the example that the Plaintiffs offer as an appropriate modification – teaching a child *about a triangle while his or her classmates are learning to calculate the interior angles of a triangle.* As Ms. Levine explained in her deposition, a child who is still learning to recognize a triangle would derive no meaningful educational benefit from a class in which other students are learning how to calculate angles. (Depo. of Levine, p. 123, line 15 – p. 124, line 19). Ms. Brock stated that such an extreme modification would actually require the child be on an *alternate curriculum rather than a modified general curriculum*; such a student would be stigmatized because of the academic gap and would perhaps be better off in a self-contained classroom. (Depo. of Janin Brock, p. 122, line 23 – p. 125, line 23).

Here the internal inconsistency in the Plaintiffs' case, noted *supra* at p. 1, becomes apparent. While they complain that the proposed IEP for 2012-2013 would have taken L.H. off the path toward a regular high school diploma, *the modifications the Plaintiffs are suggesting for L.H. would do the very same thing.* As Ms. Voss explained, modified course standards and modified grading do not allow a student to earn a regular education diploma. (Depo. of Voss, p. 43, line 3 – p. 47, line 15).[4] Tenn. Rules & Regs. 0520-01-03-.06(1)(a) provides that all students, including those receiving special education, must earn the requisite course credits in order to graduate with a regular education diploma. While Tenn. Rules & Regs. 0520-01-03-.06(1)(b) and (d)(3) permit certain accommodations to students with disabilities, the Rules do not allow a local board of education to modify course standards. Simply stated, the Plaintiffs cannot have it both ways.

### 3. What about a resource room?

The Plaintiffs also contend that school officials should have considered assigning L.H. to a resource room or an itinerant teacher instead of considering a placement in Red Bank's CDC room. In support of this argument, they point to 34 C.F.R. 300.115(b)(2), which provides in material part that school districts must "make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement."

The problem with this argument, however, is that it grossly misunderstands the level of supports L.H. was actually receiving at Normal Park. As Margaret Abernathy explains, a

---

[4] Note that L.H. would have been in the third grade during the 2013-2014 school year and would not yet have been earning graduation credits. Ideally, he could have built his prerequisite skills at Red Bank Elementary School with the hope of reentering the general education curriculum at some point prior to his ninth grade year so that he could pursue a regular education diploma.

resource room is typically a room with one teacher and several students, each of whom is receiving special education in core concepts. (Second Affid. of Abernathy, ¶ 2). While Hamilton County Schools once had resource rooms, the term is no longer used because it is pejorative and because the Defendant's current service model, direct instruction pull-outs, actually provides *more intensive and individualized* instruction than was available in the old resource model. (Second Affid. of Abernathy, ¶ 3). With direct pull-outs, such as what Mrs. Hope provided L.H., students receive one-on-one attention from a teacher with focused instruction specifically tailored to their needs. (Second Affid. of Abernathy, ¶¶ 3-7). Thus, instead of the relatively non-specific supports outlined in 34 C.F.R. 300.115(b)(2), L.H. received more intensive and individualized instruction from a specific teacher who saw him every day and who followed him back into his regular education class.

A more fundamental problem with arguing that L.H. should have received resource instruction, however, is that, by suggesting resource, the Plaintiffs have essentially conceded that L.H. needed more intensive instruction than he could receive in a general education classroom. Having made this concession, *the issue is no longer the least restrictive environment analysis* but rather a debate over methodologies. As the Sixth Circuit explained in <u>McLaughlin</u>, *supra* at p.11, in assessing whether a child should be educated in a "categorical class" (a setting much more restrictive than Red Bank's CDC setting) or a resource room, the district court must review the school system decision following the standard in <u>Board of Educ. v. Rowley</u>, 458 U.S. 176 (1982), i.e., whether the child would derive an educational benefit from the placement. <u>McLaughlin</u>, 320 F.3d at 671-72. Having implicitly conceded that a resource placement would have been appropriate for L.H. given his difficulties in a general education classroom, the

Plaintiffs cannot now be heard to complain that school officials believed that a CDC setting was preferable to a resource setting.  Id. at 673.

### C.  The Plaintiffs Mischaracterize the Nature of the CDC Placement at Red Bank Elementary School.

Throughout their Memorandum, the Plaintiffs refer to Red Bank as a "separate school" and the CDC room as a "separate classroom."  Citing to a history in which students with disabilities were often educated in these segregated settings, the Plaintiffs make the sweeping assertion that the Defendant's proposed placement for L.H. for the 2013-2014 school year was just such an effort to segregate.  Once again, in making this argument, the Plaintiffs have ignored the facts.

### 1.  Segregation?

First, note that Red Bank is not a "separate school" within the meaning of the IDEA.  It is a typical elementary school educating all manner of students.  (Second Affid. of Abernathy, ¶ 10).  While it is not L.H.'s zoned school, there is nothing in the IDEA that requires a school system to make every service available at every school or to guarantee a child's attendance at his zoned school.  McLaughlin, 320 F.3d at 671-72.  Accordingly, to refer to Red Bank as a "separate school," as if this Defendant assigns students with disabilities to their own schools, is a gross misrepresentation.

Similarly, it is a misrepresentation to refer to the comprehensive development classroom as a "separate classroom."  As Ms. Abernathy and Dr. Kabot explained at the hearing, L.H.'s IEP would have him receiving special education services for approximately 21 hours per week, 17.5 of which would have been in the CDC room.  (Second Affid. of Abernathy, ¶ 8;  T.P., p. 822, lines 5-11; Affid. and Report of Kabot, p. 20).  The remainder of that time, L.H. would be

participating in the general education setting with his typically developing peers.  While Dr.

Meece expressed some concern that students in the CDC classroom were not interacting with

typically developing peers during lunch time, Dr. Kabot observed that that would be an issue of

implementing L.H.'s IEP.  (T.P., p. 783, line 22 – p. 784, line 9).  There was no reason, given

L.H.'s gregariousness, that his aide or his teachers could not work to facilitate social interaction

throughout the day.  (T.P., p. 785, lines 18-24).[5]  Thus, to suggest that L.H. would be in a

"separate class" to the exclusion of any contact with any typically developing peers is plainly

inaccurate.

### 2.    Access to the general education setting and curriculum.

The Plaintiffs suggest that whatever contact L.H. would have had with the general

education curriculum at Red Bank Elementary School would have been meaningless.  In support

of this point, the Plaintiffs deride Margaret Abernathy's hearing testimony that L.H. would have

participated in the general education curriculum during related arts, meaning P.E./wellness, art,

music, etc.

In the Hamilton County Schools, related arts courses like P.E./wellness and art do, in

fact, teach and reinforce concepts taught in the core curriculum.  (Second Affid. of Abernathy, ¶

9).  For example, the Tennessee wellness standards for Grades 3-5 provide for written

assessments of a student's understanding of various concepts affecting health.  The State

standards for art in grades 3-5 are similar; they also provide for written assessments of a

student's understanding of his or her art work and place a premium on a child's ability to express

---

[5] Notably, Dr. Kabot found a significant lack of interaction between L.H. and his peers at The Montessori School on each of her visits.  (Affid. and Report of Kabot, p. 16-17; Montessori observation, October 17, 2013; Second Report of Kabot, pp. 8-10).

himself or herself. (Second Affid. of Abernathy, ¶ 9; Ex. 1). Thus, Ms. Abernathy was entirely correct that related arts courses do teach reading and writing.

Furthermore, a quick review of the wellness standards shows that students are supposed to understand concepts of nutrition and exercise. One can easily see how a PE/wellness teacher could incorporate principles of mathematics by having students track the calories of a Big Mac as compared to an hour of walking. This basic point as underscored in Jill Levine's deposition testimony; she has seen her P.E. teacher incorporate math into the lesson. (Depo. of Levine, p. 106, lines 5-23).

### 3. The Unique Learning System.

The Plaintiffs also criticize the curriculum that this Defendant uses in its CDC setting. As part of this criticism, however, the Plaintiffs claim that the Unique Learning System is not peer-reviewed, presumably on the belief that it should have been. The problem with the Plaintiffs' argument is that it flows from unartfully asked questions.

In both their Complaint and in their discovery requests, the Plaintiffs have asked whether the Unique Learning System's *curriculum* is peer reviewed. (Doc. 74-9). Time and again, this Defendant has explained that curricula are an established set of standards that are not peer reviewed or research based. 34 C.F.R. § 300.320(a)(4), the regulation cited by the Plaintiffs refers to "special education and related services and supports and aids," not to curricula.

During the course of deposing of Mary Ann Voss, the Plaintiffs, for the first time, apparently asked the question they intended – whether the *instructional strategies* recommended by the Unique Learning System are researched based. Ms. Voss explained that they are. In particular, the Unique Learning System has different layers of intervention, differentiated

instruction, scaffolding, and other types of supports that teachers have long recognized to be the foundation of good pedagogy. (Depo. of Voss, p. 27, line 1 – p, 29, line 1).

Additionally, it is important to note that the Unique Learning System merely provides a framework in which school officials would be providing educational services to L.H. As Dr. Kabot explained during the course of the hearing, L.H. would continue to receive instruction in the general curriculum through related arts, and he would also receive additional, more specialized instruction in other areas as the IEP team might believe appropriate. (T.P., p. 832, lines 2-13).

As part of their criticism of the Unique curriculum, the Plaintiffs suggest that the purpose of this curriculum is to bide the students' time until they age out of the school system. In support of this proposition, the Plaintiffs reference portions of testimony from Erin Knight, the Red Bank Elementary School CDC teacher, from the hearing.[6] Once again, however, the Plaintiffs have cited aspects of a witness' testimony while deliberately omitting other testimony that explains what the witness said.

With regard to the purpose of the Unique Learning System, Ms. Knight, in response to questions from the Plaintiff herself, explained that, "I was referring to that term [age out] because children with special needs have the right to stay in school until they're 22 years old. And some do, so I just used that. They may stay longer in school. *No, I have a much higher expectation. I want the children to be as independent as they can be so that they can function independently when they're finished with school*." (T.P., p. 601, line 25 – p. 602, line 7)(emphasis added).

---

[6] The Plaintiffs cited this testimony in their Complaint, and this Defendant acknowledged that they had quoted the teacher accurately. This Defendant did not accept, however, the Plaintiffs' construction of this testimony and has made clear this qualification in its Answer to Plaintiffs' Second Amended Complaint.

One cannot overlook the importance of Ms. Knight's explanation. Every Hamilton County teacher testified, and Judge Wall concluded, that L.H. was becoming increasingly isolated in his corner of Miss Higgs's classroom because he was dependent upon his aide. Likewise, when Dr. Kabot reviewed the video of L.H. at The Montessori School, and in her several visits to The Montessori School since the fall of 2013, she noted that L.H. is isolated and dependent upon his aide. (Affid. and Report of Kabot, p. 16-17; Montessori observation, October 17, 2013; Second Report of Kabot, pp. 8, 12). Ms. Levine also noticed in the Fall of 2015 that L.H. was still isolated. (Second Affid. of Levine at ¶ 1, Ex. 1).

In fact, it was precisely for this reason that Ms. Voss explained during her deposition that a placement in a general education classroom with an aide may actually be one of the most restrictive placements. (Depo. of Voss, p. 34, line 12 – p. 37, line 22). Even the training power point she prepared touches on this concern; in the slide "Me and My Shadow," she recognizes and explains that the presence of an aide can become isolating for the child so that the child attends school in a community of one. (Depo. of Voss, Exhibit 1, p. 29). That is the very problem Judge Wall foresaw.

While L.H. may indeed be social, he has not learned how to use his social skills to work independently or to collaborate with peers. Ms. Knight was justifiably proud of the extent to which her students work independently, and every educator who visited her room observed it. (Affid. and Report of Kabot, CDC observation, October 13, 2012; T.P., p. 239, lines 3-20; p. 571, line 19 – p. 572, line 15; p. 580, lines 7-12; ).

There is no reason L.H. could not have benefited from this environment apart from the Plaintiffs' refusal to consider it. Whether they simply do not understand the opportunities that were available to L.H. as part of the 2013-2014 IEP or whether they did not like it because it was

not their preferred plan is immaterial. This IEP was calculated to provide L.H. with a meaningful educational benefit in what would have been, for him, the least restrictive environment in which he could have accessed this plan.

**D.    The Plaintiffs Wrongly Denigrate Dr. Kabot's Qualifications.**

Throughout their Memorandum, the Plaintiffs refer to Dr. Kabot as the school system's "autism expert." Not only does this title wrongly limit Dr. Kabot but also it misleads the Court into believing that Down syndrome is its own subset of special education.

Congress does not treat Down syndrome as its own unique condition. There are only a handful of conditions that make a child eligible for special education under the terms of the Individuals with Disabilities Education Act. These conditions include intellectual disabilities, hearing impairments, speech or language impairments, visual impairments, serious emotional disturbances, orthopedic impairments, autism, traumatic brain injury, other health impairments, and specific learning disabilities. 20 U.S.C. § 1401(3)(A)(i). Down syndrome is not in this list.

As a child development expert, Dr. Meece has testified that students with Down syndrome are, virtually without exception, intellectually disabled within the meaning of the IDEA. Indeed, there is no dispute that L.H. is eligible for special education by virtue of being intellectually disabled as opposed to his Down syndrome.

Furthermore, there is no evidence that students with Down syndrome have unique educational needs that are separate and distinct from other students with intellectual disabilities (T.P., p. 424, line 9 – p. 425, line 7; p. 792, line 12 – p. 793, line 3; p. 842, lines 1-13; T.R. 10: Affid. of Manley, ¶ 7). To the contrary, the witness who has had the most experience educating students with Down syndrome, Jeanne Manley, has testified without contradiction that *every*

student with intellectual disabilities, whether with Down syndrome or some other condition, has his or her own unique style of learning. (T.P., p. 427, lines 6-22).

It is from this perspective one can see how unfairly limiting the Plaintiffs' criticism of Dr. Kabot is. She has extensive background in educating students with intellectual disabilities. (Affid. and Report of Kabot, pp. 4-7). She has assisted in the development of thousands of IEPs for students with intellectual disabilities, and she has authored teaching materials on the education of these students. (T.P., p. 706, line 18 – p. 707, line 24). Her understanding of the educational needs of students who are intellectually disabled as a result of autism applies equally well to students who are intellectually disabled as a result of Down syndrome. (T.P., p. 796, line 23 – p. 797, line 9; p. 833, line 21 – p. 834, line 23).

Moreover, the area in which students with Down syndrome have a particular need, the area of speech and language development, is actually a unique area of strength for Dr. Kabot; she is a licensed speech and language pathologist. (T.P., p. 796, line 23 – p. 797, line 2; p. 834, lines 15-22).[7] Indeed, she is the only person to have conducted a speech and language evaluation of L.H. in the past three years. (Second Report of Kabot, pp. 1-2).

Because of her background in this area, Dr. Kabot has noticed perhaps the most significant detail about L.H., a point overlooked by the Plaintiffs' experts – *L.H. does not fit the Plaintiffs' so-called pattern of students with Down syndrome*. Dr. Buckley has stated categorically that students with Down syndrome have a better comprehension of language than expressive language and a poor understanding of grammar. (Affid. and Report of Buckley, p. 4).

---

[7] Interestingly, the Plaintiffs also observe that Dr. Kabot last worked in a classroom with a student with Down syndrome approximately 25 years ago. For her part, Dr. Whitbread last worked in the classroom with any student 22 years ago. (C.V. of Dr. Whitbread, p. 3).

In application, students fitting this profile might be expected to know more than they can easily express.

Dr. Kabot, on the other hand, has noted that L.H. does not fit the Plaintiffs' preconceived notion of a child with Down syndrome. His expressive language is no worse than his receptive language (or comprehension), and historically it has actually been better. (Second Report of Kabot, pp. 1-2; 10). Moreover, his understanding of grammar and sentence structure is actually a relative strength *vis á vis* his other language skills, which remain poor. (Second Report of Kabot, p. 11). Even more surprisingly, however, Dr. Kabot noted that L.H. performed very poorly with pragmatic language, which measures social awareness and which is ordinarily an area of strength for students with Down syndrome. (Id.).

In other words, *L.H. has an entirely different educational profile than the Plaintiffs' experts would expect, calling into question their conclusions regarding what he needs to succeed in an academic environment*. Indeed, this discrepancy underscores that educational decisions must be based upon the needs of the individual child rather than any preconception of any particular disability. (T.P., p. 424, line 9 – p. 427, line 22; Affid. and Report of Kabot, pp. 15, 19). In the case at bar, rather than relying upon assumptions pertaining to Down syndrome, Dr. Kabot applied her experience with thousands of other intellectually disabled students and reviewed five years of data that is specific to L.H.

### E. The Plaintiffs Wrongly Denigrate the Training and Expertise of Hamilton County's Teachers.

Just as they discount Dr. Kabot's experience with intellectual disabilities, so too the Plaintiffs discount the experience of Hamilton County's educators. In this instance, however, the Plaintiffs deliberately overlook obvious facts that are harmful to their case.

Throughout their Memorandum, the Plaintiffs point to Jill Levine and implicitly argue that, because she lacked experience teaching students with Down syndrome, this Defendant's entire effort to educate L.H. must have been flawed. In making this argument, however, the Plaintiffs both misstate Ms. Levine's role in L.H.'s education and discount the relevant experience she does have.

For instance, the Plaintiffs overlook that Ms. Levine did not provide direct educational service to L.H. As the principal, she certainly played an important role on L.H.'s IEP team; however, she was not L.H.'s special education teacher. During L.H.'s two years in the first grade, Lindsey Hunt was responsible for educating L.H. Mrs. Hunt had many years of experience teaching students with special needs. (Affid. of Hunt, ¶¶ 1-2). During L.H.'s second grade year, Lisa Hope, a highly qualified special educator, was responsible for providing L.H.'s educational services. There is no dispute that Mrs. Hope was an excellent teacher who prepared herself well for the challenge of educating L.H. (T.P., p. 178, line 23 – p. 180, line 9; Affid. of Manley, ¶¶ 10-14). Similarly, Miss Higgs, L.H.'s second grade teacher, had an endorsement in special education and had demonstrated an attitude and approach to teaching that school officials though would benefit L.H. (T.P., p. 556, line 20 – p. 557, line 12; p. 558, lines 9-12).

For her part, Ms. Levine understood her own limitations and took steps to provide Normal Park and Mrs. Hope with the resources necessary to educate L.H. On August 10, 2012, at the request of Mrs. Hope, Ms. Levine asked for the assistance of Jeanne Manley, a Hamilton County lead teacher (Affid. of Levine, ¶ 5, Ex. 3). Indeed, Ms. Manley has more recent and relevant experience teaching students with Down syndrome than any other expert who would offer testimony in this case. (Affid. of Manley, ¶ 6). She provided Mrs. Hope with a great deal of support in developing strategies for L.H. (Affid. of Manley, ¶¶ 10-14).

Underscoring the point that there is no material difference between educating a student with Down syndrome and educating students with other intellectual disabilities, Dr. Kabot observed Mrs. Hope in April 2013. She noted that Mrs. Hope was using the very strategies and interventions that the Plaintiffs' experts recommended. (Affid. and Report of Kabot, p. 9). Of course, since the Plaintiffs' experts never observed Mrs. Hope teaching L.H., and since they apparently did not have the opportunity to review all of her records, they cannot be blamed for not realizing the efforts Mrs. Hope was taking to educate L.H.

Of course, one should not assume that Ms. Levine was unable to provide excellent support for her teachers on her own; she is, in fact, a nationally recognized educator who collaborated in the development of the Guided Reading literacy program. (Ex. 9: CV of Jill Levine). Dr. Whitbread wrongly assumes that Guided Reading is ill-suited for teaching reading to students with intellectual disabilities. (Affid. and Report of Whitbread, p. 9). In fact, she relies upon an erroneous understanding of this program. (Second Affid. of Levine at ¶¶ 6-7). The way Guided Reading is implemented at Normal Park comports exactly with the methods Dr. Whitbread recommends for educating students such as L.H. (Second Affid. of Levine at ¶¶ 7-8). Of course, unlike Dr. Kabot, Dr. Whitbread has never seen L.H. at Normal Park. (Id., ¶ 6).

F.     **The Plaintiffs Niggle Over the Word "Regression."**

The Plaintiffs also take issue with claims that school officials believed that L.H. had regressed or "hit a wall." They claim that students with Down syndrome do not regress and that anyone who believes to the contrary has an outmoded way of thinking.[8]

---

[8] Notably, there is no true consensus among educational researchers that students with Down syndrome do not regress. (Affid. and Report of Kabot, p. 10).

Initially, consider the preposterous nature of this argument. If typically developing students lose skills over time, then it defies logic to contend that intellectually disabled students could never lose their previously mastered skills. (T.P., p. 95, lines 16-25). Perhaps one could argue that a skill once mastered may never be lost; if the skill was lost, then it was never mastered.

In any case, Mrs. Hope never said that L.H. had regressed, and the Plaintiffs claims otherwise are simply wrong. To the contrary, she states that L.H.'s academic levels for the first grade were accurate for those standards but that second grade standards are more challenging, as a result of which he seemed to have lost reading levels. (T.P., p. 94, line 23 – p. 95, line 9; see also T.P., p. 573, lines 12-19).[9] She believes, however, that L.H. maintained the same basic skills that he had at the end of his second year in first grade. (T.P., p. 187, lines 7-21).

To the extent that he appeared to have lost basic skills over the 2012-2013 school year, Mrs. Hope presumes that L.H. had never truly mastered them. Indeed, she has reams of formal assessments of L.H. to support her conclusions. (HCDE 0009-0110; 1368-1371; 1408: 1464; 1554; 1614; 1672; 1688; 1738; 1788; 1796-1801; 1882; 2036; 2038; 2040). Additionally, she has a similar number of informal assessments that she kept as a running record of his progress in order to fine tune her instruction. (HCDE 0039; 0047 – 0053; 0055 – 0057; 0059 – 0061; 0063 – 0079; 0081 – 0097; 0099; 0101 – 0105; 0109 – 0110; 0113 –0117; 0119; 1308 – 1310; 1324; 1334 – 1336; 1366). It is baffling that the Plaintiffs' experts do not believe that Mrs. Hope kept records of her work.

---

[9] Interestingly, Dr. Whitbread refutes Mrs. Hope's statement on the grounds that, under Common Core standards, first and second grade have the same emphasis on reading comprehension. (Affid. and Report of Whitbread, p. 11). No doubt, Dr. Whitbread was unaware that Tennessee was not yet under the Common Core standards during the 2012-2013 school year. (T.P., p. 551, lines 11-16).

The only person who has stated unequivocally that L.H. regressed is Jill Levine, and she did so only recently. On September 18, 2015, she observed Ms. Rosenow perform a literacy assessment of L.H. at The Montessori School. (Second Affid. of Levine, ¶ 1, Ex. 1). During this literacy assessment, L.H. wrote two sentences about a book he had just read. Ms. Levine observed that L.H.'s ability to express his thoughts and to write them on paper had regressed since May 2013. (Second Affid. of Levine, ¶ 1, Ex. 1A and 1B). Even an untrained eye can see her point; the more recent sample from September 2015 is more remedial.

The Plaintiffs also take issue with Ms. Levine's statement that L.H. had "hit a wall," as if that were per se evidence of a discriminatory attitude toward L.H.[10] What the Plaintiffs deliberately overlook, however, is that *the mother herself first used that phrase* in March 2012 in recognition that there would be a time when the general education setting would not be appropriate for L.H. (Affid. of Levine, ¶ 3, Ex. 1). The Plaintiffs cannot now be heard to complain simply because Ms. Levine was trying to convey her concerns using a metaphor that they presumably understood.

### G.    Summary.

The record simply does not support the harsh, condemning accusations that the Plaintiffs have leveled against this Defendant and its dedicated teachers. School officials were neither incompetent nor were they neglectful or indifferent to the educational needs of L.H. While this Defendant certainly understands and appreciates the strong desire of the Plaintiffs to have what is best for L.H., their genuine disagreement with the Plaintiffs as to what constitutes "best" does not merit this degree of criticism.

---

[10] In fact, Bobbie Spink, the director of The Montessori School, stated that L.H. was on "a different path" and opined that he would someday "top out," but the Plaintiffs do not similarly accuse The Montessori School of discrimination. (Affid. and Report of Kabot, Montessori observation, October 17, 2013, p. 6 (Page ID #943)).

## III. THERE IS NO GENUINE DISPUTE THAT SCHOOL OFFICIALS FAITHFULLY EXECUTED L.H.'S IEP DURING THE 2012-2013 SCHOOL YEAR.

In view of the challenges that confronted L.H. in the second grade regular education setting, his teachers were particularly diligent to provide him with all the services and modifications envisioned in his IEP. Because of their hard work, this Defendant is entitled to judgment on this issue as a matter of law.

### A. L.H.'s Lack of Progress Does Not Evidence the Teachers' Neglect.

In their due process complaint, the Plaintiffs contend that L.H. had made academic progress during his previous three years and that, if L.H. failed to succeed in the second grade, then school officials must have failed to implement L.H.'s IEP. The Plaintiffs' argument is flawed for a host of reasons.

First and foremost, there is no genuine dispute that L.H. had *not* made steady academic progress during the previous three years. In fact, he had been retained to spend a second year in the first grade during the 2011-2012 school year. Even though the school administration chose to promote him to the second grade, school officials were well aware that L.H. was still performing at a kindergarten to beginning first grade level even after having spent twenty months in the first grade regular education setting. (Affid. of Hunt, ¶8). His plateau was not surprising to school officials given that his psychological assessments placed him at an intellectual equivalency of a kindergartner.

Indeed, Mrs. Hunt and Ms. Kendrick were so concerned about L.H.'s present levels of performance at the end of his second year in first grade that they questioned whether it was appropriate to place him in a second grade regular education setting. (Affid. of Hunt, ¶9; Affid. of Kendrick, ¶¶5-7). They ultimately agreed with this placement, however, subject to the

stipulation that Mrs. Hope would be able to modify the curriculum to match L.H.'s present levels of performance. The parents understood and agreed.

Second, there is no genuine dispute that educators worked diligently to help L.H. benefit from the regular education curriculum. Miss Higgs spent a significant amount of her instruction time providing direct instruction to L.H. Mrs. Hope worked with L.H. in Miss Higgs' classroom much more intensely than she would have any other student simply because L.H.'s needs were so much greater. She also spent almost 30 hours *more* with L.H. than his IEP had contemplated.[11] She also provided L.H. with more than fourteen hours in behavioral support throughout the school year to help him remain with his peers.

Mrs. Hope also collaborated with other teachers in the school and around the district to develop ideas regarding how to motivate L.H. She modified the curriculum to provide L.H. instruction at a level he could understand, and she employed alternate methods to teach and evaluate L.H. to account for his expressive language delays. (Affid. of Hope, ¶16).[12]

The parents assert that there was only one reading program available at Normal Park, but this fact is immaterial simply because Mrs. Hope was not tied to any particular program in her efforts to help L.H.; she tried everything. As a professional educator, she used her best efforts to help this child benefit from the regular education curriculum. (Affid. of Hunt, ¶11).

---

[11] While Mrs. Hope did perform approximately four and one-half hours fewer direct "pull out" services with L.H. than the IEP had contemplated, this difference is inconsequential compared to the intensity and extent of the inclusion services she provided L.H.

[12] The Plaintiffs now assert that Mrs. Hope essentially abandoned the existing IEP and unilaterally rewrote it. Technically, this is procedural issue that the Plaintiffs did not raise in their complaint for due process. Even so, Judge Wall considered this issue in the substantive context of whether the Defendant faithfully implemented the IEP. However one considers the issue, Mrs. Hope's effort to teach L.H. at his present levels of performance was not a unilateral revision of the IEP either as written or in theory. (Depo. of Voss, p. 55, lines 11- 18).

Similarly, the Plaintiffs now contend that Normal Park did not purchase the educational materials that Dr. Kabot recommended for L.H., Edmark Reading and TouchMath. They fail to mention, however, that Dr. Kabot did not recommended these programs until April 9, 2013. They also fail to mention that Dr. Kabot had far more serious concerns about whether the general education setting was appropriate for L.H. than the availability of particular educational materials. (Affid. and Report of Kabot, Normal Park observation, April 9, 2013).

Third, there is no genuine dispute that Mrs. Hope actually provided L.H. with more services than his IEP contemplated. As Mrs. Hope has explained, the most accurate estimation of how she served L.H. is in her service logs on which she has recorded the type of service she provided to L.H. on any given day and what she did during that service time. (Affid. of Hope, ¶ 32). For an easier understanding of how this service time relates to L.H.'s IEP, Mrs. Hope has prepared a table, attached as Exhibit 1 to her Affidavit, setting forth by quarter and by year the services L.H. received. (Affid. of Hope, ¶ 33, Ex. 1). On the last two pages of this exhibit, Mrs. Hope has set forth the services L.H. was due according to the terms of his IEP and subtracted out the days for which no instruction was provided, i.e., school-wide testing days, the days school closed for inclement weather, absences, etc. and compared the services that she or other educators provided to L.H. As one can see, Mrs. Hope provided L.H. with approximately 40 hours of support over and above what the IEP required. (Affid. of Hope, ¶¶ 33-34).

Finally, the Plaintiffs' argument actually reinforces a conclusion school officials reached in formulating the IEP for 2013-2014: L.H. needs – not merely would benefit from – an alternative curriculum to develop basic academic skills. To the limited extent that L.H. succeeded academically in kindergarten or his two years in first grade, one can only conclude that he did so because the curriculum matched his intellectual capacity; by its more remedial

nature, it incorporates the pre-teaching, re-teaching and repetition that L.H. needs. There is no genuine dispute that the second grade regular education curriculum did not have these opportunities for the over-learning that educators recognize that L.H. needs to master and maintain even very basic concepts. (Affid. of Kendrick, ¶21; T.R. 11: Affid. of Higgs, ¶23; Affid. of Hope, ¶36; Affid. of Hunt, ¶12).

### B. No One Is at Fault.

Through the fault of no one, L.H. was unable to succeed in the second grade. L.H.'s parents, however, seem to rely upon Rowley in support of the notion that school officials are strictly liable under the IDEA for a student's academic progress. Of course, the Supreme Court has set no such impossibly high standard for school districts. To the contrary, Rowley stands for the proposition that a child's IEP team has the duty to prepare a plan "reasonably calculated to enable the child to receive educational benefits." Id. at 200-01.

In L.H.'s case, his IEP team developed an IEP for the 2012-2013 school year exactly as the Rowley court envisioned. When the team was developing L.H.'s goals and objectives, Mrs. Hunt and Ms. Kendrick had serious concerns about whether L.H. would be able to meet the challenging expectations of the second grade regular education curriculum given his present levels of performance. The parents, however, refused to consider an alternative curriculum, much less an alternative placement. Even so, the team agreed to empower Mrs. Hope to modify the curriculum to meet L.H.'s present levels of performance. Rather than ignoring the parents' concerns and violating L.H.'s procedural rights, the team weighed them heavily and embedded in the IEP express modifications that were "reasonably calculated to enable [L.H.] to receive educational benefits." Id. at 200-01.

It is axiomatic that school officials do not have the legal obligation to *make* a child succeed. In <u>Nack v. Orange City School District</u>, 454 F.3d 604 (6th Cir. 2006), the Sixth Circuit considered the claims of parents that their child's lack of academic progress proved that the district had breached its duty to the child. <u>Nack</u>, 454 F.3d at 613. In rejecting this argument, however, the court noted that school officials were highly focused on the student's individual needs and communicated regularly with the parents regarding the child's performance, his homework assignments and other concerns.

In the case at bar, Mrs. Hope searched for ways to help L.H. In addition to collaborating with her colleagues, she communicated with L.H.'s mother, providing her with information and soliciting ideas; records of these communications have been identified and produced as HCDE 04268-04277; 04279-04296; 04298-04303; and 04309. Mrs. Hope would regularly send home work samples and "Week in Review" so L.H.'s parents could track L.H.'s work; these documents have been identified and produced as HCDE 0960-02310. There is no dispute that school officials were diligent in communicating with the parents and working to identify any strategy that might help motivate L.H.

School officials certainly understand that L.H.'s parents hoped for him to succeed; in this vein, both L.H.'s parents and school officials share a common goal. It does not follow, however, that L.H.'s inability to succeed is a failure on the part of school officials to implement L.H.'s IEP. To the contrary, the undisputed evidence of record establishes that school officials worked diligently to meet L.H.'s needs but that L.H.'s capabilities simply did not enable him to benefit from the second grade regular education curriculum. This Defendant is therefore entitled to judgment on this issue as a matter of law.

**IV.    THERE IS NO GENUINE DISPUTE THAT THE IEP FOR 2013-2014 OFFERED L.H. A FREE APPROPRIATE PUBLIC EDUCATION.**

This Defendant offered L.H. an individual education program specifically tailored to his unique educational needs.  Because this IEP offered L.H. a meaningful educational benefit in the least restrictive environment possible, this Defendant is entitled to judgment on this issue as a matter of law.

**A.    The 2013-2014 IEP Offered a Meaningful Educational Benefit to L.H. in View of His Unique Needs.**

The parents would argue that the 2013-2014 IEP was fundamentally flawed in that it would place L.H. in a "segregated" classroom for part of the day learning an alternative curriculum.  They contend that the only appropriate placement for L.H. would be in a regular education classroom pursuing the regular education curriculum.

In making this argument, however, they ignore the very purpose of the Individuals with Disabilities Education Act,

> that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their *unique needs* and prepare them for further education, employment and independent living.

§ 20 U.S.C. § 1400(d)(1)(A)(emphasis added).  As part of its duty to provide a child with disabilities with a free appropriate public education (FAPE), a school district is to develop an individual education program based upon the child's "present levels of academic achievement" and functional performance, including "how the child's disability affects the child's involvement and progress in the regular education curriculum."  20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa).

To address past practices of "warehousing" students with disabilities, the IDEA provides that:

> To the maximum extent *appropriate*, children with
> disabilities…are [to be] educated with children who are not
> disabled, and special classes, separate schooling, or other removal
> of children with disabilities from the regular educational
> environment [should occur] only when the nature or severity of the
> disability of the child is such that education and regular classes
> with the use of supplementary aids and services cannot be
> *satisfactorily achieved*.

20 U.S.C. § 1412(a)(5)(A) (emphasis added).

Tying together these requirements is the injunction that the school district should develop

an individual education program that is calculated to provide the child with a "meaningful

educational benefit. <u>Deal</u>, 392 F.3d at 864-865. The Sixth Circuit reminds school districts that:

> In evaluating whether an educational benefit is meaningful, logic
> dictates that the benefit "must be gauged in relation to a child's
> potential…." Only by considering an individual child's capabilities
> and potentialities may a court determine whether an educational
> benefit provided to that child allows for meaningful advancement.

<u>Id</u>. (Internal citations omitted).

Bearing in mind that education professionals usually have a better insight into a child's

needs *vis-à-vis* his potential,

> a court's review must focus primarily on the district's proposed
> placement, not on the alternative that the family preferred.  The
> proposed placement must be upheld if it was reasonably calculated
> to provide [the disabled child] with educational benefits.

<u>A.U. v. Roane County Board of Education</u>, 501 F. Supp.2d 1134, 1142 (E.D.TN 2007).

While the policy behind the IDEA would certainly prefer that every child with disabilities

be mainstreamed into the regular education setting, courts recognize that mainstreaming is not

appropriate if the disabled student would not benefit from mainstreaming; if any marginal benefit

from mainstreaming would be outweighed by the benefits gained from services that could not feasibly be provided in a non-segregated setting; or the disabled child would be a disruptive force in the mainstream setting. Roncker, 700 F.2d at 1063. The Sixth Circuit has recognized that not every child with a disability can receive an appropriate education in the regular education setting. Ultimately, the district's proposed placement is appropriate if it pursues mainstreaming the maximum extreme *possible*. Doe v. Board of Education of Tullahoma, 9 F.3d 455, 460 (6th Cir. 1993).

In the case at bar, school officials carefully analyzed L.H.'s unique needs and considered his capabilities and potentialities. With several years of academic data and a battery of tests to consider, they were acutely aware of the gap between L.H.'s intellectual capacity and the rigors of the regular education curriculum. While this gap was manageable in the first grade, even then educators realized that L.H. had been pushed almost to his limit; even after two years in the first grade, his actual levels of performance in every area except reading were more typical of kindergarten students. Moreover, the performance levels L.H. displayed at school matched the psychological assessments school officials had prepared at the end of his second year in first grade.

Once in the second grade, L.H. became frustrated by an increasingly demanding curriculum. While his classmates developed their capacity for abstract thought and so advanced in reading, language arts, and mathematics, L.H. remained at kindergarten and early first grade levels of performance. Because he had not mastered the prerequisite skills necessary for success in the second grade, his classmates have left him behind, leaving L.H. isolated.

L.H.'s adaptive behavior was also well below grade level. Whereas the second grade curriculum presupposes that students can follow simple instructions on their own and can keep

themselves on task with minimal distraction, L.H. functioned more like a toddler.  The second grade environment confounded him.

Moreover, L.H.'s time in the second grade regular education curriculum may have actually been detrimental to L.H.'s education.  Neither the regular education curriculum nor its environment lends itself to frequent drilling and repetition of basic skills.  To the contrary, this curriculum and its environment assume that students, having mastered basic concepts, are ready to move on to more challenging academics.

Consequently, not only was L.H. unable to advance past the kindergarten and early first grade levels, but also he lost skills that he may have previously had.  Mrs. Hope noticed in the Spring of 2013 that L.H. no longer grasped alphabetical order.  He also had lost the days of the week and even the basic understanding of the calendar.  Because the second grade curriculum does not drill and repeat these basic concepts, L.H. had forgotten them.

Accordingly, there is no genuine dispute that the IEP that school officials developed for the 2013-2014 school year offered L.H. a meaningful educational benefit in the least restrictive environment appropriate for L.H.  The alternative curriculum would have allowed L.H. to learn at a slower pace, moving on after he had mastered a concept.  This curriculum would also have allowed for intensive drilling and pre-teaching, re-teaching and repetition of concepts, all of which a school psychologist recommended for L.H. in the Spring of 2012.  A CDC room would also have had a much lower student teacher ratio, a factor that would benefit L.H. in light his poorly developed adaptive skills.  In the words of Mrs. Hunt, who has the unique experience of having taught in both the regular education and self-contained settings, a CDC room would have offered L.H. "everything he needs."  (Affid. of Hunt, ¶12).

**B.    The Parents' Arguments to the Contrary Are Simply Wrong.**

In support of their argument that the school district's IEP does not offer L.H. a free appropriate public education, the parents raise several complaints regarding this IEP that are predicated upon misunderstandings of fact or erroneous interpretations of the law. There remains no genuine dispute, however, that the IEP did offer L.H. a meaningful educational benefit.

**1.  Less instruction?**

The parents assert that this IEP offers L.H. less academic instruction than he had at Normal Park and that it fails to account for much of L.H.'s school day. In fact, as explained *supra* at pp. 23-24, this IEP would have had L.H. in the CDC room for three hours of intensive instruction in core academic areas and another half hour of occupational and physical therapy. The remainder of his time would have been in the general education setting working on the general education curriculum with typically developing peers. (Second Affid. of Abernathy, ¶ 8; T.P., p. 822, lines 5-11; Affid. and Report of Kabot, p. 20).

**2.  Low expectations?**

The Plaintiffs also complain that the proposed IEP set unnecessarily low expectations for L.H. and took him off the educational track to graduation. What the parents fail to grasp, however, is that, notwithstanding L.H.'s classroom placement, *his trajectory already had him off of the track to graduation.* Without the prerequisite skills to succeed in the regular education curriculum, L.H. was deriving absolutely no benefit from being in the classroom with typical peers. Based solely upon his present levels of performance, L.H. was already off the regular education track and will remain so until he develops the prerequisite skills necessary to comprehend the most basic academic concepts. Experience demonstrates unequivocally that

L.H. will not develop those prerequisite skills in a regular education setting even with the most intensive supports.

Within this vein, the Plaintiffs apparently believe that any IEP that does not pursue grade level, general education curricular standards, regardless of the child's present levels of performance, is a per se violation of the IDEA. In reaching this faulty conclusion, the parents seem to rely upon 20 U.S.C. § 1414(d)(1)(A)(i)(III)(aa), which provides that an IEP must contain "a statement of measurable annual goals, including academic and functional goals, designed to…meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general curriculum."

The Plaintiffs do not understand the purpose of an IEP. They overlook that the starting point of any IEP must be the child's present levels of performance. 20 U.S.C. § 1414(d)(1)(A)(i)(I). The IEP must explain how the child's disabling condition impedes his or her ability to progress in the general education curriculum. Id. From this starting point, the IEP must incorporate annual goals that are calculated to meet the child's needs *so that* the child may make progress in the general curriculum. 20 U.S.C. § 1414(d)(1)(A)(i)(III)(aa). Clearly, (III) does not require the IEP to pursue standards that the team has already found pursuant to (I) to be unattainable. Instead, (III) requires the IEP to set forth meaningful goals that are calculated to bridge the gap between the child's present levels of performance and where his age peers are performing, all with an eye toward the child's capabilities and potentialities. See Deal, 392 F.3d at 864-865.

The IEP for 2013-2014 met these requirements. From HCDE 0171-0175, the team considered L.H.'s present levels of performance and how they impede L.H.'s successful progress in the general education curriculum. From HCDE 0179-0185, the team considered annual goals

and short term objectives to help L.H. build the prerequisite skills necessary to succeed in the general education curriculum.  From HCDE 0186-0192, the team set forth accommodations that educators should employ in reading, English/language arts, spelling, writing, math and science. Simply stated, this IEP complies with the statutory requirements of the IDEA and the broader policy considerations of <u>Deal</u>.

### 3.  Undue reliance upon "outdated" assessments?

The Plaintiffs also assert that school officials have relied heavily on what they claim to be outdated assessments that merely predict L.H.'s future academic performance instead of what they term "longitudinal" data.[13]  The Plaintiffs apparently fail to understand that L.H.'s entire academic history at Normal Park illustrates his increasing inability to benefit from the regular educational placement.  Mrs. Hunt, Miss Higgs and Mrs. Hope have all noted L.H.'s increasing frustration with the regular education curriculum as it has become more rigorous over time.  All have likewise noted that L.H.'s academic performance seems stuck in the kindergarten or early first grade level, and it has been there over the course of years.  All have noted the lack of prerequisite skills necessary for L.H. to move forward in the regular education curriculum. Contrary to the parents' argument that school officials have not accumulated sufficient longitudinal data regarding L.H.'s performance, they are flooded with it.

Indeed, the parents fail to appreciate the significance of the *several* standardized tests that school officials performed on L.H., including the psychological assessments in the Spring of 2012, the Brigance from the Fall of 2012, the subsequent Brigance from the Spring of 2013, and

---

[13] It is ironic that the parents complain about outdated assessments given that they had a "real problem" with any reassessments and would not consent to one.  (Affid. of Kendrick, ¶16).  In any case, the psychological assessment done by June Cooper in March 2012 remained valid until March of 2015.  <u>Id</u>.

the comparative reading assessments.  These tests did not drive the decisions of school officials; *they confirmed the data that has been collected from the classroom over time.*

### 4.    Extended school year?

The Plaintiffs maintain that the IEP was inadequate in that it failed to offer L.H. more than forty-eight hours of extended school year to prevent further regression of his academic performance.  They also claim that the location of these services, the Dawn School, was inappropriate for L.H. since the Dawn School serves students with emotional disturbances.

The parents' argument rings hollow, however, given that they refused to accept *any* extended school year services and further given they had planned on L.H. spending the summer engaged in fun activities.  (Affid. of Kendrick, ¶25).  That was a rational decision that was theirs to make, but the parents may not now claim that the IEP did not offer sufficient ESY services when they did not avail themselves of anything offered.

With regard to the location of ESY services, the parents never voiced any concern about the Dawn School.  Had they done so, school officials would have explained that the Dawn School is just a location site and that L.H. would have had an ESY program tailored specifically to him.  (Affid. of Kendrick, ¶24).  The parents never raised this question because they had already made plans for how they intended to spend their summer.

### C.    Judge Wall and the Teachers Used the Correct LRE Standard.

On appeal to this Court, the Plaintiffs argue that Judge Wall and L.H.'s teachers both ignored the <u>Roncker</u> standard used by the Sixth Circuit to determine the least restrictive environment in which it is appropriate to educate a child with disabilities.  They contend that failure to follow this standard resulted in an incorrect legal conclusion regarding what was the least restrictive environment appropriate for L.H.

In his Final Order (T.R. 1), Judge Wall did not specifically address the <u>Roncker</u> decision. Instead, he focused on the specific federal regulation, 34 C.F.R. § 300.114(a), from which <u>Roncker</u> flows. He also considered a Fifth Circuit case interpreting this same regulation, <u>J.H. v. Fort Bend. Ind. School Dist</u>., 482 Fed. Appx. 915 (5th Cir. 2012). He did not err in doing so.[14]

Interestingly, the Fifth Circuit actually has a higher standard for moving a child into a more restrictive placement than does the Sixth Circuit. Instead of <u>Roncker</u>'s relatively deferential considerations (whether the disabled student would no longer benefit from mainstreaming; whether any marginal benefit from mainstreaming would be outweighed by the benefits gained from services that could not feasibly be provided in a non-segregated setting; or whether the disabled child would be a disruptive force in the mainstream setting), the Fifth Circuit considers "1) the steps taken by a school to accommodate the disabled child in general education, 2) the extent to which the student receives an educational benefit from general education, and 3) the effect the disabled student has on the general education population." <u>Id</u>. at 918.

Judge Wall borrowed from the Fifth Circuit's higher standard simply to illustrate a point. The child in <u>J.H.</u> had the very same difficulties that L.H. has. As a student with intellectual disabilities, he was increasingly overwhelmed by the general education curriculum despite the efforts of his teachers to accommodate him. <u>Id</u>. at 916. Ultimately, he was receiving no educational benefit from his general education placement. While he was not a disruption to the

---

[14] Note that the debate over the least restrictive environment is actually moot in view of the Plaintiffs' concession that a resource placement would have been appropriate for L.H. The fact that 34 C.F.R. § 300.115(b)(2) envisions that resource placements are offered to support a regular class placement is immaterial. The fact remains that a resource class is not the regular education setting. Per <u>McLaughlin</u>, 320 F.3d at 671-72, the dispute is therefore over methodologies, meaning that the <u>Rowley</u> standard applies. Given that the proposed IEP offered a free, appropriate public education, this Court need not consider this matter further.

rest of his classmates, the record supported the conclusion that the general education setting was no longer appropriate because he was receiving no educational benefit.  Id. at 918-19.

With J.H. as a parallel, Judge Wall worked through the evidence before him and concluded that Normal Park, though L.H.'s zoned school, "just did not work" despite the best efforts of the teachers to educate L.H. in that placement.  (T.R. 1, p. 18).  He then found that "the school district is not required to continue to pursue futile educational strategies just to maintain placement in a neighborhood school."  (Id.).  While he did not invoke Roncker in support of his decision, the law does not require him to point to a case name as if it were a talisman; there is no legitimate argument that Judge Wall followed the IDEA and its implementing regulations.

Likewise, the teachers followed the law in proposing the 2013-2014 IEP.  Their testimony was clear that L.H. was not benefiting from the general education classroom, that he has particular educational needs that cannot be met in a general educational setting, and that these needs can only be met in a CDC setting.  (T.P., p. 239, line 20 – p. 241, line 20; p. 242, line 17 – p. 243, line 5; p. 244, lines 9-16; p. 360, line 20 – p. 362, line 3; p. 467, lines 15-19; p. 493, lines 2-5; p. 494, line 22 – p. 496, line 19; p. 569, line 23 – p. 571, line 6; Affid. of Hope, ¶¶ 36-37; Affid. of Kendrick, ¶¶ 20-22).[15]

Furthermore, L.H. was a disruption to his class.  (T.P. p. 187, line 22 – p. 189, line 14).  In order to mitigate L.H.'s behaviors, Mrs. Hope had to isolate L.H. in the back of Miss Higgs' room where he could have his own space and "cool down" as necessary.  (T.P., p. 207, lines 3-22).  Apparently, these restrictions are still necessary at The Montessori School since L.H. is isolated during the academic day.  (Second Affid. of Levine, Ex. 1).  Frankly, it is unfair to L.H.

---

[15] While the Plaintiffs' experts dispute these conclusions, they did not review the thousands of documents pertaining to L.H.'s education, they did not observe L.H. in the classroom, and they have not considered L.H.'s unique needs as opposed to some imagined profile of students with Down syndrome.

that he has to endure this isolation simply because adults have a prejudice against a CDC classroom.

Notably, the teachers did not recommend that L.H. be in the CDC setting more than absolutely necessary. In view of the IDEA's strong preference that a child be mainstreamed to the maximum extent appropriate, the proposed IEP for 2013-2014 still had him in the general education setting for virtually half of the day. Simply stated, the teachers worked to balance the preference for mainstreaming against L.H.'s documented needs.

As the Sixth Circuit noted in both <u>Roncker</u> and <u>Doe</u>, a school district does not have the obligation to educate a child in the absolutely least restrictive environment. Instead, it must educate in the least restrictive environment that is *appropriate*. The policy of <u>Deal</u> informs school officials about the extent to which mainstreaming for any given child is appropriate; if mainstreaming will not enable the child to pursue independent living, then it is not appropriate. There is no genuine dispute that the general education setting has ceased to be appropriate for L.H.'s core academic instruction in view of his particular needs and that he requires the supports found in a CDC environment in order to pursue independence.

### D. Conclusion.

There is no genuine dispute that the 2013-2014 IEP offered L.H. a free appropriate public education. In developing this IEP, school officials gave careful consideration to L.H.'s present levels of performance, his unique needs, and his potentialities. In view of <u>Deal</u> and its policy of pursuing independence, they then drafted the IEP with an eye toward providing him with a meaningful educational benefit. While the proposed placement was more restrictive than it had been for the 2012-2013 school year, it is no more restrictive than necessary; school officials had years of data leading them to the conclusion that L.H. could not benefit from the regular

education curriculum and needed an alternative curriculum in a comprehensive disability classroom for half the day. This Defendant is therefore entitled to judgment on this issue as a matter of law.

**V.    BECAUSE THE 2013-2014 IEP OFFERED L.H. A MEANINGFUL EDUCATIONAL BENEFIT, THE PARENTS ARE NOT ENTITLED TO REIMBURSEMENT FOR THEIR UNILATERAL PRIVATE PLACEMENT.**

The Plaintiffs claim that, since the proposed IEP removed L.H. from the regular education setting, they had no choice but to reject it, remove L.H. from the Hamilton County Schools, and place L.H. in a private school. They now demand that this Defendant reimburse them for the costs of this placement. Because they cannot support their claim that this Defendant failed to provide L.H. with a meaningful educational benefit, and because they cannot demonstrate that The Montessori School was an appropriate placement, this Defendant is entitled to judgment on this issue as a matter of law.

While this Defendant has adequately addressed this issue in its Motion for Partial Summary Judgment, there are two additional points that illustrate reimbursement would be entirely inappropriate. First, note that the Plaintiffs initially filed for due process on May 5, 2013. (Ex. 10 to this Response: Depo. of D.H., p. 31, lines 9-11). As a result, the "stay put" provision of the IDEA was triggered, meaning that this Defendant could not have changed L.H.'s placement during the pendency of the due process hearing or any subsequent appeal to this Court. 20 U.S.C. § 1415(j). Not only would L.H. have remained at Normal Park but also the Defendant could not have taken him out of the regular education setting any more than the 2012-2013 permitted absent an agreement of the parents. Kuszewski v. Chippewa Valley Sch., 131 F. Supp. 2d 926, 930-31 (E.D. Mich. 2001). Rather than prosecuting this complaint for due

process, however, the Plaintiffs nonsuited that matter on June 15, 2013. (Depo. of D.H., p. 31, lines 12-16).

Second, the mother's deposition testimony explains the reason for this nonsuit. She stated that, in February 2013, when school system officials voiced concerns about L.H.'s placement, she lost confidence in the Defendant and its teachers. (Depo. of D.H., p. 32, lines 17-24). In her view, it would have been "unconscionable" for the Plaintiffs to have left L.H. in the Hamilton County Schools. (Depo. of D.H., p. 33, lines 10-12).

While the Plaintiffs are entitled to their indignation, they are not entitled to act upon it at the Defendant's expense. "Stay put" at the last agreed upon placement exists to protect both parties against the hazards and expenses of unilateral placement. In this case, however, the Plaintiffs knowingly embraced that risk, and they are not entitled to the equitable relief of reimbursement.

The Plaintiffs are not entitled to reimbursement because the proposed IEP for 2013-2014 offered L.H. a free appropriate public education and because, regardless of the IEP, the parents' unilateral placement was improper. In view of these undisputed facts, this Defendant is entitled to judgment on this issue as a matter of law.

## VI. THERE ARE NO GENUINE DISPUTES OF FACT SUPPORTING THE CLAIM THIS DEFENDANT HAS DISCRIMINATED AGAINST L.H. IN VIOLATION OF SECTION 504 OR THE ADA.

As explained in this Defendant's Motion for Partial Summary Judgment, there is no basis for asserting that this Defendant has discriminated against L.H. in violation of Section 504 or the ADA . For the same reasons that this Defendant is entitled to summary judgment on these claims, this Court must deny the Plaintiffs' own motion for summary judgment.

Initially, note that the Plaintiffs have not cited this Court to the correct regulations governing the educational placement of a student with disabilities, much less have they cited this Court to the correct legal standard. This omission is fatal given that all three statutes relevant to the case at bar, Section 504, the ADA and the IDEA, have specific regulations addressing placement issues. For example, 34 C.F.R. § 104.34(a) is the regulation for Section 504 that applies specifically to educational settings. This regulation states that persons with disabilities are to be educated with persons without disabilities "to the maximum extent *appropriate* to the needs of the handicapped person." Id. (Emphasis added). The regulation further provides that a school system "shall place a handicapped person in the regular educational environment operated by the [school system] unless it is demonstrated by the [school system] that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved *satisfactorily*." Id. (Emphasis added).

The regulations under the Americans with Disabilities Act are strikingly similar. 28 C.F.R. § 35.130(d) provides that "a public entity shall administer services, programs, and activities in the most integrated setting *appropriate to the needs of qualified individuals with disabilities*." (Emphasis added). Just as the Section 504 regulations provide, there is special consideration for the setting that is "appropriate to the needs" of the disabled student.

Of course, a substantial aspect of the IDEA pertains to the duty to educate a child in the least restrictive environment. To this point, 34 C.F.R. § 300.114(a)(2) provides that "to the maximum extent *appropriate*, children with disabilities…[must be] educated with children who are non-disabled." (Emphasis added). Subsequently, the regulation provides that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that

education and regular classes with the use of supplementary aids and services cannot be achieved *satisfactorily*." 34 C.F.R. § 300.114(a)(2)(ii) (emphasis added). In the context of educational placement, the IDEA serves the same purpose as Section 504 and the ADA – to ensure that students with disabilities are included in the regular education setting to the maximum extent *appropriate*.

Because all three statutes serve the same purpose with regard to educational placement, the case at bar is therefore substantially different from the case cited by the Plaintiffs, K.M. v. Tustin Unified Sch. Dist., 725 F.3d 1088 (9th Cir. 2013), in which the plaintiffs were asking for benefits and accommodations under the ADA that were over and above the accommodations provided under the IDEA. The Ninth Circuit Court of Appeals carefully analyzed the various regulations under the different federal statutes that were at issue and concluded that, based upon their language, compliance with one regulatory provision did not necessarily operate as compliance with another regulatory provision. Id. at 1101. Where the statutes serve different purposes and their regulations therefore go in different directions, compliance with one does not establish compliance with another.

The Sixth Circuit Court of Appeals has recognized that, in the context of educational placement, the IDEA and Section 504 overlap. Campbell v. Bd. of Educ. of the Centerline Sch. Dist., 58 Fed. Appx. 162, 166 (6th Cir. 2003). Both statutes address the extent to which it is appropriate for a disabled student to be educated with his non-disabled peers. Id. Likewise, since Section 504 and the ADA have similar regulatory provisions with regard to placement, these statutes should be treated the same. S.S. v. E. Ky. Univ., 532 F.3d 445 (6th Cir. 2008).

From this perspective, the Sixth Circuit has recognized that, in order to establish a claim under Section 504 or the ADA for discrimination in assigning an educational placement, a

plaintiff must prove far more than the placement in question failed to provide a free and appropriate public education under the IDEA. Campbell, 58 Fed. Appx. at 166-67  The plaintiff must show, additionally, that the defendants actually discriminated against the student on the basis of his disability; to carry this burden, he must demonstrate that the defendant acted in bad faith and recklessly disregarded the needs of the student. Id. at 167.  The logic for this very heavy burden is obvious – in a discipline such as education in which reasonable minds can differ rather sharply, school officials cannot be burdened with the prospect that the exercise of their sound discretion would ever be tantamount to discrimination.

In their Motion for Summary Judgment, the Plaintiffs do not even assert that school system officials acted in bad faith apart from the unsupported claim that school officials were motivated by a desire to retaliate against L.H.'s mother for her alleged advocacy on behalf of another child with Down syndrome.  The problems with this argument, however, have been discussed thoroughly in this Defendant's Motion for Partial Summary Judgment.

The most obvious problem is causation.  Merely the timing of the teachers' concerns debunks the Plaintiffs' arguments.  School system officials were concerned about L.H.'s placement in March 2012, *more than six months before* the mother's alleged advocacy.  They were concerned about L.H.'s placement in May 2012, *more than four months' before* the mother's alleged advocacy.  They were concerned about L.H.'s likelihood of success in early August to the point that they brought in a lead teacher as a special consultant for intellectual disabilities.  There is no basis from which any trier of fact could infer that the Defendant was motivated by D.H.'s alleged advocacy.

Furthermore, there is absolutely no evidence that this alleged advocacy was an issue for anyone or that the IEP team was even aware of it.  Hanging upon the rankest of speculation, the

Plaintiffs surmise that another child with Down syndrome might have increased costs for Normal Park, thereby angering Ms. Levine. The problem, of course, is that (1) this child never attended Normal Park and (2) no one knows if such a child, had she ever attended Normal Park, would have increased the school's costs. Ms. Levine has testified that she assumes that these costs would have been covered by the State, and no one has said that she is in error.

Additionally, there is no evidence to link any alleged animus from Ms. Levine to the rest of the IEP team. No one even suggests that Mrs. Hope, Miss Higgs, Mrs. Manley, Ms. Kendrick, Ms. Abernathy, or anyone else was aware of or concerned with whatever bad faith may have been in Ms. Levine's heart. Underscoring this point, Dr. Meece, who attended most of the IEP meetings for L.H. during the 2012-2013 school year, has stated unequivocally that *he believes school officials acted in good faith* from a position of ignorance. While Dr. Meece is mistaken about the teachers' so-called ignorance, he is certainly correct regarding their good faith. Judge Wall had the opportunity to observe each school system official testify, and he completely rejected the notion that they were motivated to exert anything short of their best efforts on behalf of L.H.

Likewise, consider the testimony of experts from outside Normal Park. Mrs. Manley, who worked for the Central Office rather than for Ms. Levine, testified that she observed Mrs. Hope working as hard as she could to educate L.H., employing every strategy in an effort to improve this child's performance. She even worked alongside Mrs. Hope to reach L.H. Then there is the testimony of Dr. Kabot, who has opined that Mrs. Hope was actually using many the very same strategies that the Plaintiffs' experts believe are necessary for students with Down syndrome. For her part, she firmly believes that L.H. needs an environment with more structure and support, and she has encouraged the school system to consider such a placement.

Then there are the years of data that show that L.H. was deriving an increasingly less meaningful educational benefit from the regular education setting even with extensive supports, discussed *supra* at pp. 4, 14, and 33-34. Acting in good faith based upon their understanding of L.H.'s unique needs, the teachers rationally concluded that he needed a more restrictive placement where he could develop the prerequisite skills that would enable him to develop independence, to close the achievement gap with his typically developing peers, and hopefully to reenter the regular education setting at some point later in his academic career.

There is simply no evidence that this Defendant or any of its educators were motivated to retaliate against the Plaintiffs or that they acted in bad faith. To the contrary, there is no genuine dispute that they acted in good faith to serve L.H.'s educational needs to the best of their abilities. Because they acted in good faith, the Plaintiffs cannot establish that they discriminated against L.H. in violation of Section 504 or the ADA. This Defendant, therefore, is entitled to judgment on this issue as a matter of law.

## **CONCLUSION**

For the reasons set forth in this Defendant's closing argument during the due process hearing (T.P., pp. 874-88), which is incorporated herein by reference, and for the additional reasons set forth both in this Memorandum of Law and the Memorandum of Law in support of this Defendant's Motion for Partial Summary Judgment, this Court should deny the Plaintiffs' Motion for Summary Judgment and should, instead, grant this Defendant judgment on all issues as a matter of law.

Respectfully submitted

LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC

By: _s/ D. Scott Bennett_____
        D. SCOTT BENNETT – TNBPR: 015988
        MARY C. DECAMP – TNBPR: 027182
        *Attorneys for Defendant Hamilton County*
        *Department of Education*
        Tallan Building, Suite 500
        200 West M.L. King Blvd.
        Chattanooga, TN 37402
        Telephone: (423) 265-0214
        scott.bennett@leitnerfirm.com
        mary.decamp@leitnerfirm.com

## CERTIFICATE OF SERVICE

      I hereby certify that on October 8, 2015, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

        s/ D. Scott Bennett_____
        D. SCOTT BENNETT – TNBPR: 015988
        MARY C. DECAMP – TNBPR: 027182