# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

L.H., a Minor Student,        )
by and through his parents G.H. and    )
D.H. and G.H. and D.H., individually,   )
               )
      **Plaintiffs**       )    **Case No. 1:14-cv-00126**
               )
**vs.**               )    **Judge Curtis L. Collier**
               )
**HAMILTON COUNTY DEPARTMENT**   )    **JURY DEMAND**
**OF EDUCATION,**         )
               )
**and,**              )
               )
**TENNESSEE DEPARTMENT OF**     )
**EDUCATION**           )
               )
      **Defendant**       )

---

## PLAINTIFFS' RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

**PLAINTIFFS** oppose the motion for summary judgment for the following reasons:

## I.  INTRODUCTION

Unlike Plaintiffs, Defendant has not moved for "judgment" upon the administrative record for the IDEA claims. (D.E. 74, Plaintiff's Memorandum). Defendant has only moved for partial summary judgment.[1] Defendant does acknowledge the traditional summary judgment analysis which requires a Court to "view the facts and all reasonable factual inferences in Plaintiffs' favor." See *A.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687 (6th Cir. Tenn. 2013).

---

[1] Plaintiffs addressed the differing standard of review for motions for judgment under IDEA versus summary judgment under Rule 56 (See D.E. 74, p. 4).

However, Defendant only sets forth facts supporting its own position. That is not proper under Rule 56. By its nature, Rule 56 is designed for *undisputed* matters, not a weighing of evidence by the Court akin to a bench trial. The two should not be confused. "To survive summary judgment, Plaintiffs need only rebut, not disprove, [the defendant's] proffered reasons…." *A.C.*, at 705; *see also* Judge Bernice Donald, <u>Trial by Jury or Trial by Motion? Summary Judgment, *Iqbal,* and Employment Discrimination</u>, 57 N.Y.L. Sch. L. Rev. 659+ (2012-2013).

In narrative form, Defendant essentially argues that L.H. made little to no academic progress in four years, that he required a more structured setting of a CDC environment at Red Bank Elementary, and HCDE came to these conclusions, even if wrong, without being deliberately indifferent. However, each of these areas is hotly disputed through evidence—they are not *undisputed*. Rather than require the Court to re-digest competing narratives or paragraphs here, Plaintiffs respectfully incorporate its Memorandum in Support of Motion for Judgment, (D.E. 74).[2] In other words, Defendant's motion is still-borne—at best, it amounts to little more than its own selective gloss upon certain hotly disputed facts.

## II.     SECTION 504 AND TITLE II OF ADA

Defendant merges Section 504, Title II of the ADA, and the First Amendment/1983. But those are not coterminous, so Plaintiffs must begin with 504 and the ADA which, themselves, have a liability standard and a separate damages standard.

---

[2]     For example: (1) L.H. is actually a highly capable student with Down syndrome, *evidenced* in part by his strong progress in first grade, second grade, third grade and fourth grade. (D.E. 74, pp. 14-20)[2]; (2) the need for segregation to Red Bank Elementary arises from outdated beliefs about Down syndrome and incorrect standards for least restrictive environment. (D.E. 74, pp. 21-35); (3) The segregated setting of CDC at Red Bank is unequal, unmonitored, separate, not peer reviewed, and lacking in instruction. (D.E. 74, pp. 35-39); (4) Defendant's beliefs are shaped by persons—Dr. Sue Kabot, Principal Jill Levine, and teachers—who simply lack experience and any training whatsoever in understanding Down syndrome, and will not get it. (D.E. 74, p. 3); and (5)  the "good faith" is contradicted by, *inter alia* Defendant's deliberate *refusal* to listen, and locking L.H.'s IEP participants out of meetings. (e.g., D.E. 45, Entry No. 45, Meece Affidavit).

A.    __LIABILITY__ _STANDARD_

In 2013, Plaintiffs' counsel argued _A.C. v. Shelby County Bd. of Educ._, 711 F.3d 687 (6th Cir. Tenn. 2013), a case establishing that Section 504 and the ADA prohibit schools from retaliating against parents who advocate for their children with special needs by filing reports against the parent to the Department of Children's Services.  In _A.C.,_ Judge Batchelder addressed exhaustively how suspicious timing coupled with challenges to the defendant's stated reasons present triable claims to a jury for retaliation.  If the plaintiff produces evidence to rebut the defendant's explanation, then the addition of the prima facie evidence supports a trial.  _Id_. at 705.

Advocating for special needs children, including one's own, is also protected activity under the First Amendment and Section 1983.  _Wenk v. O'Reilly_, 2015 U.S. App. Lexis 6102 (6th Cir. April 15, 2015); _Jenkins v. Rock Hill Local Sch. Dist._, 513 F.3d 580 (6th Cir. 2008).  Defendant does not argue otherwise, though it seeks to import a "bad faith" or "deliberate indifference" standard into Section 1983 which does not exist.

Defendant also does not argue that segregation of L.H. to Red Bank Elementary with no grades, report cards, or opportunity for diploma is not an "adverse action" that would "chill an ordinary person."  Rather, Defendant simply argues that any claim under Section 504 or Title II requires, first, a denial of FAPE under the IDEA, plus a further showing of "bad faith." (D.E. 70, pp. 11-12).  That is incorrect on two counts.  First, the ADA is broader than both IDEA and Section 504, such that provision of IDEA FAPE does _not_ preclude claims under 504 or ADA.  _K.M. v. Tustin Unified Sch. Dist._, 7255 F.3d 1088, 1097 (9th Cir. 2013); _Miller v. Bd of Educ. of Alberquerque,_ 565 F.3d 1232, 1245-46 (10th Cir. 2009).   Second, as explained under "Damages," below, the so-called "bad faith" or "deliberate indifference" standard is limited to the _damages_ phase, not the liability phase.

Rather than repeat the standards for differential treatment, unequal access, and reasonable modifications, Plaintiffs respectfully directs the Court to its own motion for summary judgment on liability (declaratory relief) under the ADA and Section 504.  (D.E. 74, pp. 51-58).  There, Plaintiffs set forth the liability standards, explain the different or separate benefits, and the focus upon whether the segregated setting was legally *necessary*.[3]

## B.   DAMAGES STANDARD OF DELIBERATE INDIFFERENCE OR BAD FAITH

Defendant's motion rests mostly upon the money damages standard for ADA and Section 504 claims.  It asks the Court to direct a ruling that it did not engage in either bad faith or deliberate indifference to L.H.'s educational needs.[4]  Plaintiffs disagree, noting the standard of "deliberate indifference" is actually knowledge of the child's need, and failure to act upon it.

Defendant wants a finding of "we are not bad people."  But that is not the standard.  For ADA and 504 damages, the majority approach in the Circuits is not intentionality, or maliciousness, but rather "deliberate indifference" in order to effectuate the remedial purposes of Section 504 and Title II of the ADA.  *Prakel v. Indiana*, 2015 U.S. Dist. LEXIS 40123, *54

---

[3]     Succinctly, Plaintiffs explain how Section 504 and Title II of the ADA entitle L.H. to equal educational opportunity, not "different or separate aids, benefits, or services… unless necessary." (Id. at p. 53) (citing 28 C.F.R. 35.130(b)(1)(ii) and 34 C.F.R. 104.4(b)(1)(ii).   Then, Plaintiffs explain how Red Bank Elementary and the CDC alternative curriculum is certainly different or separate—it is not L.H.'s zoned school, it offers him no homework, no report card tracked to any educational standards, no opportunity to even pursue a diploma, and he will simply "age out."  Thus, there is no question this is a *different or separate* benefit.

[4]     Sixth Circuit cases have referenced both, "bad faith or gross misjudgment," *see Campbell v. Bd. of Educ.*, 58 Fed. Appx. 162, 167 (6th Cir. 2003), as well as the "deliberate indifference" standard, *see Hill v. Bradley*, 295 Fed. Appx. 740 (6th Cir. 2008); *Bishop v. Children's Cntr. for Developmental Enrichment*, 2011 U.S. Dist. LEXIS 104663 (S.D. Ohio 2011) (declining to determine the intent required because the result in that case would be the same under either standard). *R.K. v. Bd. of Educ.,* 2014 U.S. Dist. LEXIS 121340 (E.D. Ky. Aug. 28, 2014) (applying deliberate indifference standard); *Nixon v. Greenup County Sch. Dist.*, 890 F. Supp. 2d 753 (E.D. Ky. 2012) (applying deliberate indifference standard and finding factual issues abound with regard to whether and to what extent Defendants failed to comply with the 504 Plan).

4

(S.D. Ind. Mar. 30, 2015). One of the most thorough cases addressing the scope of 504 and the ADA, and the *means rea* for damages is *Mark H. v. Haw. Dep't of Educ.,* 513 F.3d 922 (9th Cir. 2008), cited by *Prakel*. *Mark H.* explains how Section 504 and the ADA themselves require "equal access" and "reasonable accommodations." Thus, a heightened standard risks nullifying these laws.

*Mark H.* says that "intentional discrimination" can be met through "deliberate indifference," which is "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 937. "Thus, a public entity can be liable for damages under §504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Id.*[5] On remand from the Ninth Circuit, the district court in *Mark H.* rejected the school district's argument of lack of "deliberate indifference" because the parents/child provided evidence that the school knew the child needed an autism-specific accommodation and failed to investigate such availability. *Mark H. v. Hamamoto,* 849 F.Supp.2d 990, 1002 (D. H. 2012).

---

[5] The Seventh Circuit, in *Prakel*, agrees, as do the district courts within the Sixth Circuit cited in the footnote above. See also, *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 264 (3rd Cir. 2013) (Section 504 and Title II of the ADA are aimed "not [at] invidious animus, but rather of thoughtlessness and indifference—of benign neglect."); *Liese v. Indian River County Hosp. District*, 701 F.3d 334, 351 (11th Cir. Fla. 2012) (As a result of *knowing the plaintiff's requested accommodation and choosing not to provide it*, the "deliberate *indifference*" standard was met); *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 429 (D. Md. 2014)(A plaintiff is entitled to damages, "even if the violations resulted from mere 'thoughtlessness and indifference' rather than because of any intent to deny Plaintiff's rights."); *Bartless v. New York State Board of Law Examiners,* 156 F.3d 321, 331 (2d Cir. 1998), rev'd on other grounds, 527 U.S. 1031 (1999) ("personal animosity or ill will" is not required); *Nixon v. Greenup County Sch. Dist.*, 890 F.Supp. 2d 753, 757-58 (E.D. Ky 2012) (repeated non-compliance with Section 504 Plan amounted to intentional discrimination or deliberate indifference)

## C.   CAUSAL CONNECTION AND PRETEXT EVIDENCE

Defendant argues Plaintiffs cannot prove bad faith or deliberate indifference to L.H.'s needs. In doing so, Defendant invokes the familiar burden-shifting approach, arguing that L.H. cannot prove "causal connection" and/or pretext.[6] Causal connection and pretext are frequently intertwined and evidence of one can also satisfy the other.[7] Therefore, Plaintiff sets forth evidence of causal connection as well as pretext, below, mindful that at summary judgment a plaintiff can create a triable issue of fact by casting sufficient doubt upon the defendant's own explanations. *Reeves v. Sanderson Plumbing,* 530 U.S. 133 (2000)*; Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).[8]

As background, L.H.'s mother, D.H., advocated for children with Down syndrome to be included as students in general education at Normal Park Museum Magnet school. L.H. was the

---

[6]   Retaliation under Section 504 and the ADA requires a showing that: (1) Plaintiffs engaged in activity protected under Section 504 and the ADA; (2) HCDE knew of this protected activity; (3) HCDE then took adverse action against Plaintiffs; and (4) there was a causal connection between the protected activity and the adverse action. *A.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687 (6th Cir. 2013). "*The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.*" *Id.*

[7]   *Cantrell v. Nissan North America, Inc.*, 145 Fed.Appx. 99, 107 (6th Cir. 2005) (same evidence may satisfy both); *see also, Wooley v. Madison County, Tenn.*, 202 F.Supp.2d 836, 848 (W.D. Tenn. 2002) (the same evidence the plaintiff offered to establish causation as part of the plaintiff's prima facie case was also sufficient to establish pretext).

[8]   This inferential model often turns upon disbelief of the Defendant's stated reasons, including the well-traveled phrase "suspicion of mendacity." In *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), the Supreme Court explained:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

*Hicks*, 509 U.S. at 511.

6

first child ever enrolled and, based upon his success, D.H. endorsed other children with Down syndrome, like Isabella from Knoxville, to attend the school too.  (See Decl. of D.H., ¶¶ 4-6, attached as **Exhibit A**; Decl. of D.T., attached as **Exhibit F**).  After advocating for Isabella in September of 2012, three rapid changes occurred:  (1) in October, L.H.'s teacher began teaching him on kindergarten level (two grades below) without informing the parents; (2) in November 2012, L.H.'s aide was reprimanded and subsequently dismissed for speaking to D.H. about an accommodation; and (3) in February of 2013, the principal advised the parents that L.H. had suddenly "hit a wall" with his learning and would need to be moved out of the school to Red Bank Elementary.

To prevent her son's removal, D.H. brought in her own Child Development Expert, a professor from UTC, Dr. Darrell Meece, who knew L.H. very well.  The *idea* was to explain how L.H. learned, and how curriculum could be modified for him to succeed in regular education. Dr. Meece was extraordinarily well positioned to help, as he not only teaches in the School of Education, but holds a Ph.D. in Early Childhood Education and Statistics.  But beyond academics, he knew L.H. intimately as his Cub Scout leader, little league baseball coach, neighbor down the street, one who has spent at least eight overnight campouts with him, and one who has attended parties and playgroups with L.H.  (R. 45, Entry No. 45, Meece Affidavit, p. 2). Dr. Meece also knows Normal Park Museum Magnet intimately, having spent "hundreds of hours in the school as volunteer." (*Id.*)  Plaintiffs' search of all special education decisions in the country yields no expert in child development who *also* knows the child in question so intimately and personally, as well as the school itself.  It may be fairly said that Dr. Meece is the educational "unicorn," in comparison to the typical parent who can find herself overwhelmed by the sheer resources of school personnel.

Dr. Meece was invited by D.H. to attend the IEP meetings for L.H., and he attended multiple meetings. (Meece Affidavit, p. 5). Dr. Meece also took issue with NPMM's proposed actions. Instead of L.H. being cast poorly in terms of his intelligence and behavior with respect to non-disabled peers, Dr. Meece explained that, in relationship to children with intellectual disabilities, L.H. is "a high performing child with Down syndrome" in cognitive skills, communication, social skills, and adaptive behavior. (Meece Affidavit, p. 2). This, of course, fought with sending him away to an alternative school where he has no access to grades, progress monitoring, modified curriculum, or opportunity for diploma.

But instead of amending their ways, or at least learning how to modify curriculum, Plaintiffs contend that NPPM became threatened, at times altering the evidence or at least engaging in gross "spinning" to meet its own end of removing L.H. from the school entirely (and thus eliminating D.H. and her advocacy for L.H. and others with Down syndrome). And it brought in an autism expert, Sue Kabot, who has no knowledge whatsoever of the correct process for determining placement.

That is not simply a supposition. Below, Plaintiffs set forth *evidence* from which deliberate indifference to L.H.'s ability to remain in the general education classroom with appropriate accommodations can be inferred.

1.   <u>**Temporal Proximity (Timing)**</u>

In May of 2012, eleven HCDE employees unanimously agreed that L.H. was prepared for eight IEP goals tied to the second grade curriculum. Thus, L.H. began second grade in the fall of 2012.

8

In September 2012, D.H. advocated at an IEP meeting for another child with Down syndrome named Isabella to enter NPMM and be in the general education classroom (Decl. of D.H., ¶ 6).

In October, L.H.'s teacher began teaching him on kindergarten level (two grades below) without ever informing L.H.'s parents or calling an IEP meeting.  (Hope Trans. 97; 116).[9]

In November 2012, D.H. spoke to L.H.'s classroom aide (Ms. Sutherland) about an accommodation for L.H.'s spelling tests (spelling aloud).  Behind the scenes, the teacher, Ms. Hope, wrote to special educator Jeanne Manley:   "See below—this concerns me.   I have reviewed communication protocol with his assistant numerous times."  (Levine depo., p. 77, Ex. 5, relevant portions attached as **Exhibit B**).  Ms. Sutherland was then reprimanded for speaking to D.H. about an accommodation and soon thereafter she was escorted off of campus and transferred away from L.H. (Levine depo, pp. 68-69; 77-78).

In February of 2013, at the next IEP meeting for L.H., NPMM's principal, Jill Levine, claimed L.H. had "hit a wall" and that CDC placement at Red Bank Elementary was necessary. (D.E. 45, Ex. 20, Kendrick Aff., ¶ 13); (Levine depo., p. 81).  This rapid succession of events after D.H. advocated for another child with Down syndrome—dropping L.H. two grades without telling parents (one month), removing his classroom aid (two months), and then claiming he "hit a wall" and must be moved to a totally different school (five months), *is* evidence which allows the inference of causal connection. *A.C.*, 711 F.3d 687, 699 (6th Cir. 2013); (Decl. of D.H., ¶ 7).

---

[9]    While doing so, Ms. Hope reported to the parents, until January 2013, that L.H. was on target to meet his academic IEP goals tied to the *second* grade curriculum (D.E 45, Entries 3; 4, First and Second Quarter Progress Reports 2012-2013).

9

## 2.   Gross Dissembling:  Years of Good Progress Have Now Become "Four Years of No Progress"

In May of 2012, L.H. was considered for advancement to the second grade.  At his IEP meeting, the entire IEP team, including those members from HCDE, agreed that L.H. would be placed in the general education classroom at NPMM for his second grade year (2012-2013 IEP). This included the judgment of Jill Levine.  (Levine depo, pp. 27-28).

In Plaintiffs' Memorandum in Support of Motion for Judgment, (D.E. 74), Plaintiffs address the data of L.H.'s strong first grade performance (see p. 16), then his strong second grade performance for the first two semesters to the point of segregation (p. 18), and even his subsequent third and fourth grade strong performance in private school.

In spite of this data, HCDE asks the Court to make a mandatory and opposite inference at summary judgment—that L.H. had been failing to meet his goals and that *four* years of data shows this. (D.E. 70, pp. 13-14; 23).  That is clearly pretextual.  Plaintiffs have cited this Court to the report cards and progress reports from HCDE year after year showing L.H. was on target to meet goals and was making academic gains.  Plaintiffs have also cited the Court to how L.H. is entitled to modified curriculum, not an "on par" standard of typical peers.[10]  So, how can HCDE plausibly make this claim at summary judgment?

---

[10]    *See* Plaintiffs' Memorandum in Support of Motion for Judgment, D.E. 74, Section V.A.2.b., "On Par" or "Rigorous" Standard to Remain in General Education Classroom is Incorrect); *see also Conklin v. Anne Arundel County Bd. of Educ.*, 946 F.2d 306 (4th Cir. 1991) (recognizing that some children, due to the extent of their disabilities, will never be able to perform at grade level and will require several years to achieve what would be to a nondisabled child a year's worth of progress); and *L.F. v. Houston Indep. Sch. Dist.*, 459 Fed. Appx. 358 (5th Cir. 2012, *unpublished*), *cert. denied*, 133 S. Ct. 248 (2012) ("although [the student] consistently performed at least one grade level below her peers, the IEP listed goals, specific objectives, and evaluation methods required [for her] to improve").

It cannot, at least not without fudging or changing the evidence. For example, Ms. Hope swore to the Administrative Law Judge in paragraph 7 of an affidavit that L.H.'s progress report for the second nine weeks of his second grade year reflected his lack of prerequisite skills and inability to complete his goals. (De. 45, Ex. 7, Hope Aff. ¶ 7). That is simply a mistruth. (See D.E. 45, Ex. 4, Second Quarter Progress Report).[11]

Moreover, if it were actually true that L.H. had not made any academic progress across four years, and could not even meet his IEP goals, then HCDE would have denied FAPE to L.H. for four years. In other words, pulling on this thread unravels the whole educational cloth. Were this so, HCDE would have been required to call an IEP meeting to discuss his failures, change his goals, work on different strategies, change teachers, etc. *See, e.g.,* 34 CFR 300.324 (b)(ii)(A) (explaining that if a student fails to make progress within a reasonable period of time, the district must convene an IEP meeting).[12] Had this been a FAPE case of denial of adequate education for

---

[11]    Much other evidence exists too of L.H.'s strong performance, but Plaintiffs are limited in space. As Plaintiffs' Memorandum shows in detail, L.H. *did* make tremendous progress, with HCDE officials all signing off in agreement in May 2012 that he was ready for second grade in the general education classroom as the entire team agreed he was reading on grade level for first grade at the time. (D.E. 74, Memo, pp. 16-19; D.E. 45, Ex. 2, 2012-2013 IEP). And while HCDE now claims that Spring 2012 psychological testing confirms L.H. needs to be in the CDC classroom, that very testing was available and was used by HCDE in developing the 2012-2013 IEP placing L.H. in the general education classroom. (2012-2013 IEP). That very testing also supports L.H.'s inclusion as it shows the following scores for L.H.: in Reading, a 96 out of a mean of 100; in broad reading composite, an 82 out of a mean of 100; in spelling, a 75 out of a mean of 100; in writing, a 78 out of a mean of 100; and, in academic skills, a 76 out of a mean of 100. (D.E. 45, Ex. 6, 2012 Psychoeducational Testing, Hyde 00618).

[12]    A district's continuation of inadequate services will almost certainly be regarded as a denial of FAPE. *See, e.g., District of Columbia Pub. Schs.*, 49 IDELR 267 (D.D.C. 2008) (Appx. 1) (noting that a student's present levels of performance remained stagnant for several years); *Unionville-Chadds Ford Sch. Dist.*, 47 IDELR 280 (SEA PA 2007) (Appx. 2) (finding that a district should have addressed a child's reading deficiencies when it became apparent that the student was not making any progress); and *Department of Educ., State of Hawaii*, 47 IDELR 238 (SEA HI 2007) (Appx. 3) (criticizing the ED's decision to continue an ineffective reading program despite the student's lack of progress over a three-year period).

11

four years, HCDE would have almost certainly trotted out the report cards and progress reports to show otherwise.  It simply cannot have it both ways.

### 3. <u>Dissembling:  Claiming "No Memory" of D.H.'s Advocacy</u>

Ms. Levine is committed to her defense that segregation of L.H. was proper—to a fault. In Defendant's motion for summary judgment, Levine now claims she has "no memory" of D.H.'s advocacy for another child with Down syndrome named Isabella and, therefore, she could not be motivated by D.H.'s advocacy or any desire to keep children with Down syndrome out of the high-performing school.

The proof supports a different inference.[13]  After the September 2012 IEP meeting, D.H. emailed Ms. Levine *regarding her advocacy for Isabella*. (Decl. of D.H., Ex. 1).  D.H. wrote, in an email titled "ADVOCACY":  "*Jill, I hope you **understand my advocacy for Isabella**, and any other child who has an opportunity to come to NPMM. YOUR school is the reason Luka will have a future and the reason that we have a "normal" life, filled with good friends and great activities and complete acceptance. I would want this for every child.*" (*Id.*).

Levine read this email because she responded to it:  **"*Deborah, I do understand your advocacy,*** *and I feel that [Isabella's mother] definitely needs some support.  She is fortunate to have you!  We are both in a tough position because your child is also at our school, and I feel that there is a high level of mutual respect between the two of us.*"  (*Id.*).[14]  While that email

---

[13]     Isabella was not allowed to attend NPMM as a student—she, too, was sent to CDC setting.  Thus, contrary to Defendant's implication, she was not a student.  (D.E. 70, p. 21 (citing Affid. of Levine)).

[14]     In the event HCDE claims this email was not produced, it was not produced by HCDE *either*. Regardless, Plaintiffs had no idea that Jill Levine would feign a "lack of memory" about D.H.'s advocacy; thus, the email is rebuttal evidence which requires no prior production.

12

itself is pleasant, its purpose here is to rebut. Moreover, as shown below, the upcoming IEP meetings became hostile.

### 4. Adversarial IEP Meetings: Ganging Up Mentality, Closed Doors, and "Us Versus Them"

IEP meetings are supposed to be collaborative. But Dr. Meece, who began attending in March of 2013, describes them as having an "us versus them" attitudinal bias. (Meece Aff., p. 5). Apparently threatened by the advocacy, HCDE would gang up at these IEP meetings, sending in "three to four administrators from the HCDE central office." (*Id.*). Then, prior to each meeting, "11-12 HCDE personnel would meet and confer behind a locked door for 15 to 20 minutes, before allowing other team members to join the meeting." (*Id.*) Then, as if a mediation or an *adversarial setting,* HCDE provided what it termed an "impartial facilitator" or "neutral person," acknowledging the sides were anything but "impartial" or "neutral." (*Id.*); (Decl. of D.H., ¶ 8).[15] While "preparation" might be normal, holding meetings with a locked door with school officials but not the parents is anything but.

### 5. Fictitious "Hit A Wall" Phenomenon

Plaintiffs incorporate the discussion beginning at page 21 of their Memorandum in Support of Judgment concerning the falsity of the "hit a wall" phenomenon. Closely tied to the temporal proximity evidence, above, Plaintiffs have adduced strong expert testimony that no such "wall" even exists—much like a glass "ceiling," it is an invention to keep a child down. As Dr. Buckley, the Founder of Down Syndrome International explains, "[t]here is simply no ceiling, plateau, wall, or fixed point in elementary school" for Down syndrome and learning. (D.E. 74-1, Buckley Affidavit, p. 3). It is a pretext.

---

[15]   Notably, this defeats HCDE's argument that Plaintiffs "eggs" are all in Jill Levine's basket. Plaintiffs advocacy for her son is well known to all members, including Levine and Kendrick. Moreover, Jill Levine was involved in decisions about both Isabella as well as L.H.

### 6.  **Dropping L.H. Two Grade Levels Without Informing Parents**

Plaintiffs incorporate the discussion at page 33 of their Memorandum in Support of Judgment.  There, Plaintiffs address how HCDE dropped L.H. "two grades"—back to kindergarten *without holding an IEP meeting which would alert the parents.*  (Hope, Trans. 97, 116).  As HCDE's inclusion trainer states, this is simply not permissible. (Voss depo, p. 30, relevant portions attached as **Exhibit C**).  The available inference to Plaintiffs is that this was done to keep the parents in the dark, so that HCDE could say L.H. was not "capable."  This evidence goes to illegal motive—changing grade levels *without parents' knowledge* precisely because they are active at IEP meetings (and obviously would disagree).

### 6.  **Pattern Evidence of Segregation Kids with Down Syndrome to Red Bank**

L.H. is not alone.  Another child with Down syndrome, I.L., for whom L.H.'s mother advocated, was *also* sent to Red Bank's CDC program instead of even being given an opportunity at general education at Normal Park—or given services *at her neighborhood school.* (See Decl. Taylor, ¶ 6).

### 7.  **Using An Autism Expert Who Addresses Placement Before Supports and Services**

In what can only be described as reactive thinking, on April 9, 2013, HCDE obtained a "report" from an Autism expert named Sue Kabot. (D.E. 45, Ex. 25, Kabot Autism Consortium Consultation Form).  Under IDEA, a child's placement must be based upon the IEP. 34 C.F.R. 300.116(b)(2).  This of course requires consideration of all supports and services to support the child *in general education.*  Reversing the order by considering placement first, or "shoehorning" a child into a particular placement, is illegal.  Dr. Kabot's own writing does precisely that.  At page 3 of her report, she writes:  "It does not seem that Luca is making steady progress in his current learning environment.  Other **placements** should be considered by the IEP team to

14

determine whether there are other supports, services, and placements that would allow him to be more independent and successful." (D.E. 45, Ex. 25, Kabot Consultation Form, p. 3). This is backward thinking—pick the placement first, then go after supports. It ends up supporting a separatist environment based upon biases of educators, not the least restrictive environment.

### 8. A Framework Designed to Segregate

Consistently, Dr. Meece observed that HCDE seemed to frame all discussions "*toward a CDC setting from the very beginning of the team meeting.*" (Meece Affidavit, p. 6). He states that in October of 2012, one month after D.H.'s advocacy for another child with Down syndrome, the principal, Jill Levine, had already visited Red Bank's CDC program and decried it the "perfect place for Luka." (*Id*).

Others stated that the regular education classroom—the mantle of least restrictive environment—was a "waste of time." (*Id.*) And Levine expressed her stern opinion, aloud, that "Normal Park is not Luka's least restrictive environment" before the IEP team even discussed his present levels of performance or supplemental aids and services. (*Id.*) By contrast, Dr. Meece noted that "every one of the special education professionals" indicated that L.H. was making progress—including "great progress," "wonderful progress," "good progress," "wonderful," and "does a great job." (*Id.*)

This shows a motive to remove L.H. *notwithstanding the evidence* of his true abilities, permitting the inference that *D.H. and her advocacy*, not L.H.'s actual abilities, was the motivation for the segregation. Why would that even matter? It shouldn't, of course, but NPPM is known as a *high achieving school* and the entrée of children with Down syndrome would inevitably require more intensive supports and lower standardized test scores.

### 9.    Intentionally Downgrading L.H.'s Standardized Test Score

Dr. Meece also described HCDE as "lowering" L.H.'s score on the single appropriate testing measure used for L.H.:  the "Kaufman Assessment Battery for Children-2 (KABC-2)." (Meece Affidavit, p. 7).  As Dr. Meece states, this gives rise to two possible inferences:  at best, "sloppiness," but, **"at worst, it is an indication of intentional obfuscation of the manner in which the assessment was conducted."** (*Id.* at p. 9) (emphasis in original).  Moreover, HCDE's finding that L.H.'s percentile ranking is "<1" is "mathematically impossible."[16] (*Id.*).  Dr. Meece even advised the team that a "visual processing" score for a child with visual impairments cannot bring L.H. down overall. (*Id.*)  Dr. Meece explains, in summary, that L.H.'s "overall score was retroactively lowered following expression of my belief that Luka actually performed quite well." (*Id.* at p. 11).  Plaintiffs are entitled to the strongest *possible* inference at summary judgment—intentional manipulation of scores to justify a design to segregate him.

### 10.    Deliberate Indifference to Modifications of Curriculum

Plaintiffs respectfully incorporate pages 26-28 of their motion for judgment. (D.E. 74). There, Plaintiffs show how HCDE knows, full well, that modifications to curriculum are appropriate for inclusion.  At page 26, Plaintiffs use HCDE's own trainer, Mary Ann Voss, who illustrates that even a *middle school* student with a disability may be recognizing a triangle, while non-disabled peers are working on the *angles* of a triangle.  (*Id.*, p. 26; training slide illustration).

Levine did not object outright when shown this example, but claimed it was "a very poor example." (See D.E. 74, p. 27).  Then she, and others too, insisted upon a "typical" peer standard.  As Dr. Meece and others pointed out, L.H is *not* a "typical second grader," he is a

---

[16]    The Court will note that, even at summary judgment, Defendant repeats the 1% refrain, as if this is undisputed.  It is not.

second grader who has Down syndrome. Additionally, expecting him to perform "second grade *curriculum*" is incorrect; rather, the child must work toward his/her IEP goals. (Meece Aff, 27).

### 10. Falsely Calling L.H. a "Toddler" to Justify Segregation

Perhaps most insulting, and false, members of the IEP team called L.H. a "toddler" in terms of behavior—as if he were a 2 or 3 year old. (*Id.* at p. 13). Dr. Meece explains there is no *evidence or measurement* to support a "toddler meme," and it is used as a "pejorative," in order "to degrade Luka and give the impression that he is infantile." (*Id.* at p. 14). A toddler, of course, is someone beginning to walk—not a nine year old boy who has successfully completed an entire year of first grade in a regular education classroom.

### 11. Exaggerating L.H.'s Deficits, Ignoring His Assets

HCDE twists data too—in an outcome determinative way. While denigrating L.H. as "<1" and stating he is a "toddler" with behavior problems, the assets were ignored: Such as high performing child with Down syndrome, caring and involved parents, progressive neighborhood, strong peer relationships at NPMM, good socio-economic status, and enrichment opportunities at NPMM were ignored. (Meece Affidavit, p. 18).

Dr. Meece rhetorically asks the question which Plaintiffs' counsel, too, asks himself: "If inclusion cannot work for a child with *this list of assets in every important context,* then where could it possibly work for a child with an Intellectual Disability in Hamilton County?" (*Id.*)

### 12. "No Time" for L.H. at a Magnet School Like Normal Park

Dr. Meece also addressed how the principal, Jill Levine, remarked that there was not time in the "museum magnet curriculum" for a child like L.H. (Meece Affidavit, p. 26). This belief is simply rank prejudice—and when Levine was questioned how the enrichment at NPMM could not possibly help L.H., Levine directed Dr. Meece to "the school web page." (*Id*) As Dr.

17

Meece states, NPMM and Ms. Levine cannot create their own "schools" or "strategies" for high-achieving children—"those" children, but not "these" children—because NPMM is a *public* school where *every* child in its zone, disabled or not, has a civil right to a free appropriate public education. (*Id.* at p. 27). They cannot send off "undesirables" for matters of convenience.

### 13. <u>Indifference to Harming L.H. Emotionally</u>

In a new affidavit, Dr. Sue Kabot has asserted that inclusion is not substantially accepted. She is simply wrong, and in any event she may not argue about the law. Least Restrictive Environment to the maximum extent appropriate is the law; as Plaintiff pointed out at page 28 of its Memorandum (D.E. 74), Congress reauthorized the ADA with *"findings"* that "30 years of research and experience has demonstrated" the benefits of Least Restrictive Environment. (D.E. 74, p. 8). Thus, Kabot, who hails from a segregated facility and has little to no contemporary experience with Down syndrome, may not claim otherwise.

Indeed, L.H. enjoyed *four years* of making friends with non-disabled peers in his neighborhood school. He would have benefitted tremendously from this type of peer interaction. (Meece Affidavit, p. 25). While Dr. Meece acknowledges that a CDC classroom can be best for some profoundly disabled children at the far end of the educational continuum, L.H. would be harmed. (*Id.* at p. 26). Dr. Meece believes any malbehavior would be exacerbated there, L.H. would not be able to form and maintain relationships with other children as well, and he would be more at risk of stereotyping and bullying behaviors. (*Id.*). Dr. Meece was right there, attending the IEP meetings, a person with PhD knowledge of child development, and intimate knowledge of L.H.—but his opinions were rejected.

### D. <u>DEFENDANT'S EXHAUSTION ARGUMENT HAS BEEN REJECTED</u>

Defendant may not raise issues already decided, as if they have not been decided.

Defendant already argued lack of exhaustion when Plaintiff moved to amend to add the retaliation claims. (D.E. 54). Plaintiffs responded (D.E. 56) and this Honorable Court issued an Order ruling that Defendant failed to show Plaintiffs' prior due process hearing was insufficient for purposes of exhaustion for Plaintiffs' retaliation claims and therefore permitted Plaintiffs to add the retaliation claims. (D.E. 63).[17] There is no "second bite."[18]

## IV. DEFENDANT'S REMAINING ARGUMENTS

Defendant makes a handful of other arguments; (A) that it has no "policy" of retaliation for Plaintiff's First Amendment and Section 1983 claims[19]; (B) that predetermination under IDEA has not been exhausted at the due process hearing; (C) that Montessori is not appropriate; and (D) an unpled Mt. Healthy argument. Each is addressed in turn.

## A. FIRST AMENDMENT AND SECTION 1983: CUSTOM OR POLICY

The elements of a first amendment action against a school system by a parent are: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Wenk*, 783 F.3d at 593.

---

[17]    Defendant HCDE also previously moved to dismiss Plaintiffs' ADA and 504 claims in their entirety also asserting failure to exhaust at due process, which this Court properly denied. (D.E. 48; 49).

[18]    Solely out of precaution, Plaintiffs fully incorporate their exhaustive previous briefings on this issue (D.E. 23; 31; 40; 44; 56). The *Fry v. Napoleon Community Schools*, cited by Defendant, had not been issued at the time. However, in *Fry,* the parents did not engage in due process at all and the issue concerned the entirely dissimilar issue of use of a service dog.

[19]    Section 1983 does not apply to the 504 and ADA claims.

Defendant HCDE argues that it does not have a retaliatory policy. (D.E. 70, pp. 18-19). This seems a straw argument, as if a school would *ever* have a literal "policy" of retaliation.[20] Even though a policy is not even required, see footnote above, Defendant actually *does* have an unwritten practice, "policy," or custom of not serving the needs of students with intellectual disabilities in their least restrictive environment. One such example is the other child with Down syndrome, I.L. (See Decl. Taylor, Ex. F).

Moreover, on a broader scale, Dr. Meece, who is also qualified as a statistician, explains the alarming statistical patterns of segregation of children in Hamilton County in comparison to national averages. (Meece Affidavit, p. 18). It is across-the-board of ages. (*Id.*) Thus, he concludes: "**This is unequivocal evidence of systematic aberration in the educational placements of children with Intellectual Disabilities in Hamilton County Schools compared to the rest of the nation.**" (*Id.* at p. 19) (emphasis in original).

While the Tennessee Department of Education has settled its dispute with L.H., the statistics at NPMM, as reported by NPMM to HCDE and included on the Tennessee Department of Education's website, show under Levine's helm, the percentage of students with disabilities in placements at NPMM is much lower than the percentage of students with disabilities in Hamilton County. It has continued to decline year after year while increasing throughout Hamilton County, the State and the Nation. This chart reflects that publicly available information:

| Disabled Student Sub-Group | 2008-2009 | 2009-2010 | 2010-2011 | 2011-2012 | 2012-2013 |
|---|---|---|---|---|---|
| NPMM | 11.3% | 10.2% | 8.7% | 8.2% | 7.4% |
| Hamilton | 19.3% | 19.3% | 19.7% | 20.2% | 18.5% |

---

[20] Case law has long rejected the requirement of a formal policy, as "custom or usage" suffices, *St. Louis v. Praprotnik,* 485 U.S. 112 (1988), as does a decision made by a single official without regard to any "policy" if the decision was made pursuant to that official's decision-making authority. *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986).

| County | | | | | |
|---|---|---|---|---|---|
| All Tennessee Public Schools | 12.0% | 12.0% | 12.0% | 12.5% | 12.8% |
| All U.S. Public Schools | 12.3% | 12.5% | 12.8% | 12.9% | 13.0% |

(See Decl. of D.H., ¶ 9).

While HCDE argues that these statistics cannot be explained without an "expert statistician," Dr. Meece *is* such an expert statistician. "Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group, can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Conner v. State Farm Mut. Auto. Ins. Co.*, 273 Fed. Appx. 438 (6th Cir. 2008)**.**

Moreover, Jill Levine *is* the principal of NPMM. That makes her the highest ranking authority at NPMM. Levine herself even testified regarding placement decisions of her students, explaining while she meets with teachers and parents and reviews work, "I have  - - I make the final decision on that." (Levine depo., p. 26). Thus, Levine has admitted final authority.

Defendant wishes to posit Margaret Abernathy as the sole decision-maker. While Abernathy was certainly complicit,[21] she was hardly the sole decision-maker or even present much of the time.[22] But even if she were, Dr. Meece brought the problems to Abernathy's

---

[21]     When Dr. Meece advised Ms. Abernathy in an IEP meeting of potential due process violations that could be corrected in a due process hearing, he alleges Ms. Abernathy responded "I don't know that they would [appeal.]"  (D.E. 45, Entry No. 45, Meece Aff, p. 5)

[22]     During *any* IEP meeting, the school is required to have certain members present—a general education teacher, special education teacher, person capable of reviewing test results, and a representative of the local education agency (LEA) knowledgeable of the resources of the district and qualified to provide those, among others.  34 C.F.R. § 300.321(a)(4)(ii)&(iii).  In the due process case, Ms. Abernathy testified that February 2013 was the first IEP meeting for L.H. she was called to attend and that she attended that meeting at Levine and Kendrick's requests.  (Abernathy, Trans. pp. 505-06).  Abernathy explained while she is capable of attending any IEP meeting at any school in the district, she only goes to certain meetings to check compliance of staff members or she attends only if a staff member or parent has requested her presence

attention, explaining that parents too, and a hearing officer ultimately, would be involved in placement decisions. (Meece Affidavit)

## B.    <u>IDEA AND PREDETERMINATION</u>

Defendant HCDE next argues Plaintiffs did not raise the issue of predetermination in the underlying due process hearing.  This makes little sense.  Plaintiffs, who were *pro se* at due process, *did* assert the issue of predetermination in their due process filing.  In fact, the Due Process Request Form itself states in the first paragraph:

> NPPM's claim L.H. has "hit a wall" and is unable to progress in the curriculum. However, **when this was "decided" in January there were no meetings held to discuss additional supplementary aides and services or various educational strategies that would improve L.H.'s progress during the remainder of the school year.**

(D.E. 45, Entry No. 82, Due Process Hearing Request Form).    The magic word "predetermination" need not appear.  *See e.g. Brown v. Dist. 299 - Chi. Pub. Schs*, 762 F. Supp. 2d 1076, 1085 (N.D. Ill. 2010) (parents do not have to list claims with specificity just present the issue in the underlying due process).  Moreover, Dr. Meece's Affidavit, filed in the underlying due process, devoted an entire section to this topic entitled: "The IEP Meetings were Not Collaborative and were Based on a **Predetermination of Placement**."  (D.E. 45, Entry No. 45, Affidavit of Dr. Meece). [23]

---

specifically.  (Abernathy, Trans. Pp. 505-07).  In fact, Abernathy, the person whom on summary judgment HCDE now misleadingly represents to this Court as the "only" decision-maker in the HCDE with regards to placement, was not even at L.H.'s May 2012 IEP meeting in which the 2012-2013 IEP was formulated and signed off on by Willeata Kendrick as the "LEA representative" agreeing that L.H.'s placement would be the general education second grade classroom.

[23]    And, in the ultimate "gotcha," it was HCDE who filed a Motion in Limine to Exclude all References to Predetermination on the grounds that the word "predetermination" was not plead.    (D.E. 45, Entry No. 29, HCDE's Motion in Limine to Exclude References to Predetermination).  The Administrative Law Judge granted HCDE's Motion in spite of the *pro se* parents and the due process request form.  (D.E. 45, Entry No. 19, Order Granting Motions in

As a last resort, Defendant claims the evidence will not support predetermination. Again, however, Defendant merely presents the facts as if they are undisputed—as if hours of IEP meetings, alone, means lack of predetermination. This notion of hours spent was rejected in *Deal v. Hamilton County Bd of Ed,* 392 F.3d 840 (6th Cir. 2004) (parents attended IEP meetings but school still predetermined child's educational program). Moreover, as Dr. Meece explained in his Affidavit, at every meeting, there were between 11-12 HCDE educators including the principal and four to five members from Central Office who were present prior to the start of L.H.'s IEP meetings behind closed doors for approximately 15-20 while Dr. Meece and L.H.'s family were kept outside. (D.E. 45, Entry 45, Meece Aff. Section I.C., p. 5). While Levine's most recent affidavit attempts to spin these pre-meetings as educators who just arrived and were "waiting," (D.E. 70, HCDE Memo in Support of MSJ, p. 27 (citing Affid. of Levine, ¶ 10)), the locked door and subsequent interactions allow an entirely different inference.[24]

In addition, Jill Levine, NPPM Principal, stated in October 2012, well before the IEP meetings in 2013, that she had already visited the CDC classroom at Red Bank and described it as "the perfect place for L.H." (D.E. 45, Entry No. 45, Meece Aff., p. 6). This was reconfirmed in later IEP meetings, the first of which occurred in February 2013, when Levine, "stated frankly, 'I believe L.H. has hit a wall,' meaning that he was not going to make any additional academic progress in the regular education setting." (D.E. 45, Ex. 20, Kendrick, Aff., ¶ 14).[25]

---

Limine). That sleight may have worked on the Administrative Law Judge, but it should not follow here.

[24]    Indeed, D.H.'s mother testified that they were never late to a meeting, always politely five to ten minutes early, and the entire IEP team meeting members from HCDE would be present meeting without them and they were kept outside until HCDE was done with their pre-meeting.

[25]    In this same February 2013 meeting, "school officials discussed how a more restrictive placement, such as a self-contained, comprehensive development classroom (CDC).

Ms. Levine further stated this predetermined notion that CDC was best for L.H. in the March 6, 2013 meeting when Levine announced that "Normal Park is not L.H.'s least restrictive environment," even restating it when questioned by Meece. (Meece Aff., p. 6). This conversation occurred early in the IEP meetings *before the team even reviewed L.H.'s present levels of performance. Id.*

As further proof of HCDE's strong-arming and pre-determining L.H.'s 2013-2014 placement, during the March 6, 2013 IEP meeting, Margaret Abernathy, HCDE's Director of Special Education, stated firmly that "Final decision on placement are up to the school district, not the parents." (*Id.*). She repeated, "School districts have final authority on placement decisions." (*Id.*).

Of course comments stating that the "school district has final authority on placement" stands in direct contradiction to the federal regulations which require that all placement decisions are made by "a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 CFR 300.116(a)(1). Additionally, during the fourth IEP meeting during the Spring of 2013, L.H.'s father described similar condescending remarks from Ms. Abernathy which made it plain that HCDE would do what it wished with L.H.'s placement and that L.H.'s parents' concerns and input would not be considered, as L.H.'s father described the following exchange between Ms. Abernathy: "… [S]itting in an IEP meeting and Margaret Abernathy telling us that it was a team,

---

implementing an alternative curriculum, would benefit L.H." (D.E. 45, Ex. 7, Hope Aff., ¶ 23). And as L.H.'s mother explained, "You know, this is communicated to us without any discussion about present levels of performance, about any accommodations or modifications, about him having any problems whatsoever in school." (D.H. depo., pp. 47-49, relevant portions attached here as **Exhibit D**).

it was a team decision. But since we disagreed with it, that we could talk to her lawyer and there was nothing we could do about it." (G.H. depo., p. 36, portions attached here as **Exhibit E**).

## C.      MONTESSORI IS AN APPROPRIATE PLACEMENT

Defendant's whack-a-mole approach to knock down Montessori is misplaced too. L.H.'s positive outcomes in third grade and fourth grade have already been introduced in Plaintiffs' motion for judgment. (D.E. 74). By definition, it is *working*—one need not speculate.

HCDE quibbles, citing *Berger v. Medina City Sch. Dist.*, 348 F.3d 513 (6th Cir. 2003) for the proposition that "a unilateral placement cannot be regarded as 'proper under the Act' when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient." (D.E. 70, p. 29) (citing *Berger*, 348 F.3d at 523). Teasing out this line, and certainly over-inflating it, HCDE concludes Montessori is not appropriate because it does not offer any special education services like occupational and speech therapy, that the instruction is lacking, and, in perhaps its greatest airbrushed argument yet, that L.H. is isolated from his peers at Montessori all day with complete dependence on his aide.

HCDE misreads *Berger*. Contrary to HCDE's argument, as the Second Circuit has explained, *Berger* does not stand for the proposition that if a private placement does not provide "special education services," then the placement is not reimbursable. (D.E. 70, p. 29); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. N.Y. 2006). In *Frank G.*, the court explains how *Berger* is not intended to replicate the public schools and that a private school teacher who "worked with Anthony one-on-one, created a communications book, gave Anthony extra time to complete work, and allowed him to work in isolated areas of the classroom," along with another aid was sufficient. *Id.* at 365-66 (2d Cir. N.Y. 2006) (emphasis added).

Unlike HCDE, Montessori is willing to meet federal mandates of an inclusive environment with non-disabled peers; as Drs. Buckley, Meece and Whitbread have explained, this is crucial for L.H. to make continued educational and social progress.

Undaunted, HCDE argues that the placement is not reimbursable because Montessori does not provide an aide and that L.H's aide *comes into Montessori and is paid separately* by L.H.'s parents. That is incorrect, though it would not matter. The aide *is* a Montessori employee who *is* paid by the Montessori school, and who *is* entirely directed by the Montessori school's regular classroom teacher and director. (Decl. of D.H., ¶ 11). The parents are billed for her services like they are billed for tuition. (*Id*.) Even so, parents are allowed reimbursement when they do privately provide and pay for the aide. *E.g. Anchorage Sch. Dist. v. M.P*., 456 Fed. Appx. 706, 708 (9th Cir. Alaska 2011) (finding award of tutoring expenses well-supported for reimbursement by public agency); *Deal v. Hamilton County Dep't of Educ*., 2006 U.S. Dist. LEXIS 76324, *7 (E.D. Tenn. Aug. 1, 2006); (D.H. depo., pp. 34-37).

Next, HCDE claims that CDC is a more appropriate placement because L.H.'s placement at Montessori in the general education classroom with an aide is "arguably the most restrictive educational environment—a classroom of one" (repeating the ALJ's blinkered phrase of "classroom of one"). HCDE insultingly writes that L.H.'s "inclusion is nothing more than a geographical location as opposed to a legitimate educational strategy." (D.E. 70, p. 30). As support for this argument, HCDE claims the video of a typical day for L.H. during the Spring 2014 semester (his third grade year) allegedly shows L.H. isolated from his peers working alongside his aide while everyone else is working together on projects. *Id.*

But this is simply not accurate at all; one must question why, *at summary judgment,* HCDE would even contend this is an undisputed fact. In the beginning of the video, L.H. is

pulled out working one-on-one at a computer.[26]  But the remainder of the video clearly shows L.H. alongside his peers appropriately interacting with them during portions of academic instruction which require collaboration.  (Video of L.H. during a day at Montessori Spring 2014, attached hereto as **Exhibit G**).[27]  Thus, HCDE's isolation arguments are completely without merit and cannot be regarded as "undisputed" for summary judgment.

HCDE is not finished.  To disallow reimbursement, HCDE asserts that it is HCDE, and not the Montessori School, that has been providing training in reading strategies to L.H.'s mother and L.H.'s aide.  (D.E. 70, p. 29).  Again, HCDE engaged in spinning.  HCDE knows that this training is for the Wilson Reading Program and was *free training provided to ALL private school parents and educators*.  (Decl. of D.H., ¶ 10).  Plaintiffs still reside in Hamilton County and, much as Defendant may wish otherwise, are entitled to "equal access" to all programs and services as other children.

And lastly, Defendant HCDE asserts that the Montessori educational approach is not appropriate because the Montessori School allegedly does not incorporate the teaching strategies *its* autism expert, Dr. Kabot, claims L.H. needs: visual support, emphasis of concrete rather than abstract concepts, step-by-step teaching, reinforcements, and frequent feedback.  (D.E. 70, p. 29) (citing Kabot Report, pp. 9; 15-17).  Notably, as mentioned in Plaintiffs' Memorandum in Support of Summary Judgment, Dr. Kabot is an autism expert, not a Down syndrome expert, and her last experience providing educational programming to a child with Down syndrome was approximately 25 years ago. (Kabot, Trans. 790-91).

---

[26]     HCDE knows full well that this is during L.H.'s thirty minute per week "pull out time" with a computer teacher who comes to Montessori School and provides computer training to all children who pay extra for it.  (D.H. depo., pp. 71-73).

[27]     Due to the nature of this exhibit being a video, it has been manually filed with the Court.

27

Who is Dr. Kabot to argue services and supports and programming? She was a chief accomplice to segregating L.H. to a school without grades, homework, standard curriculum, or the opportunity for a degree on a now-debunked theory that L.H. had "hit a wall" as a mere second grader.  Not even HCDE followed Kabot's recommendations. (See, Hope, Trans. 159-161) (admitting no documentation of implementing any strategies suggested by Dr. Kabot for working with L.H. during remainder of the school year); (*Id.* at pp. 167-168) (cannot name any additional educational strategies used with L.H. once determined he "hit a wall").

Kabot's "expertise" notwithstanding, the Montessori School clearly provides the individualized reinforcement L.H. needs to make progress and retain information.  As the Montessori School's Director, Bobbe Spink, explained, the Montessori approach is premised on mainstreaming regardless of disability, as they try to meet each child's individual needs.  (Spink, Trans. 851).   In fact, the Montessori approach is based in special education and thus, the Montessori approach uses manipulatives as well as constantly changing the presentation of materials in order to make the individual child learn.  (Spink, Trans 856).  Spink has a special education degree and has taught Montessori for forty (40) years.  (Spink, Trans. 851-53).  She was therefore tendered as an expert witness in the due process hearing, and expressed that in her opinion, Montessori is an appropriate placement for L.H.  (Spink, Trans. 852-53).

An integral part of the Montessori approach is that it does not make children learn the same things at the same time—it is, therefore, naturally individualized instruction.  As L.H.'s third grade teacher Mr. Watts testified,[28] L.H. is not following a "separate" curriculum from the

---

[28]    HCDE also claims that Mr. Watts has no instruction on educating students with special needs, was uninformed about special education in general and thought ADHD qualified as an intellectual disability.  Again, this is entirely disingenuous given that NPMM's own principal and teachers assigned to teach L.H. (the same ones who claim he "hit a wall") have not had any training whatsoever in teaching to or understanding the learning profiles of a child with Down

other non-disabled students; rather, like other Montessori students, Watts makes an individualized lesson plan for L.H. for two week periods of time so that L.H.'s assignments are tailored to his individual level. (Watts, Trans. Pp. 612-616). In addition, L.H. is given homework every night of reading, spelling, and flashcards, and is receiving more reading comprehension work than other students, all of which are obviously reinforcement mechanisms. (*Id.* at pp. 630-31). Further, as Mr. Watts pointed out in his testimony, the Montessori approach works for L.H. the same way it does for all students—introducing skills with concrete materials and moving to abstraction at a pace individualized to that student which allows L.H. to learn at his ability and pace level. (*Id.* at pp. 633-35). Thus, L.H.'s accommodations and modifications are a natural part of the individualized Montessori approach and L.H. is being taught in methods and pace that are individualized to his needs—the very essence of special education.

Finally, as stated at the outset, the proof is in the pudding—as Plaintiff's Memorandum in Support of Summary Judgment shows, L.H. has made *significant* progress both academically and socially in the general education curriculum after HCDE claimed he was no longer educable in that setting, as shown by his work samples, report cards, and standardized test scores. (D.E. 74, pp. 14-21). Montessori is therefore abundantly appropriate for L.H.'s needs.

**D. THE MT. HEALTHY ARGUMENT**

At page 23, Defendant contends that it *still* would have removed L.H. from its school and sent him away to Red Bank's CDC notwithstanding D.H's advocacy for kids with Down syndrome at NPMM. (D.E. 70, p. 23) (citing *Mt Healthy City Sch. Dist. Bd. Of Ed v. Doyle,* 429

---

syndrome despite L.H. being in their school for four years. Even after they determined they could allegedly no longer educate L.H. in a general education classroom, the expert brought in to assist them in strategies and placement was Dr. Sue Kabot, an autism specialist, with no hands on educational programming for a child with Down syndrome in approximately 25 years. (*See* Plaintiffs' Memorandum in Support of Summary Judgment, D.E. 74, pp. 6; 27-28).

29

U.S. 274, 287 (1977)). Mt. Healthy is an affirmative defense which has not been plead and, therefore, is waived. *Owens v. Ala. Dep't of Mental Health & Mental Retardation*, 2008 U.S. Dist. LEXIS 66530, *23, footnote 4 (M.D. Ala. Aug. 29, 2008).

Even if not waived, Defendant would bear the burden of conclusively proving such affirmative defense which it cannot do. Until D.H.'s advocacy for L.H. and another child, L.H.'s first and second grade report cards and progress reports were replete with positives. He had overcome any cultural bias or preference for segregation. Thus, when Defendant writes that, on April 9, 2013, when Dr. Kabot believed that "during his four years in the general education setting, L.H. had completed none of his IEP goals," it is simply contrary to the known evidence. Defendant is *misstating the facts of the case.* Indeed, Plaintiffs respectfully point the Court to how HCDE mistakenly believes L.H. must meet standards of "typical second graders," but when the teachers are asked the appropriate question of whether he is making progress on his IEP, the answers are positive. (See D.E. 74, p. 30)

## VIII. CONCLUSION

Summary judgment requires undisputed facts, not arguments and gloss. For all the reasons set forth above, Plaintiffs requests Defendant's motion for summary judgment be DENIED.

Respectfully submitted,

**GILBERT RUSSELL McWHERTER**
**SCOTT BOBBITT, PLC**

 /s Justin S. Gilbert_____
Justin S. Gilbert (TN Bar No. 017079)
Jessica F. Salonus (TN Bar No. 28158)
100 W. Martin Luther King Blvd, Suite 504
Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
***ATTORNEYS FOR PLAINTIFFS***

**CERTIFICATE OF SERVICE**

      I, the undersigned, do hereby certify that a true and exact copy of the foregoing has been mailed electronically via the Court's electronic filing system, to all counsel of record on this the 12th day of October 2015.

D. Scott Bennett and Mary DeCamp
Leitner, Williams, Dooley & Napolitan, PLLC
801 Broad Street, Third Floor
Chattanooga, Tennessee 37402

Tennessee Department of Education--Office of the Attorney General and Reporter
Michael Markham
Cordell Hull Building, Second Floor, P.O. Box 20207
Nashville, Tennessee 37202-0207

                          /s/ Justin S. Gilbert_____