UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| L.H., *a Minor Student, et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:14-CV-00126 |
| | ) | |
| v. | ) | Judge Curtis Collier |
| | ) | |
| HAMILTON COUNTY DEPARTMENT | ) | Magistrate Judge Susan Lee |
| OF EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## M E M O R A N D U M

Plaintiffs, L.H., a thirteen-year-old school boy with Down Syndrome, and his parents, G.H. and D.H., seek in this Court a review of a determination by a state administrative law judge (the "ALJ") that the general-education setting in the public schools of Defendant Hamilton County Department of Education ("HCDE") was not appropriate for L.H.

After carefully reviewing that determination and giving it due weight, considering the additional evidence presented by the parties at the evidentiary hearing before this Court, and taking into account the applicable law, the Court reaches its independent decision that HCDE's proposed placement at the Red Bank comprehensive development classroom (the "CDC") was more restrictive than necessary, but that the alternative private placement Plaintiffs chose—The Montessori School of Chattanooga ("TMS")—is not an appropriate educational environment for L.H. Accordingly, Plaintiffs are not entitled to reimbursement for the costs of educating L.H. at TMS.

# I.    LEGAL BACKGROUND

As a condition for receiving federal funds, the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400 *et seq.*, requires participating States to provide a "free appropriate public education" (a "FAPE" in education law parlance) for all children with disabilities.  20 U.S.C. § 1412(a)(1).  It further requires States to educate disabled children alongside nondisabled children "to the maximum extent appropriate"—a mandate known as the "least restrictive environment" (or "LRE") requirement.  *Id.* § 1412(a)(5).  Plaintiffs contend this latter requirement means L.H. should be educated in a regular-education classroom at his neighborhood school—Normal Park Museum Magnet School.  Defendant HCDE maintains—and the ALJ previously determined—that the general-education setting was not appropriate for L.H. and he needed to spend half of his day receiving academic instruction in the CDC, a self-contained classroom at Red Bank Elementary School designed for children with intellectual disabilities.  Plaintiffs now seek review of that determination in this Court.

It is the Court's responsibility to "make an independent decision based on the preponderance of the evidence," while giving "due weight" to the ALJ's findings and conclusions.  *See Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (*Deal I*) (quotation marks omitted).  In fulfilling its responsibility, the Court has very closely examined the evidence presented before it, as well as the evidence received in the administrative hearing.

In deciding issues such as this, the Court proceeds with caution, mindful it lacks the "specialized knowledge and experience necessary to resolve persistent and difficult questions of education policy."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 208 (1982) (quotation marks omitted).  The Court also recognizes, however, that while the determination of sensitive issues such as a child's least-restrictive environment "imposes a difficult burden on the district court[,] [s]ince Congress has chosen to

impose that burden, [the Court] must do [its] best to fulfill [that] duty." *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir. 1983). Ultimately, while reasonable minds could differ with the Court's conclusion because the evidence considered as a whole is extremely close, the Court ultimately concludes Plaintiffs have met their burden to establish by a preponderance of the evidence that L.H.'s proposed placement at the Red Bank CDC was more restrictive than necessary, but they have not established that the alternative private placement they chose at TMS is an appropriate educational environment for L.H. Thus, Plaintiffs are not entitled to reimbursement for the costs of educating L.H. at TMS.

## II. FACTS

In addition to thoroughly reviewing the record of the administrative proceeding, the Court received additional evidence during a hearing held on January 11–14, 21, 25, and 26, 2016. At the hearing, the Court heard from four witnesses called by Plaintiffs and six witnesses called by HCDE, and also received a number of documentary and video exhibits. From these sources, the Court makes the following factual findings.

### A. General Information about L.H.

L.H. has Down Syndrome and is classified as intellectually disabled under the IDEA. This means his intellectual ability falls two standard deviations below the average, or in the bottom 2.2% of the population, and his adaptive behavior, or daily-living skills, are significantly impaired. As is also common with Down Syndrome, L.H.'s receptive and expressive language skills are impaired relative to those of typically developing children. As a result, L.H. qualifies for special-education services under the IDEA and has received these services since he was three years old.

L.H. is, by all accounts, a personable, fun-loving child. He enjoys playing on his iPad, listening to music, and interacting with friends. He is generally respectful and kind, though sometimes he has difficulty expressing himself in socially appropriate ways. L.H. enjoys school and learning, although he occasionally acts out or refuses to work, and he often needs motivators or prompting to help him stay on task. L.H. is a visual and kinesthetic learner and has a good short-term memory.

L.H. attended Normal Park in 2009–2010 (kindergarten), 2010–2011 (first grade), 2011–2012 (repeating first grade), and 2012–2013 (second grade). While at Normal Park, L.H. was educated pursuant to an individualized education program (an "IEP"), a planning document with goals and objectives for the upcoming year formulated based on L.H.'s present levels of performance. This document was prepared and updated annually by L.H.'s parents, HCDE teachers and staff, and other service providers (the "IEP team"). Through second grade, L.H.'s IEPs directed he be taught the regular curriculum in a regular-education classroom alongside typically developing peers. The IEPs also specified certain special-education supports and services to enable L.H. to access the regular curriculum, such as daily "pull-out time" (one-on-one instruction with a special-education teacher outside the regular classroom), "push-in time" (instruction from a special-education teacher in the regular classroom), occupational therapy, speech-language therapy, and a full-time aide.

L.H.'s parents are extremely invested in his educational success and have been highly involved in his education and the process of formulating his IEPs. They strongly made known to HCDE personnel their desires and wishes for L.H.'s education and did not hesitate to point out perceived deficiencies. They also regularly provided HCDE personnel with information regarding Down Syndrome that they thought would assist in L.H.'s educational progress and development. They have worked hard to supplement his education outside the classroom as well

by reading with him and reviewing his homework on a daily basis and by scheduling extensive extracurricular activities for him. L.H.'s parents have high expectations for him and have diligently tried to ensure he is challenged to reach his full potential. It was their strong and clearly stated desire that L.H. be educated in the standard public-school setting and that he be taught the standard curriculum.

L.H. made some progress academically during the first three years he was at Normal Park (kindergarten through first grade), though he did not keep pace with his age-level peers. By the end of first grade, L.H. had learned some basic math concepts, such as using manipulatives to add and subtract numbers to twenty, telling time to the hour and half-hour, and skip-counting by two, five, and ten for four or five steps, but overall, he was functioning at a kindergarten level. L.H.'s independent writing ability was also at or below a kindergarten level, although he was able to write up to two or three sentences at a time. In the area of reading, however, L.H. was relatively advanced. Both his year-end report card and his results on the Woodcock Johnson, an academic assessment given in March 2012, show he was reading at a mid-to-late first-grade level, or nearly on par with his normally developing grade-level peers, although his comprehension level was further behind.

### B. The 2012–2013 IEP

In May 2012, L.H.'s IEP team met to develop his second-grade IEP. At the meeting, HCDE staff members queried whether, given the gap between L.H.'s abilities and second-grade expectations, the team should consider placing L.H. somewhere other than the general-education environment. L.H.'s parents strongly disagreed with this thinking and vocally and vigorously insisted that L.H. remain in the regular-education classroom. Acquiescing to L.H.'s parents' insistence, the final IEP recommended L.H. continue to be educated in a regular-education classroom, with the aid of various special-education supports and services.

While L.H.'s placement remained unchanged, the goals and objectives set forth in the IEP did not. At L.H.'s parents' demands, the educational goals in L.H.'s 2012–2013 IEP were tied closely to regular second-grade curricular goals. Given L.H.'s previous performance and the professional opinions of his teachers and the staff, these goals were unrealistic. They represented a significant step up from the goals contained in L.H.'s 2011–2012 IEP, both in number and in difficulty. To appreciate the difference, compare the goals and objectives from the two IEPs in the areas of language and reading (formatting has been changed for clarity):

|  |  |
|---|---|
| <u>**2011-2012 IEP**</u> | <u>**2012-2013 IEP**</u> |
| **Language/Reading Goals and Objectives** | **Language/Reading Goals and Objectives** |

| Language/Reading Goals and Objectives (2011-2012) | Language/Reading Goals and Objectives (2012-2013) |
|---|---|
| • **Goal**: L.H. will improve his ability to use and understand language for success in classroom.<br><br>  - Answer WHICH questions when provided with 2 choices (e.g., "Do you want to play basketball or go swimming?")<br><br>  - Answer WHY questions regarding specific choice made (e.g., "Why did you chose basketball instead of swimming?")<br><br>• **Goal**: L.H. will employ a variety of strategies to decode words and expand vocabulary.<br><br>  - Be secure in 75% of the reading strategies at each level before progressing to the next reading level<br><br>  - Make some appropriate conclusions from text and conversations<br><br>  - Follow simple directions in short informational text (e.g., assignment directions) | • **Goal**: L.H. will develop critical speaking skills essential for effective communication.<br><br>  - Answer wh- questions involving temporal and spatial concepts from a context<br><br>  - Make inferences and draw appropriate conclusions from social situations and stories read to him<br><br>  - Utilize strategies to initiate conversation acceptably (role-play and visuals)<br><br>  - Utilize strategies to decrease rate of speech in conversation (role play and visuals)<br><br>  - Be able to identify the most important word in a single step direction<br><br>  - Complete if/then statements to develop knowledge of cause and effect and improve ability to answer WHY questions<br><br>• **Goal**: L. H. will employ a variety of strategies to decode words and expand vocabulary.<br><br>  - Build vocabulary by reading to level L by the end of 2nd grade,<br>  - Identify compound words and positional words in text<br>  - Provide synonyms and antonyms for given words<br><br>• **Goal**: L. H. will demonstrate control of Standard English usage, mechanics, spelling, and sentence structure.<br><br>  - Identify and use adjectives (i.e., descriptive, comparative, superlative), nouns (i.e., common and proper, singular and plural, possessive), pronouns (i.e., substitution for nouns), and verbs (i.e., past and present tense, action and linking, regular and irregular, subject-verb agreement) correctly<br><br>  - Use capital letters in the first word of a sentence (i.e., first and last names, pronouns, proper nouns)<br><br>  - Identify and use correct punctuation at the end of declarative, exclamatory, and interrogative sentences<br><br>  - When given a list of words, combine two words to form contractions using apostrophes<br><br>• **Goal**: L. H. will develop and maintain phonemic awareness.<br><br>  - Change the letters of a given word to create new words (e.g., pan to nap, ten to net)<br><br>  - Use sound stretching of one syllable words to identify each phoneme<br>  - Use sound blending of each separately spoken phoneme to make meaningful words<br><br>  - Segment one-syllable words into individual sounds and blend the sounds into whole words<br><br>  - Identify and produce rhyming words<br><br>  - Recognize words that have the same beginning, middle, and ending sounds<br><br>  - Understand words are made up of one or more syllables (e.g., students clap syllables, move objects, etc. in words.)<br><br>  - Add, delete, and change targeted sounds to change words (e.g., bed to bad, hat to bat)<br><br>• **Goal**: L. H. will develop critical listening skills essential for comprehension, problem solving and task completion.<br><br>  - Listen attentively to speaker for specific information by sitting for 15 minutes and answering up to 3 questions regarding situation |

(*See* Due Process ("DP") Ex. 6, 2011–2012 IEP 00445–446; Pl.'s Ex. 1-2, 2012–2013 IEP at 5, 8–10.[1])  Notwithstanding these changes which incorporated L.H.'s parents' demands, all of the members of the IEP team—including L.H.'s parents and eight HCDE teachers and staff members—agreed the goals and objectives outlined in the 2012–2013 IEP were appropriate based on L.H.'s present levels of academic performance.  (*See* Pl.'s Ex. 1-2 at 22 (signature page); DP Ex. 6, Notes of May 10, 2012 IEP Meeting 00371.)

### C.    Second Grade at Normal Park

As could be expected, L.H. struggled to meet these goals.  From the very beginning of the school year, his classroom teacher, Ms. Stefanie Higgs, and his special-education teacher, Ms. Lisa Hope, were concerned he lacked the prerequisite skills to be able to perform at a second-grade level.  Both teachers, though relatively inexperienced,[2] worked hard to try to bring L.H. up to speed.  Ms. Higgs gave L.H. intensive, one-on-one reading instruction for thirty minutes every day.  Ms. Hope followed this up with an hour of daily pull-out time, during which she would review his reading and math lessons for the day, along with daily push-in time, during which she would visit L.H. in the regular-education classroom to monitor his behavior and prompt him to complete his work.  Both teachers used creative, individualized teaching strategies, such as songs, video modeling (recording a video of L.H. performing a task well, then showing it to him as motivation), a token-based reward system, visual schedules and cues, manipulatives, and a variety of instructional formats (oral, visual, kinesthetic, etc.).  Ms. Hope also consulted with Ms. Jeanne Manley, an experienced special-education teacher designated by HCDE to provide

---

[1] The pages in this exhibit are out of order.  The citation refers to the document's original printed pagination.

[2] Ms. Higgs was in her second year of unassisted teaching; Ms. Hope had six years of teaching experience but had never worked with a student with an intellectual disability.

training and support to other teachers within the district, on a number of occasions regarding different teaching strategies to try with L.H.

Despite their efforts, L.H. did not progress as fast or as far as they had hoped. While L.H.'s first quarter IEP progress report indicated he was on track to meet all his goals by the end of the year, review of L.H.'s progress on the objectives underlying the goals reveals a number of objectives toward which his teachers indicated he was making very little progress, either for insufficient time or because he lacked prerequisite skills. (*See* DP Ex. 3, 2012–2013 First Quarter IEP Progress Report.) L.H. had difficulties with one-to-one number correspondence in math (the idea that the number "3" means three things), and could not remember basic addition and subtraction facts. He could read on a mid-first-grade level, but he could not answer basic comprehension questions about what he had just read. He was very dependent on adult prompts, or "scaffolding," to complete assignments. He had trouble coming up with and writing more than a sentence or two without prompting or being permitted to copy pre-written sentences. His first-quarter report card stated his progress in reading was at the "basic" level, and he was "below basic" in the areas of speaking and listening, language, math, science, social studies, and conduct. (*See* DP Ex. 6, First Quarter Progress Report 00131.)

On that last point, L.H.'s teachers noticed his behavior was particularly disruptive during the first quarter of second grade. He would invade his classmates' personal space, disobey his teachers' directions, and frequently "shut down" or refuse to work. His first-quarter IEP progress report relayed "[h]is behaviors have frequently impeded his learning as well as the learning of the students around him," and he needed to "continue to work on respecting the personal space and possessions of others." (DP Ex. 3 at 3.) His report card similarly noted several subjects in which his "[b]ehavior interferes with his work." (DP Ex. 6 at 00131.) These

behaviors continued to occur even after Ms. Hope implemented several of the strategies suggested in the behavioral intervention plan contained in L.H.'s IEP.

Surmising these behavioral issues were due to frustration with the difficulty of the work, Ms. Hope modified L.H.'s lessons until she was teaching him at a kindergarten level, with the exception of reading, where he could work at a first-grade level.[3] Ms. Hope explained she was able to do this because Normal Park uses a "spiral approach" to curriculum, teaching students the same skills at increasing levels of difficulty at different grade levels. Thus, when L.H. "shut down," she was able to drop down and teach him the same general skill set but at a less intensive level. (DP Tr. at 209.) His teachers also attempted to minimize distraction in the classroom by seating him toward the back of the room, away from tables with containers of distracting work materials and the traffic of the other students.

After these adjustments, particularly the work-level modification, L.H.'s behavior improved noticeably. Ms. Hope recounted the percentage of time he was able to work with five or fewer adult prompts went from thirty-three percent to ninety-five percent, the amount of time he successfully completed individually assisted work went from thirty-four percent to ninety-four percent, and the percentage of time he demonstrated respect for others' personal space went from thirty-six percent to eighty-six percent. (*Id.* at 210.) His second-quarter IEP progress report reflected these changes, noting his "behavior has been much improved over the past nine weeks!" (*See* DP Ex. 4, 2012–2013 First Quarter IEP Progress Report at 3.[4])

---

[3] Ms. Hope made this change on the basis of several provisions in L.H.'s IEP specifically permitting his teachers to modify assignments to meet his present levels of performance and to address the goals and objectives contained in the IEP. (*See* DP Tr. 97–101; Pl.'s Ex. 1-2 at 13–14.)

[4] Several pages are missing from this progress report, so the citation refers to the internal pagination.

While L.H. made strides in his behavior during the second quarter, his progress toward the second-grade goals in his IEP remained poor. His second-quarter IEP progress report listed three goals—in writing, reading, and math—for which his teachers no longer anticipated meeting the goal by the end of the year. (*Id.* at 5 (goal 5), 10 (goal 11); *see* DP Ex. 6, 2012–2013 Q3 IEP Progress Report 00318 (goal 4 for the second reporting period)). Additionally, L.H.'s progress on every single one of his academic objectives was characterized as "very little" due to insufficient time or a lack of prerequisite skills. (*See* DP Ex. 4 at 5–11.) L.H.'s teachers also noted in several places they had modified the curriculum to meet L.H.'s present levels of performance. (*Id.* at 7, 9.) To L.H.'s teachers, it was clear that until L.H. mastered certain basic skills, such as one-to-one number correspondence, phonemics, and analytical thinking—he was not going to be able to meet the second-grade standards outlined in his IEP goals. (*See* DP Ex. 16, Higgs Aff. ¶ 23; DP Tr. 433.)

### D. The 2013–2014 IEP

Shortly after receiving the second-quarter IEP progress report, L.H.'s parents requested an IEP meeting. At the meeting, held February 6, 2013, HCDE staff members explained L.H. was working far below grade-level expectations. Ms. Jill Levine, principal of Normal Park, told the parents that although L.H. had benefitted from being in a regular-education setting in kindergarten and first grade, he had now "hit a wall"[5] and was no longer progressing. For these reasons, HCDE staff felt the time had come to consider other placement options. L.H.'s parents expressed strong opposition to the idea of placing L.H. in a dedicated special-education classroom. They specifically objected to the lack of interaction with typically developing peers,

---

[5] Plaintiffs argue that by using the phrase "hit a wall" Ms. Levine and others at Normal Park had reached a conclusion that L.H. had reached his maximum academic achievement and additional educational endeavors would be to no avail. This is an erroneous interpretation of what Ms. Levine said and her intent. The Court thus rejects any notion that Ms. Levine or any of the other HCDE personnel or staff had reached a decision that educating L.H. in the regular-education setting would be futile.

the absence of a normal academic curriculum or standards, and separating L.H. from his established friends—necessary if L.H. were to be placed in a CDC, since Normal Park did not have one.  After a period of contentious discussion, the parents abruptly left the meeting.

Over the course of the next four months, the two sides entrenched.  Four lengthy and heated IEP planning meetings were held, at which the parents contested HCDE's assessment of L.H.'s present levels of performance, questioned the qualifications of L.H.'s teachers, and presented evidence regarding the benefits of mainstreaming and the downsides of placement in the CDC.  HCDE, in turn, reemphasized L.H.'s poor academic performance and the necessity of a CDC placement.  Unfortunately, it appears from a review of the IEP meeting notes and intervening email communications that the relationship between the parties became quite strained.

On May 6, 2013, over the parents' objections, L.H.'s 2013–2014 IEP was finalized.  The academic goals in this IEP were not tied to third-grade regular-education standards, but were derived strictly from L.H.'s present levels of performance.  Furthermore, because HCDE had concluded L.H. needed more extensive supports than could be provided in a regular-education classroom at Normal Park, the IEP team determined L.H. would need to receive his academic instruction in a CDC at Red Bank Elementary.

Specifically, the proposed IEP provided L.H. would receive ninety minutes of reading instruction, ninety minutes of math instruction, and thirty minutes of pre-vocational instruction, a total of three and a half hours per day, in a special-education classroom.  (*See* Pl.'s Ex. 57, 2013–2014 IEP at 25.)  The proposed IEP further provided L.H. would participate with non-disabled peers for lunch and related arts—things like music, art, and physical education—during which

time he would also receive an additional thirty minutes of social/emotional special education via inclusion, or push-in instruction.[6] (*Id.* at 24–25.)

The proposed IEP also indicated L.H. would be educated pursuant to an alternative curriculum. (*See id.* at 9–13.) This alternative curriculum would have consisted of a program called the Unique Learning System (the "ULS"), an online special-education software program designed to teach reading and math within the framework of monthly science and social studies units, supplemented as necessary by more focused reading and math lessons. The ULS curriculum is not tied specifically to Tennessee general-education standards, but it is aligned with Common CORE standards.

---

[6] The Court questions HCDE's contention that because the 2013–2014 IEP does not specifically state L.H. would receive instruction in science and social studies in the special-education environment, he would necessarily have been taught these classes in the general-education setting with regularly developing peers. This contention is belied by the proposed IEP's statement, under the section headed "[e]xplain the extent, if any, in which the student will not participate with non-disabled peers in . . . the regular class" that L.H. would "receive academic and pre-vocational instruction in the Special Education setting," but would "participate in related arts classes with his non-disabled peers." (Pl.'s Ex. 57 at 26.) The most natural reading of this statement is the two categories of instruction were intended to be mutually exclusive; that is, L.H. would receive all of his academic and pre-vocational instruction—including science and social studies—in the CDC, and he would attend all related arts classes in the regular-education setting.

This understanding is corroborated by the structure of the CDC curriculum, which, as noted below, uses science and social studies as vehicles to teach math and reading. Ms. Willeata Kendrick, HCDE's special-education supervisor, clarified this point in her testimony at the due-process hearing. She explained that under the proposed IEP, L.H. would have received the bulk of his instruction in science and social studies in the CDC as part of the Unique Learning System curriculum. He would have received additional instruction in the regular-education science and social studies classes only when there were "hands-on activities" such as experiments in which he could participate. (*See* DP Tr. 489.) The Court finds this explanation to be more plausible than the explanation given by Ms. Margaret Abernathy, HCDE's director of exceptional education: that L.H. would have fully participated in regular-education science and social studies classes in addition to the science- and social-studies-based CDC curriculum.

The Court does understand that things on the ground are often different than what is described in plans or even directives. So it is possible HCDE intended to provide instruction in these subjects as they contend. However, the plan itself does not state this.

The CDC itself is small and fairly self-contained: at the time, the CDC at Red Bank had two teachers and nine students. Although students in the CDC have some opportunities to participate with non-disabled peers in lunch and related arts, experts from both sides agreed that, practically speaking, there is little interaction between the two groups of students. While in music or at lunch, CDC students sit and interact almost exclusively with each other. Also, while nearly all of the students in the CDC were verbal to some degree or another, and most demonstrated an ability to work with fewer adult prompts than L.H. had been requiring, none appeared to be as advanced as L.H. in reading or in their desire or ability to socialize.

### E. The Montessori School of Chattanooga

L.H.'s parents rejected the IEP proposed by HCDE. Instead, when the 2013–2014 school year began, they enrolled L.H. at TMS, where he has been for the past three years. TMS is a private school that operates pursuant to the Montessori Method, an open-ended, child-directed theory of education, in contrast to the more traditional, highly structured, teacher-directed approach used by most schools. The TMS curriculum, called Albanesi, is aligned with Common CORE standards and covers language and math, as well as a variety of so-called "cultural" subjects, such as botany, zoology, Spanish, cooking, and history. Classrooms at TMS are multi-grade, and students proceed through the curriculum at their own pace. Every two weeks, the teacher prepares an individualized lesson plan for each student, and each day, the student picks the order in which he or she works on those lessons. At the end of the two weeks, the teacher prepares a new lesson plan based on the student's progress.

Some aspects of the Montessori curriculum appear to be a good fit for L.H. For instance, instruction at TMS is highly differentiated. Each student is taught at his own level in each subject. Also, the use of manipulatives to teach abstract concepts features highly in the curriculum, which plays to L.H.'s learning style. Other aspects of the curriculum, however,

appear a less-than-ideal fit for L.H.  Montessori's child-directed learning philosophy presupposes a certain amount of independence and self-motivation on the part of the child, and these are areas of particular weakness for L.H.  The Court heard no evidence that TMS itself or the teachers at TMS had any experience in instructing intellectually disabled students or students with Down Syndrome.  Also, TMS does not have a systematic approach to teaching students with special needs or language impairment, nor are any of the teachers at TMS trained in special education.

L.H.'s class sizes at TMS have ranged from seventeen to eighteen students.  In addition to the classroom teacher, L.H. has had a full-time aide to help him with his work and keep him on task.[7]  L.H.'s parents are responsible for the aide's compensation, although she is technically employed by TMS.  L.H. reportedly gets along well with his classmates, all of whom are typically developing peers.  L.H. continues to have some issues respecting others' personal space and behaving in socially inappropriate ways when he gets excited, but he is generally friendly, respectful, and well-behaved.

### F.  Progress at The Montessori School

The parties offer differing assessments of L.H.'s academic progress while at TMS.  According to TMS testing and progress reports, L.H. has made steady progress.  At the time of the administrative hearing, in the first semester of third grade, TMS considered L.H. to be working on a first-grade level in math, a beginning second-grade level in language, and a third-grade level in his cultural subjects.  (*See* DP Tr. 628–629.)  By the end of fourth grade, L.H.'s report card indicated he had progressed to working on second-grade geometry (shape names) and third-grade language skills.  L.H.'s fourth-grade report card omits any reference to L.H.'s grade level for general math.  Instead, it provides only narrative information regarding L.H.'s progress in math, such as noting he was working on fractions, learning to read large numbers, learning the

---

[7] L.H.'s mother testified that in fifth grade, the aide was only with L.H. for half days, as they are working to reduce his dependence on the aide.

concept of "carrying," and working on skip-counting; "numbers about [sic] 3" were "challenging" for him; he needed frequent review of measurement concepts; and his progress was being hindered by deficiencies in his skip-counting skills. (*See* Pl.'s Ex. 11 at 5.)

L.H.'s fourth-grade standardized testing scores provide the most dramatic—and enigmatic—evidence of L.H.'s academic improvement at TMS. According to the results of a standardized test administered in the spring of 2015, known as the ERB Comprehensive Testing Program, among all fourth-graders in the nation, L.H.'s performance ranged from the 39th percentile for verbal reasoning to the 66th percentile for reading comprehension. (Pl.'s Ex. 12, 4th Grade ERB Test Scores 1.) His scores in mathematics, vocabulary, quantitative reasoning, and writing fell within this range. (*Id.*) Curiously, these results received the barest of mentions during the evidentiary hearing. The Court also finds it significant that Plaintiffs provided no indication of the extent of supports, modifications, or accommodations L.H. received during the administration of the test.

HCDE conducted several assessments of L.H. during the fall of 2015 and obtained very different results. HCDE's math coach, Ms. Jamelie Johns, assessed L.H.'s mastery of mathematics via a computerized math assessment called the i-Ready Diagnostic Assessment. Ms. Johns also assessed L.H.'s abilities by asking him questions following completion of the computerized test. Based on the results of the test and her interaction with L.H., Ms. Johns opined that overall, L.H. was performing on a kindergarten level. Ms. Johns noted L.H. could perform a few skills she would classify as second- and third-grade skills, but in her opinion, he had not internalized some fairly basic mathematical concepts and skills, such as one-to-one number correspondence and the ability to consistently process numbers larger than ten.

HCDE's reading coach, Ms. Debbie Rosenow, administered a Fountas & Pinnell reading assessment, characterized as the "gold standard" in reading assessments. L.H. began by reading

through a series of word lists of increasing difficulty, designed to approximate the grade level at which he is able to process text. L.H. read through the third-grade word list, but could not complete the fourth-grade list. Based on the results of the word-list test, Ms. Rosenow gave L.H. a beginning-third-grade-level book to read. Fountas & Pinnell directs that if a child is unable to read a book with at least 95% accuracy, it may indicate the text is too hard for the child. L.H. was able to read the book, but at a fluency rate about half that of a normal third-grader, and not at the recommended 95% accuracy level. When asked questions about the text, L.H. had great difficulty recounting any information from the text. Ms. Rosenow concluded from this that the book was too hard for L.H., and dropped down to a beginning-to-mid-second-grade text. L.H. read this book with 99% accuracy and was able to answer some literal questions about the text, though he could not answer questions requiring inference-drawing.

Ms. Rosenow testified reading ability hinges on at least two types of processing: visual processing, or the ability to see and decode a word, and meaning processing, or the ability to understand the meaning of the words being decoded. The most accurate assessment of an individual's reading level is where the individual's visual processing and meaning processing are equally taxed. Based on her assessment, L.H. is functionally able to decode words at a third-grade level, but the level at which his ability to comprehend matches his ability to decode is a mid-second-grade level. Ms. Rosenow recommended instructing L.H. primarily at this level for now, while occasionally providing a more rigorous text to allow him to practice decoding strategies and build vocabulary.

L.H.'s results on the Fountas & Pinnell assessment conducted by HCDE in the fall of 2015 were largely consistent with his results on a series of reading assessments administered at Plaintiffs' behest during the summer of 2015 at a literacy clinic for Down Syndrome children operated by the University of Saint Joseph in Connecticut. These assessments were overseen by

Plaintiff's expert, Dr. Kathleen Whitbread. L.H.'s results on the CORE Vocabulary Screening indicated his vocabulary knowledge was strong through the second-grade level, but he may experience difficulties comprehending text at or beyond the third-grade level. Similarly, L.H.'s results on the San Diego Quick Assessment of Reading Ability reflected an ability to read independently at a second-grade level, but frustration at the third-grade level. The only result that was somewhat out of line with Ms. Rosenow's evaluation was L.H.'s score on the CORE Reading Maze Assessment, a test of reading comprehension. His results on this test showed him to be comprehending at a third-grade level, although Ms. Rosenow testified these results are perhaps more reflective of his sentence-by-sentence comprehension, rather than an accurate gauge of his understanding of the passage as a whole.

The Connecticut assessment also provided data on L.H.'s component skills in the areas of phonological segmentation and phonics. No grade-level estimates were given, but L.H. appeared to have difficulty segmenting words into individual phonemes and difficulty decoding non-words, as well as deficiencies in several fundamental phonics skills. Ms. Rosenow testified these results were consistent with what she observed during the Fountas & Pinnell assessment. She opined L.H. may be relying on his visual memory to recall words, rather than actually decoding the phonetic structure of the word, and he likely needs additional instruction in phonics.

Overall, the Court does not find the parties' assessments of L.H.'s progress and present levels of performance at TMS to be inconsistent. Apart from the TMS standardized testing results, which the Court discounts for the reasons mentioned above, the evidence supports a finding that L.H.'s overall math skills are at approximately a first-grade level, with a few skills above and a few skills below that level; L.H.'s ability to decode words is largely at a third-grade level, although certain basic phonics and phonological skills are significantly more impaired; and his reading comprehension is at an early-second-grade level.

### G. The Court's Overall Assessment of the Testimony

This is not a case where parents were confronted with uncaring and heartless bureaucrats unconcerned about the progress and well-being of L.H. If that were the case, it would not be as difficult as this case has turned out to be. Contrary to the suggestion by Plaintiffs that there was an effort to remove L.H. from Normal Park because of concerns his test scores would depress Normal Park's overall test scores, the Court finds that at all times the staff and personnel at Normal Park were operating with a sincere and heartfelt desire to do what was in L.H.'s best interest. No one could observe the testimony given before the Court and not conclude that both the parents and the staff and personnel at Normal Park care a great deal about L.H. This fact was palpably demonstrated during the testimony of the child's mother, D.H., and the testimony of Jill Levine, the principal of Normal Park. Both of their testimonies were moving, sincere, and obviously motivated by what each believed to be the best interest of L.H. Both became emotional while on the witness stand, and the Court could see tears in their eyes. This genuine concern was also demonstrated by the other staff and personnel of Normal Park.

The parties reach diametrically different conclusions as to what is in L.H.'s best interest, but the Court attributes that to their perspectives, the difference in their experience in early-childhood education, and the degree of objectivity and realism each brings to the issue. D.H.'s perspective leads her to conclude it is in L.H.'s best educational and life interests to attend a school where he is taught on the same level as his same-age peers and remain in a regular-education class. Moreover, D.H. strongly desires L.H. to remain in regular-education classes at Normal Park. Principal Levine's perspective leads her to conclude L.H. will not be able to keep pace with his same-age peers and would fall farther and farther behind while in the regular-education classroom at Normal Park. She concludes Normal Park has made its best efforts and has not been able to provide L.H. with the educational benefit and progress he deserves.

Accordingly, she concludes L.H.'s best educational and life interests would not be furthered at Normal Park but rather would be better met in another educational setting.

## III.    STANDARD OF REVIEW

Under the IDEA, any party aggrieved by the findings and decision made by the state agency regarding a due-process complaint may seek review in federal district court.  20 U.S.C. § 1415(i)(2)(A).  The district court "shall receive the records of the administrative proceedings; . . . shall hear additional evidence at the request of a party; and . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  *Id.* § 1415(i)(2)(C).

From this mandate, the Supreme Court has distilled what has been termed a "modified *de novo*" standard of review: a reviewing court "should make an independent decision based on the preponderance of the evidence, but also should give 'due weight' to the determinations made during the state administrative process."  *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003) (quoting *Rowley*, 458 U.S. at 206).  This standard requires reviewing courts to strike a balance between deference and policy-making.  They may not "simply adopt the state administrative findings without an independent re-examination of the evidence" on the one hand, nor may they "substitute their own notions of sound educational policy for those of the school authorities which they review" on the other.  *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) (citations omitted).

The amount of weight due to administrative findings varies based on several factors, including "whether the finding is based on educational expertise," which the administrative fact-finder is presumed to have, *McLaughlin*, 320 F.3d at 669, and the extent to which the administrative findings are supported or controverted by the new evidence received by the

reviewing court, *Deal v. Hamilton Cty. Dep't of Educ.*, 258 F. App'x 863, 865 (6th Cir. 2008) (*Deal II*).

## IV.   ANALYSIS

Judicial review in suits under the IDEA has both a procedural component and a substantive component. *Gibson v. Forest Hills Local Sch. Dist. Bd. of Ed.*, No. 14-3575, 2016 WL 3771843, at *8 (6th Cir. July 15, 2016). First, the court looks at whether the school district complied with the procedural requirements of the IDEA in developing the child's IEP. *Id.* (citing *Deal I*, 392 F.3d at 853). If these procedural requirements are met, the court must then determine whether the resulting IEP complies with the IDEA's substantive requirements. *See id.* For a plaintiff to prevail, he must establish by a preponderance of the evidence the proposed IEP was not appropriate under one or both of these standards. *Id.*

When parents decide to place their child in private education, they may obtain retroactive reimbursement from the school district if (1) the school district's proposed placement violated the IDEA and (2) the private placement was proper under the IDEA. *Deal I*, 392 F.3d at 855. "A private placement is proper under the IDEA if the education provided in the private placement is reasonably calculated to enable the child to receive educational benefits." *Id.*

Here, Plaintiffs do not seriously dispute HCDE's compliance with the IDEA's procedural requirements.[8] Thus, the Court will proceed to examine whether L.H.'s proposed IEP complies with the IDEA's substantive requirements.

---

[8] The possible exception is Plaintiffs' contention that HCDE committed a procedural violation when Ms. Hope altered L.H.'s 2012–2013 IEP to begin teaching L.H. at a kindergarten level without calling an IEP meeting. The Court finds no merit to this argument. L.H.'s IEP explicitly provided that his teachers could modify his assignments to meet his present levels of performance. (*See* Pl.'s Ex. 1-2 at 13–15.) The Court agrees that at some point, continuing to focus on a child's present levels of performance to the exclusion of his or her IEP goals when it is clear that doing so will cause the child to fail to meet those goals, without calling for an IEP

**A.       Relevant Substantive Requirement under the IDEA**

To begin, the Court must resolve a dispute about which of the IDEA's substantive requirements is at issue.  The IDEA includes at least two substantive requirements.  First, the IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 206.  The Sixth Circuit Court of Appeals has interpreted this requirement to mean the IEP must be reasonably calculated to "confer a '*meaningful* educational benefit' gauged in relation to the potential of the child at issue."  *Deal I*, 392 F.3d at 862 (emphasis added).  Second, the IDEA contains a "requirement that handicapped children be educated alongside non-handicapped children to the maximum extent appropriate"—i.e., in the least restrictive environment. *McLaughlin*, 320 F.3d at 673 (quoting *Roncker*, 700 F.2d at 1062).

As a technical matter, the least-restrictive-environment mandate is probably best conceived as a subcategory of the *Rowley-Deal* FAPE analysis, but evaluated using the LRE-specific test set forth by the Sixth Circuit Court of Appeals in *Roncker*.  *See A.S. ex rel. S. v. Norwalk Bd. of Educ.,* 183 F. Supp. 2d 534, 540 (D. Conn. 2002) (observing that while "*Rowley* demarcates an outer limit to the IDEA's LRE preference, *Rowley* does not provide guidance for determining whether, in a specific case, the IDEA's LRE requirement has been met," and citing

---

meeting to discuss adjusting the IEP goals, violates the IDEA.  Given that L.H.'s IEP explicitly contemplated modifying his assignments to meet his present levels of performance, however, the Court concludes that it was reasonable to afford Ms. Hope some amount of time to see if reducing the difficulty of L.H.'s instructional level would allow him to build the prerequisite skills to get back on track with his IEP goals, before calling an IEP meeting to discuss changing those goals.

Here, Ms. Hope attempted the curriculum modification for at most nine weeks before an IEP meeting was requested.  The Court does not find this to be an unreasonable amount of time.  Moreover, even if this delay did amount to a procedural violation, the Court does not find it to have resulted in substantive harm to L.H.  *See Deal II*, 392 F.3d at 854 ("Only if a procedural violation has resulted in substantive harm, and thus constitutes a denial of a FAPE, may relief be granted.").  For these reasons, the Court will **DENY** Plaintiffs' motion for judgment as to this this claim.

various circuit cases, including *Roncker*, that "set forth tests to be used in specific cases implicating the IDEA's LRE requirement"). In other words, placement in the least restrictive environment is not the goal in and of itself, but is desirable as a means of advancing the education of the child in question.

HCDE contends the issue is whether the 2013–14 IEP would have provided L.H. with a meaningful educational benefit, and thus the Court should apply the FAPE analysis articulated in the *Rowley-Deal* line of cases. (*See, e.g.*, Doc. 169 at 45.) Plaintiffs assert this case is about whether the 2013–2014 IEP proposed to educate L.H. in his least restrictive environment, and thus the Court should apply the specialized LRE analysis set forth in *Roncker*. (*See, e.g.*, Doc. 170 at 3.)

The Court will adopt Plaintiffs' position. HCDE's position is based entirely on the Sixth Circuit Court of Appeals's decision in *McLaughlin v. Holt Public Schools Board of Education*. The contested IEP in *McLaughlin* provided the child would be completely mainstreamed with regularly developing peers during the entirety of the half-day kindergarten class and would receive additional instruction in a separate special-education classroom the remaining half of the day. 320 F.3d at 667–68. The parents challenged the IEP based on their desire to have their child mainstreamed at her neighborhood school and receive the additional instruction in a resource room there, rather than mainstreaming the child at a different school and receiving additional instruction in a specialized classroom at that school. *Id.* at 668. The Court of Appeals characterized the dispute as one regarding the *location*, rather than the *extent*, of mainstreaming, and held that because the child was already being mainstreamed to the maximum extent possible—the entire half-day kindergarten class—the least restrictive environment was not implicated. *Id.* at 671–72. As a result, the Court of Appeals determined *Roncker*'s least-restrictive-environment analysis was inapplicable. *Id.*

Case 1:14-cv-00126-CLC-SKL Document 172 Filed 11/04/16 Page 23 of 54 PageID #: 6195

The present case is readily distinguishable from *McLaughlin*. Here, as Plaintiffs argue, the extent of mainstreaming *is* the central issue in dispute. The 2013–2014 IEP did not propose to fully mainstream L.H.; rather, the proposed IEP would have had L.H. receive all or substantially all of his academic and pre-vocational instruction in the CDC. This would have constituted a significant change from the previous school years, in which L.H. was mainstreamed in the regular-education classroom with a brief period of daily pull-out instruction. (*Compare* Pl.'s Ex. 57, 2013–2014 IEP at 26 *with* Pl.'s Ex. 1-2, 2012–2013 at 21.) Accordingly, the Court will follow the least-restrictive-environment analysis laid out by the Sixth Circuit in *Roncker*.

## B.   *Roncker*'s Least-Restrictive-Environment Analysis

In *Roncker*, the Court of Appeals, noting the "very strong congressional preference" in favor of mainstreaming, concluded "the proper inquiry is whether a proposed placement is appropriate under the [IDEA]." 700 F.2d at 1063. "[W]here a segregated environment is considered superior, the court should determine whether the services which make that placement superior could feasibly be provided in a non-segregated setting. If they can, the placement in the segregated [setting] would be inappropriate under the Act." *Id.*

The *Roncker* court identified three categories of children for whom mainstreaming would not be appropriate: (1) where the child would not receive a benefit from mainstreaming; (2) where any marginal benefits of mainstreaming would be far outweighed by the benefits of a separate setting that could not feasibly be provided in a non-segregated setting; or (3) where the child would be a disruptive force in the non-segregated setting. *Id.*; *accord Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 460 (6th Cir. 1993). *But see McLaughlin*, 320 F.3d at 673 n.4 (recounting, in dicta, a modified list, denominated as factors, not categories). In analyzing whether mainstreaming is appropriate for a child, courts are to consider not only the child's educational needs, but also his or her physical and emotional needs. *Id.*

Hence, the Court must determine whether L.H. falls into any of the three categories of children for whom mainstreaming is not appropriate. If he does not, the proposed CDC placement in the 2013–2014 IEP violates the IDEA's least-restrictive-environment mandate.

### 1. Could L.H. receive a benefit from mainstreaming?

The Court finds Plaintiffs have established L.H. could receive a benefit from inclusion in the general-education environment. This finding is supported by ample evidence, including expert testimony regarding the benefits students with Down Syndrome typically realize from mainstreaming and testimony regarding L.H.'s actual progress during the years he was mainstreamed at Normal Park. The evidence HCDE musters in opposition, while not without weight, is ultimately unpersuasive: it does not prove L.H. could not receive a benefit from inclusion, only that L.H. could not achieve results commensurate with those achieved by his non-disabled peers. Because this is not the standard by which progress is measured under the IDEA, the Court concludes L.H. does not fall within *Roncker*'s first exception to the IDEA's mainstreaming mandate.

### a. Expert testimony regarding the typical benefits of inclusion for children with Down Syndrome

Plaintiffs' experts offered persuasive evidence that educating children with Down Syndrome in the general-education environment typically provides a greater benefit than education in a segregated setting. Dr. Kathleen Whitbread, an expert in the education of children with Down Syndrome with thirty-five years' experience in the field as a teacher, researcher, author, and consultant, testified there is virtually no disagreement among researchers that children with Down Syndrome fare better, both socially and academically, the more inclusive their educational experience is. Dr. Whitbread's expert report cites several studies finding students with Down Syndrome who are educated in inclusive settings experience significant benefits, particularly in the area of literacy, but also in their standardized test scores, their

Case 1:14-cv-00126-CLC-SKL   Document 172   Filed 11/04/16   Page 25 of 54   PageID #: 6197

behavior, and their ability to live independently following their education.  (Pl.'s Ex. 6b at 11–12.)

Dr. Buckley, acknowledged by witnesses for both sides to be the leading expert in the field of education of children with Down Syndrome, submitted an expert report supporting Dr. Whitbread's conclusions regarding the benefits of mainstreaming.[9]  Dr. Buckley's report references a 2006 study done in the United Kingdom of students with Down Syndrome between the ages of 11 and 20 finding that students educated in mainstream classrooms were significantly more advanced academically than students educated in segregated schools.  (Pl.'s Ex. 5.)  Specifically, the study found that compared to the students who had been educated exclusively in segregated settings, mainstreamed students were an average of 3.3 years ahead in reading and writing and 2.5 years ahead in their expressive language abilities.  (*Id.* at 7–8.)  The UK study also found that students in fully inclusive settings who are able to model their behavior after non-disabled peers had fewer behavioral problems than did students with Down Syndrome educated in segregated settings.  (*Id.* at 7.)  Dr. Buckley's report also referenced a 2012 article in which the authors conducted a systematic review of forty years of international research on the effects

---

[9] Plaintiffs retained Dr. Buckley as an expert witness and intended to have her testify via video-link during the hearing.  But during Plaintiffs' case-in-chief, HCDE asked Dr. Whitbread a series of questions from the report.  After several questions, HCDE's counsel moved the report into evidence, commenting that while he believed Plaintiffs' counsel had intended to tender the report, he would go ahead and do it himself.  Thereafter, Plaintiffs chose to forego calling Dr. Buckley to testify about her report.  Instead, Plaintiffs relied on the opinions contained in the report, referencing it multiple times throughout the hearing.

At the conclusion of the hearing, HCDE contended that it had submitted the report only for cross-examination purposes, and not as substantive evidence.  It is true that evidence may be admitted not for its truth, but solely to impeach.  While that may have been HCDE's initial intent, HCDE chose to tender the entire report into evidence without any request that it be used for a limited purpose.  In fact, when offering the report, HCDE's counsel explicitly referenced Plaintiffs' intent to introduce and use the report, intimating he was admitting the report to save Plaintiffs the trouble.  Then, when Plaintiffs *did* use the report substantively, HCDE never objected or otherwise gave any indication of having offered the report for a limited purpose. HCDE is therefore estopped from asserting it did not intend the report to be used substantively.

of mainstreaming on children with Down Syndrome. (*Id.* at 9.) Overall, the authors found mainstreamed students developed better language and academic skills than students in segregated settings, even accounting for selective placement of students. (*Id.*) In sum, Dr. Buckley opined the great weight of research supports the conclusion that for most children with Down Syndrome, inclusion in the regular-education classroom provides an appreciable benefit.

In response, HCDE offered the testimony of its consultant, Dr. Susan Kabot, a licensed speech and language pathologist and an acknowledged expert in the field of educating children with intellectual disabilities. Dr. Kabot agreed the research was almost entirely favorable regarding the benefits of mainstreaming children with Down Syndrome, and acknowledged she had been unable to find any studies showing inclusion was not beneficial for Down Syndrome students. Dr. Kabot opined, however, that due to certain limitations in the studies, it is difficult to determine conclusively that inclusive settings are generally better than non-mainstreaming settings. Dr. Kabot identified several limitations with the design of many of the studies, including a lack of experimental controls and randomization, small sample size, the inability to control for different teaching techniques in inclusive classrooms and non-mainstreaming classrooms, and a lack of easily comparable results due to the difficulty of using standardized instruments to assess students with Down Syndrome. Dr. Kabot acknowledged, however, that most, if not all, of these limitations are inherent due to the nature of the subject being researched. Because the incidence of Down Syndrome is fairly low, it is difficult to obtain a large sample of students with Down Syndrome to study. Additionally, it is not feasible to randomly assign students to different settings solely for the purpose of gauging the relative benefit of non-mainstreaming versus inclusive settings.

The Court finds the research regarding inclusion of children with Down Syndrome to be fairly consistent in concluding that students with Down Sydrome generally receive appreciable

benefits from mainstreaming. Dr. Kabot did not disagree with this conclusion; she simply pointed out that the results of the studies were not airtight, due to the nature of researching a relatively rare condition in the inherently sensitive and ethically fraught area of childhood education. The Court appreciates these limitations, but does not find them to negate the findings of these studies *in toto*.

While the benefits of mainstreaming are uncontroversial as a general proposition,[10] this does little to advance Plaintiffs' case unless Plaintiffs can show the proposition holds true for L.H.

### b. L.H.'s progress while mainstreamed at Normal Park

Plaintiffs seek to establish the applicability of this general premise to L.H. by showing he did in fact make progress and obtain a benefit during the four years he was mainstreamed at Normal Park. HCDE generally does not dispute that L.H. made progress during the three years leading up to his second-grade year. (*See, e.g.*, DP Ex. 6, Notes of February 6, 2012 IEP Meeting 00336 (Ms. Levine acknowledges L.H. benefited from being in an inclusive environment at Normal Park during kindergarten and first grade); Pl.'s Ex. 1-17, 2011–2012 Report Card at 1 ("[L.H.] is very close to reaching the end of the first-grade [reading] goal. He is reading more independently and fluently. He has come a long way since the starting of the year. Way to go!").) Where the parties' accounts diverge is the 2012–2013 school year. HCDE's position is that L.H. did not make appreciable progress during this year. HCDE bases this conclusion on testimony from L.H.'s teachers, corroborated by L.H.'s 2012–2013 IEP progress reports, that he made very little progress toward his second-grade-based IEP goals. Plaintiffs' position is that L.H.'s progress should be measured in terms of his own abilities, and under this

---

[10] In fact, this appears to be a basic assumption of the IDEA. *See* 20 U.S.C. § 1400(c)(5) ("Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by . . . ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible.").

standard, L.H. continued to make progress and receive a benefit from mainstreaming during second grade.

### i.　　　Measuring progress under the IDEA

The basic question the Court must resolve is the appropriate standard by which to measure whether a child is making progress and receiving a benefit in the regular-education environment.　Does a child have to be able to "keep pace with the curriculum" in order to be mainstreamed?　Or is the propriety of mainstreaming determined based on the child's ability to make reasonable progress toward individualized goals aligned in some way with grade-level standards?　The Court concludes, based on case law and the IDEA itself, that the latter standard is correct.

A review of the nature and purpose of IEP goals is a helpful starting point.　Every child receiving services under the IDEA must have an IEP containing "a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Knable*, 238 F.3d at 763 (citing 20 U.S.C. § 1401(a)(20)).　Regarding the IEP goals, the IDEA provides they must be "measurable annual goals . . . designed to . . . meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(II).

From these provisions, the Court divines the following relevant principles.　IEP goals are to be firmly grounded in a child's current abilities, but aligned with, or pointed toward, the applicable general-education standards for the child's current grade level.　The role of special-education services and supports, then, is to enable the child to make appropriate progress toward these goals, thereby accessing the general-education curriculum as intended by the IDEA. *See* 20 U.S.C. § 1401(29) (explaining the purpose of aids, services, and supports is "to enable

children with disabilities to be educated with nondisabled children to the maximum extent appropriate"). To put it in more concrete terms, if a child's current level of performance is the ground, and the general-education grade-level standard is the roof, special-education supports and services provided pursuant to an IEP are intended to function as a ladder upon which a child can climb from his or her current level of performance toward the general-education curriculum.

Sticking with this analogy, the relevant question is how far and how fast a child must climb that ladder to remain in the regular-education classroom. The language of § 1414(d)(1)(A)(i)(II)—that the IEP must contain "annual goals . . . designed to . . . enable the child to be *involved* in and *make progress* in the general education curriculum"—strongly implies that IEP goals need not be pegged to the top of the ladder, with mainstreaming predicated on achieving those goals. Rather, IEP goals should be set as far up the ladder as the child can reasonably be expected to progress within one school year.

What the IDEA implies, the case law makes explicit: a child need not master the general-education curriculum for mainstreaming to remain a viable option. *See, e.g.*, *K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 810 (8th Cir. 2011) (holding the IDEA does not require a child to achieve results commensurate with those of nondisabled children on the child's grade level); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir. 1989) ("[W]e cannot predicate access to regular education on a child's ability to perform on par with nonhandicapped children.")[11]; *Mavis v. Sobol*, 839 F. Supp. 968, 988 (N.D.N.Y. 1993) ("Given the fact that the

---

[11] The Court of Appeals for the Fifth Circuit's cogent discussion of this point (in relation to the Education for All Handicapped Children Act (EHA), a materially similar predecessor statute to the IDEA) is worth setting out at length:

> States must tolerate educational differences; they need not perform the impossible: erase those differences by taking steps to equalize educational opportunities. As a result, the Act accepts the notion that handicapped students will participate in regular education but that some of them will not benefit as much as nonhandicapped students will. The Act requires states to tolerate a wide

Case 1:14-cv-00126-CLC-SKL   Document 172   Filed 11/04/16   Page 30 of 54   PageID #: 6202

IEP process is designed in part to define satisfactory education for each child on an individual basis and that this process is part of the statutory scheme, we cannot conclude that Congress intended mainstreaming to be restricted to those who could progress from grade to grade in the normal academic program.") (quoting *Thornock v. Boise Indep. Sch. Dist. No. 1*, 767 P.2d 1241, 1250 (Idaho 1988)).

Rather, "the appropriate yardstick is whether [the child], with appropriate supplemental aids and services, can make progress toward [the child's] IEP goals in the regular education setting." *See A.S. ex rel. S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 546 (D. Conn. 2002); *see also Mavis*, 839 F. Supp. at 988 ("[T]he ability of the child to be mainstreamed successfully will depend on the goals of the IEP and the child's achievement of those goals."); *Cty. of San Diego v. Cal. Special Educ. Hearing Office,* 93 F.3d 1458, 1462 (9th Cir. 1996) ("To measure whether a child benefits from the current educational services she receives, the IEP team determines whether there is progress toward the central goals and objectives of the IEP.").

### ii. How HCDE gauged L.H.'s progress

Notwithstanding the acknowledgement by HCDE that "[t]he law does not require L.H. to master the general education curriculum" (*e.g.*, Doc. 169 at 41 n.8), the record is replete with

---

range of educational abilities in their schools and, specifically, in regular education—the EHA's preferred educational environment. Given the tolerance embodied in the EHA, we cannot predicate access to regular education on a child's ability to perform on par with nonhandicapped children.

We recognize that some handicapped children may not be able to master as much of the regular education curriculum as their nonhandicapped classmates. This does not mean, however, that those handicapped children are not receiving any benefit from regular education. Nor does it mean that they are not receiving all of the benefit that their handicapping condition will permit. If the child's individual needs make mainstreaming appropriate, we cannot deny the child access to regular education simply because his educational achievement lags behind that of his classmates.

*Daniel R.R.*, 874 F.2d at 1047.

evidence that HCDE staff held L.H. to just such a standard. This is understandable, because the IEP adopted at the parents' insistence incorporated the general-education curriculum as the goal. So it would be surprising if HCDE personnel had not made reference to the general-education curriculum. Ms. Hope, L.H.'s second-grade special-education teacher, testified at the due-process hearing that she was very concerned at the beginning of the year because she knew "what would be expected of [L.H.] in the regular-ed[ucation] curriculum." (DP Tr. at 181.) When asked whether L.H. had made progress during second grade, she testified he had made some progress, but he "was not able to meet those second[-]grade standards outlined in his IEP" and he simply "did not get to the second[-]grade standards as his IEP was written." (DP Tr. at 243.) In her affidavit, which was introduced into evidence at the due-process hearing, Ms. Hope averred that despite her best efforts, she "simply could not close the gap between L.H.'s levels of performance and the rigorous expectations of the second[-]grade regular[-]education curriculum in the inclusion setting." (DP Ex. 7 at 13.)

Likewise, Ms. Higgs, L.H.'s classroom teacher, testified she was able to find some educational strategies L.H. found engaging, but "they weren't on the second[-]grade level." (DP Tr. at 369.) Ms. Higgs also averred L.H. needed to be in the CDC because, given his present levels of performance, "expecting him to perform at the level of a typical second[-]grader would be futile." (*See* DP Ex. 16 at 10.) Ms. Higgs concluded by opining that even if L.H. had remained in the regular-education setting, he would have been held back because he "failed second grade." (*Id.*)

Nor was this view limited to L.H.'s teachers. Ms. Manley, the experienced special-education teacher HCDE relied on to teach the teachers, testified L.H. had not made substantial progress during second grade because, "given his present levels of performance," the effort of trying to "keep[] up" with the "rigor and pace of the second[-]grade curriculum was just too

much of a challenge for him." (DP Tr. at 433.) Ms. Kendrick, HCDE's special-education supervisor, testified L.H.'s "goals were written on a second[-]grade standard, and "no amount of scaffolding" would ever have enabled L.H. to "reach[] those second[-]grade goals." (DP Tr. at 493.) Even Dr. Kabot, the special-education expert HCDE hired to provide training and consultation to HCDE staff, advised HCDE that mainstreaming—"[t]he inclusion model with pull-out and push-in support"—was inappropriate for L.H. because it is "designed to meet the needs of students who are able to *master* the general education curriculum."[12] (*See* DP Ex. 27 at 4–5 (emphasis added).)

### iii.     The relevance of L.H.'s failure to meet his IEP goals

This is where things get complicated. The law is clear that a child who is making progress toward appropriate goals—goals based on the child's present levels of performance and aligned with state general-education curriculum standards—is receiving a benefit from being in the general-education setting; and logically, a child who is making no, or trivial, progress toward those goals is not. It is also fairly clear from the record that HCDE did not hold to this standard, but rather adhered to the IEP, stating at times the goal was "meeting," "reaching," "keeping up with," "performing on the level of," or "mastering" the general-education curriculum. But it is also plain that L.H. made very little progress toward his IEP goals during second grade. So, irrespective of HCDE's use of an improper standard, does L.H.'s insubstantial progress toward his IEP goals, adopted at the strong insistence of his parents, necessarily mean he could not receive a benefit from mainstreaming?

---

[12] To be fair, in her testimony before this Court, Dr. Kabot retreated from that position, agreeing that the correct standard for a child with an IEP is not necessarily mastery of the general-education curriculum, but making progress on the child's individualized IEP goals. However, Dr. Kabot's *ex post* position is largely irrelevant to the question of what HCDE believed in 2012–2013.

It does not.  Although there is little dispute L.H. was not making adequate progress toward the goals contained in his IEP, there is also little dispute those goals were essentially second-grade general-education goals.  (*See, e.g.*, DP Tr. at 243 (testifying L.H. ""was not able to meet those second[-]grade standards outlined in his IEP"); DP Ex. 6, 2012–2013 IEP Third Quarter Progress Report 00321–00330 ("[L.H.] has not demonstrated progress in meeting the objective *as written for 2nd[-]grade standards and expectations*." (emphasis added)); *id.*, 2012–2013 IEP Fourth Quarter Progress Report at 00218–00222, 00224–00226 (same.)  The Court credits the assessment of L.H.'s teachers and HCDE staff that he lacked the prerequisite skills to achieve general-education-level goals.  But to the Court, this establishes only that the goals contained in L.H.'s 2012–2013 IEP were not appropriately calibrated to his present levels of performance; it does not establish L.H. could not receive a benefit from a general-education setting, given appropriate goals.  (*Cf.* DP Ex. 27, Kabot Report at 5 (opining the possible reasons for L.H.'s lack of progress "are *either* that the goals/objectives were set too high *or* that the service delivery was not designed to teach a student who needed more and/or different support" (emphasis added)).)

The Court recognizes that, per the terms of the final pretrial order, whether the 2012–2013 IEP was reasonably calculated to provide a FAPE is not at issue.  (*See* Doc. 148 at 10–11.)  But this does not preclude the Court from determining, based on the record, that the use of regular second-grade standards in L.H.'s 2012–2013 IEP was not appropriate, when that determination is relevant to the least-restrictive-environment question of whether L.H. could receive a benefit from mainstreaming.  The Court also recognizes L.H.'s parents' insistence on holding him to high standards was a significant, if not the deciding, factor in the IEP team's decision to peg the IEP goals to second-grade standards.  (*See, e.g.*, DP Tr. at 493.)  Although

seemingly unfair, this does not absolve HCDE from *its* obligation under the IDEA to educate L.H. in the most inclusive environment appropriate.

### iv.    Evidence of L.H.'s progress during second grade

Given the Court's finding that the IEP team's focus on second-grade general-education standards—to the exclusion of L.H.'s present levels of performance—in setting the academic goals in L.H.'s 2012–2013 IEP was inappropriate, the Court does not find his inability to meet these goals dispositive of the question whether he could make progress toward *appropriately* calibrated goals.   Instead, the Court credits the testimony of L.H.'s teachers, who, despite laboring under an incorrect understanding of the standard he had to meet under the IDEA, both testified L.H. *did* make some progress, both academically and behaviorally, during second grade. Ms. Hope, who, as L.H.'s special-education teacher, was in perhaps the best position to gauge L.H.'s progress, testified:

> He made progress . . . he made progress in word work.  He started with his word work level being at an early kindergarten level [and progressed] to [working] toward [the] end of kindergarten level.  He made some progress behaviorally.  He made progress with skip counting.  He made some progress with recognizing a few basic addition facts, and he made some progress behaviorally.   And his stamina for working longer periods of time did progress.

(DP Tr. 243.)  Ms. Higgs likewise noted L.H.'s progress in the area of word work, from a Level A at the beginning of the year to a Level C by the end of the year.  (DP Tr. at 347–48.)  Ms. Higgs also testified she found several strategies that were successful in helping L.H. progress toward his IEP goals, including the use of manipulatives and visuals.   (DP Tr. at 369.) Commenting on L.H.'s progress, Dr. Kabot opined his teachers did an excellent job incorporating a number of different teaching strategies designed to help him progress, and ultimately, while he did not make a *lot* of progress, she felt he did make some.

L.H.'s IEP second-semester progress reports, particularly the fourth-quarter report, flesh out this testimony.  Regarding L.H.'s progress working independently and with a minimum of

adult prompts, the fourth-quarter report stated "[L.H.] has improved in this area. He struggles on some days, but has been able to respond to verbal and non-verbal prompts/cues 70% of the time with no more than 5 prompts," and L.H. "has been able to complete individually assisted work until a task is complete 74% of the time." (DP Ex. 6 at 00213–14.) As for L.H.'s behavioral objective to "appropriately approach others and . . . maintain appropriate personal space" at least 80% of the time, the report indicates L.H. not only "made progress in this area," but he actually completed the objective. (*Id.* at 00214.)

With regard to L.H.'s first reading goal, "listening attentively . . . for specific information by sitting for 15 minutes and answering up to 3 questions regarding [the] situation," the report noted L.H. was not comprehending on a second-grade level, but that he "listens attentively for 15 minutes" and "sometimes answers basic questions regarding the situation." (*Id.* at 00218.) As for L.H.'s other reading objectives, the report noted L.H. was not able to read on a Level L, the goal for typical second-graders, but he had made "some progress" toward his remaining objectives, "demonstrat[ing] a basic understanding" of compound words and "do[ing] well" understanding synonyms and antonyms—though not to second-grade standards. (*Id.* at 00218–19.)

The report reflects a similar pattern of progress in math. Under the objective of skip-counting by 2s, the report noted L.H. was "able to count to 12 by [2s] consistently, which is an improvement from the beginning of the year, which was counting to 8 consistently," and was sometimes "able to count to 20 and 24 by 2's with manipulatives, songs, charts, scaffolding[,] and supports." (*Id.* at 00223.) As for counting to 100 by 5s and 10s, the report states "[L.H.] has made progress in these areas, particularly with counting to 100 by 10s!" (*Id.*) Under the goal of "solv[ing] simple arithmetic problems using various methods," the report stated "[L.H.] has been able to solve simple arithmetic problems with the use of a calculator and manipulatives as well as

with supports and scaffolding," but that he had not yet internalized these skills. (*Id.* at 00224.) With regard to L.H.'s objective of understanding the concept of a number line, the report remarks L.H. "has worked hard with number lines and can place a missing number on the number line 1–10" with the help of scaffolding, modification, supports, and manipulatives. (*Id.* at 00224.) "This is progress for [L.H.]," the report concluded, albeit "not . . . progress in meeting the objective as written for 2nd[-]grade standards and expectations." (*Id.*)

The record is abundantly clear: L.H. could, and did, make behavioral and academic progress in a regular-education classroom at Normal Park during kindergarten, first grade, and second grade. He did not receive a benefit commensurate with that of his typically developing peers; he did not reach the grade-level expectations set for him; but he definitely received *some* benefit.[13] The Court thus concludes L.H. does not fall within the first category of students identified by the *Roncker* court for whom mainstreaming is not appropriate—those who would not receive a benefit in the regular-education setting. *See* 700 F.2d at 1063.

### v. The ALJ's findings regarding L.H.'s progress

HCDE contends the Court must give due deference to the ALJ's finding that L.H. was *not* receiving a meaningful benefit from inclusion at Normal Park despite the support from his teachers. (Doc. 169 at 42.) It is true that in the context of his least-restrictive-environment analysis, the ALJ found "[i]t is clear from the previous year that [L.H.] did not make much progress at Normal Park." (Technical Record ("T.R.") 1, Final Order at 11; *see also id.* at 18

---

[13] HCDE argues there was evidence L.H. lost ground in some areas over the course of second grade (*e.g.*, DP Tr. at 132 (testimony L.H. forgot the days of the week); DP Tr. at 227 (testimony that L.H. forgot the order of the alphabet)), and this regression cancels out any minimal progress he may have made. (*See* Doc. 169 at 42.) First, the Court notes there was also evidence L.H. had *not* forgotten these skills. (DP Tr. at 624–625 (testimony by L.H.'s third-grade teacher that he knew the order of the alphabet and the days of the week).) Second, even assuming L.H. had not internalized these skills, overall, the Court does not find L.H.'s diminished proficiency in these two areas to outweigh the documented progress he made in many other areas.

("At any rate, given [L.H.]'s lack [of] progress in second grade, it would seem that the Normal Park environment, even with the extensive aids and accommodations given [L.H.], just did not work.").)

On this point, the Court first notes the ALJ did not conclude L.H. made no progress at all at Normal Park; he found only that L.H. was not making *much*. This finding, on its face, is not inconsistent with the Court's conclusion that L.H. made *some* progress. Second, the ALJ did not cite to *Roncker*, or otherwise identify the correct legal framework for conducting a least-restrictive-environment analysis in the Sixth Circuit.[14] This, by itself, renders application of the *Roncker* analysis to his factfinding difficult, if not inappropriate. *See Roncker*, 700 F.2d at 1062 n.5 (concluding, after finding that the district court erred in its conclusions of law, that remand for application of the correct legal standard was "preferable to attempting to apply the proper legal standard to factual findings which were made under an overly deferential standard of review"). Third, and most importantly, the ALJ did not clarify his understanding of how progress is measured under the IDEA. In fact, in places, it appears the ALJ improperly gauged L.H.'s progress against grade-level standards, rather than L.H.'s own abilities. (*See id.* at 4 (noting L.H. "was not working at a second[-]grade level); *id.* at 10 (assuming keeping L.H. at Normal Park would have required instructing him at a third-grade level, which, given L.H.'s current levels of performance, would be fruitless and counterproductive); *id.* at 12–13 (assuming the only alternative to placing L.H. at the CDC was instructing him at a third-grade level, which would cause him to act out); *id.* at 18 (holding that mainstreaming L.H. at Normal Park would require the school district to "pursue futile educational strategies").) For these reasons, the Court

---

[14] The ALJ's only reference to case law interpreting the IDEA's least-restrictive-environment provision was a one-sentence reference to a decision by the Fifth Circuit Court of Appeals in 2012. (*See* T.R. 1 at 17 (citing *J.H. v. Fort Bend Ind. Sch. Dist.*, 59 IDELR 122).)

does not find the ALJ's conclusion that L.H. failed to make meaningful progress at Normal Park to be entitled to deference.

To recapitulate the Court's conclusions under *Roncker's* first prong, the Court finds that children with Down Syndrome typically benefit from inclusion in general-education classrooms; L.H. did receive such a benefit through first grade at Normal Park; L.H.'s failure to achieve or even substantially progress toward grade-level-tied IEP goals during second grade does not preclude a finding that he could make progress when measured against the correct standard; and, once the strict grade-level-standard lenses have been doffed, there is ample evidence that L.H. did in fact make appreciable academic and behavioral progress during second grade at Normal Park as well. Accordingly, the Court finds L.H. could receive a benefit from mainstreaming.

**2.      Are the non-portable benefits of mainstreaming far outweighed by the benefits of a non-mainstreaming setting?**

HCDE argues that, given L.H.'s unique needs, placement in a CDC, with an alternative curriculum, is academically superior to placement in a regular-education classroom. Because this perception "may reflect no more than a basic disagreement with the mainstreaming concept," which, "is not, of course, any basis for not following the Act's mandate," the Court must determine whether the services that purportedly make the CDC superior "could be feasibly provided in a non-segregated setting." *See Roncker*, 700 F.2d 1063.[15]    Even where those services could not feasibly be provided in a regular-education classroom, mainstreaming remains

---

[15] The Court would be remiss if it did not acknowledge this inquiry borders on an educational-policy determination better left to school officials with educational expertise. *See Daniel R.R.*, 874 F.2d at 1046 (5th Cir. 1989) (declining to adopt the least-restrictive-environment analysis in *Roncker* in part because the inquiry "whether a particular service feasibly can be provided in a regular or special education setting is an administrative determination that state and local school officials are far better qualified and situated than are we to make"). The Court is not aware of any Sixth-Circuit precedent abrogating this step of *Roncker*'s analysis, however, and in fact, in *Roncker* itself, the Court of Appeals expressly acknowledged the difficulty of the burden the mainstreaming analysis imposes on a district court. *See* 700 F.2d at 1063. Accordingly, the Court will proceed with the inquiry.

the appropriate placement unless "any marginal benefits received from mainstreaming are far outweighed by the benefits" of the CDC. *See id.*

This inquiry can be broken down into three steps. First, the Court must identify the supposedly superior services of the non-mainstream setting. Second, the Court must determine whether those services could be provided in a mainstream setting. Finally, if the benefits of the non-mainstream setting are not portable to the non-segregated setting, the Court must determine whether those non-portable benefits *far* outweigh the benefits of mainstreaming. If Plaintiffs prevail on either of the latter two steps, they will have established L.H. does not fall in *Roncker*'s second category of students for whom mainstreaming is inappropriate.

### a. Reasons why HCDE believes the CDC is superior for L.H.

HCDE argues L.H. cannot be educated with his typically developing peers in a regular-education classroom because the gap between his current levels of performance and the general-education curriculum is so great "the nature and extent of the pre-teaching, re-teaching, and reinforcement that L.H. needs to develop and retain prerequisite skills could not have been accomplished in the mainstream setting." (Doc. 169 at 42.) A number of witnesses testified to this effect. Ms. Hope foresaw that as the demands of the general-education curriculum grew increasingly harder, L.H. would inevitably be left further and further behind his typically developing peers academically, "working on his present levels while the rest of the class is just . . . a satellite around him." (DP Tr. at 241.) Ms. Hope believed L.H. needed to be able to work at his own level and at his own pace, and he needed to develop greater independence—to be able to work without relying on an aide or teacher for prompting and assistance. (*See id.* at 241, 313, 314–315.)

Other teachers provided similar testimony. In Ms. Higgs's view, the CDC would allow L.H. to work at a slower pace and build the prerequisite skills he needed to work at a second-

grade level.  (DP Tr. at 360–61.)  Ms. Higgs did not think L.H. would be able to develop these skills in a regular-education setting because there simply would not be enough time, given his learning pace and the level of repetition he needed to internalize skills, for him to be able to learn the prerequisites and catch up to the skills being taught at grade level.  (*See id.* at 361–362.)  Ms. Manley testified the teachers tried to draft an IEP for third grade that would keep L.H. in a regular-education classroom, but they just did not believe L.H. would be able to catch up to the level of his typically developing peers—as she put it, "make more than one year's gains in one year."  (DP Tr. at 435–36.)  Instead, she testified, L.H. needed to be in a setting where he could work at his own pace on the prerequisite skills he was lacking so he would be able to move forward in the curriculum.  (DP Tr. at 443.)

Ms. Johns testified before the Court that L.H. needed either a modified curriculum or a slower pace so he could fill in the gaps in his math skills.  Ms. Johns did not think a teacher could provide the modifications necessary to address these needs in a regular-education classroom, although she acknowledged she was not a special-education teacher and did not have much experience with the types of supports that could be provided.  Ms. Rosenow likewise testified L.H.'s needs could not be met in a regular-education setting because there would not be enough time for L.H. to go back and master the fundamentals of phonics he needed, given the pace and level of the general-education curriculum.  Ms. Rosenow did clarify, however, that intensive phonics and reading instruction could sometimes be provided by a special-education teacher via pull-out time.  (*Id.* at 270–72.)

Bolstering the testimony of HCDE teachers was the expert testimony of Dr. Kabot.  Dr. Kabot testified at the due-process hearing she did not believe the proposed 2013–2014 IEP could be implemented at Normal Park because she did not think L.H. could access the third-grade general-education curriculum at that time, regardless of the accommodations provided him, and

she felt that given his present levels of performance, he needed intensive instruction from a special-education teacher, not just a little help from an aide in a general-education classroom. (DP Tr. at 779–81.) Dr. Kabot also concurred in the assessment that L.H. needs to develop greater independence, and a CDC environment would help in this area.

It appears the consensus is L.H. needs (1) focused instruction, (2) on the prerequisite skills he currently lacks, (3) at a pace slow enough to enable him to truly internalize the concepts, as well as (4) an environment conducive to building greater independence. HCDE's answer to each of these needs is for L.H. to receive academic instruction pursuant to an alternative curriculum in a specialized classroom. The alternative academic track proposed by HCDE would be much more loosely connected to the general-education curriculum and more focused on developing life-help skills than on academic aptitude. Under this alternative curriculum, HCDE reasons, L.H. would not be under constant pressure to keep up with the general-education curriculum, but would be able to work at his own pace and acquire the basic academic skills he currently lacks. Because the CDC has a lower student-teacher ratio, HCDE posits L.H. would also have a greater opportunity for personalized instruction and attention from specialized instructors. Additionally, given the slower pace and the specialized environment of the CDC, HCDE believes L.H. would not need a full-time aide, and would thus have the opportunity to develop greater independence than he would in a regular-education setting.

Having identified the purported benefits of the CDC for L.H., the Court must next determine whether these services could feasibly be provided in a regular-education setting.

### b. The feasibility of providing the CDC's supposedly superior services in the regular-education setting

From the testimony of HCDE's witnesses, it appears their conclusions regarding whether L.H.'s needs could be met in the regular-education setting were based in large part on their understanding that to be mainstreamed, a child had to be able to keep up with the general-

education curriculum. A number of the teachers testified the reason they believed L.H. could not be educated in a regular-education classroom was because it was not feasible for him to both learn the prerequisite skills he was lacking and keep pace with the regular curriculum. (*See, e.g.*, DP Tr. at 361–362 (opining "there is not time for the daily repetition of these very basic concepts that he needs, much less the introduction of these new grade-level standards").) They were rightly concerned about requiring him to work at a level and pace for which he was unprepared.

But correctly understood, the IDEA does not require L.H. to keep up with the pace of the regular-education curriculum and of his typically developing peers in order to be mainstreamed. It must be understood that certain children covered by the IDEA will fall farther and farther behind their typically developing, same-age peers. As the Court explained above, the standard for mainstreaming under the IDEA is whether a child is able to make reasonable progress toward individualized goals, not master grade-level standards. *See* section IV.B.1.b.i *supra*. In other words, with a proper understanding of the standard for mainstreaming under the IDEA, HCDE's concerns that mainstreaming would prevent L.H. from working at his own pace and level—two of the primary reasons put forward in support of a CDC placement—dissipate.

The Court is left with the contentions that L.H. needs focused, intensive instruction, and he needs to be weaned off his aide so he can develop greater independence. The Court does not find either of these needs to be so great that they cannot feasibly be met in the regular-education environment, whether at Normal Park or some other school, with appropriate supports and aids under the IDEA. As for L.H.'s need for greater independence, part of the reason the CDC was deemed superior was because L.H. could work at a slower pace, and thus would have less need for a full-time aide. But if L.H. is not required to work at the pace or level of typically developing peers, his need for an aide will likely be commensurately diminished. And as for L.H.'s need for intensive instruction in prerequisite skills, Dr. Whitbread testified at the

supplemental evidentiary hearing that this need could be fully addressed in the regular-education setting through judicious use of accommodations and additional pull-out or push-in time with a special-education teacher, and some modification of the general-education curriculum.

For example, L.H.'s teachers cited his difficulty remembering the order of the alphabet as an area in which he needed focused instruction at a level and to an extent not available in a regular classroom. (*See* DP Ex. 11 at 5.) They testified he needed one-to-one instruction on this skill to internalize it and avoid disturbing the learning of other students. (*Id.*) Dr. Whitbread explained that in her experience, this situation was not all that uncommon, and could easily be handled in a general-education environment with the use of an accommodation during the in-class activity requiring knowledge of the order of the alphabet (such as referencing a dictionary), followed up with one-on-one instruction on alphabetical order during pull-out time. Dr. Whitbread testified similar steps could be taken to address the teachers' concern L.H. had difficulty with several phonemic concepts: he could be assisted with an accommodation in class, and then given focused instruction in the area of weakness either via push-in or pull-out instruction with a special-education teacher. As for L.H.'s deficits in reading and mathematics, Dr. Whitbread testified teachers frequently provide differentiated instruction to students working at different levels in these subjects. She opined L.H.'s present levels of performance were not so deficient he could not be provided differentiated instruction in the regular classroom, although she acknowledged it would be a challenge, and might require additional training for the teacher.

A frequent refrain from HCDE staff was L.H. needed "overlearning" to master concepts—he needed to be pre-taught the concept ahead of time, re-taught the concept afterward, and then have it repeatedly reinforced for a period of time. Dr. Whitbread explained these techniques are commonly implemented in a typical classroom, and although L.H. would likely need them to a greater extent than non-disabled peers, nothing in her evaluation of L.H. led her

to believe he could not be provided sufficient overlearning in a regular-education setting with the use of pull-out or push-in instruction for an hour or more a day. Dr. Whitbread also testified L.H. had only been receiving one hour of pull-out time a day, and if HCDE believed L.H. would benefit from additional one-on-one instruction, additional daily pull-out time could and should be provided. (*Id.* at 134.) In sum, Dr. Whitbread could not conceive of any reason why L.H. could not receive the instruction he needed in a regular-education setting.

In light of this testimony, and given a correct understanding of what mainstreaming entails under the IDEA, the Court finds the services HCDE thinks make the CDC a superior placement for L.H. could feasibly be provided in a regular-education setting.

### c. Weighing the benefits of the CDC against the benefits of a regular-education setting

In the alternative, even if the Court accepted HCDE's position that L.H. would have greater opportunities for focused, personalized instruction and independence-building in the CDC, the Court does not find these benefits to "far outweigh[]" the substantial benefits L.H. would realize from mainstreaming. *See Roncker*, 700 F.2d at 1063. In addition to the testimony regarding the substantial academic benefits children with Down Syndrome typically receive from mainstreaming, *see* section IV.B.1.a *supra*, it is undisputed a regular-education setting is particularly beneficial for L.H. in terms of social development. As the ALJ found, L.H. has relatively advanced social skills and relationships are very important to him, and, thus, placement in the more isolated CDC would likely be frustrating for him. (*See* T.R. 1 at 12–13.) Indeed, both sides' experts agreed the proposed placement at the CDC was not ideal in terms of providing opportunities for interaction with typically developing peers. (*See* DP Tr. at 59–61 (Dr. Meece); 783–85 (Dr. Kabot).) Moreover, Dr. Whitbread testified adaptive behavior, particularly pre-vocational and social/emotional skills, are best taught in a regular environment where the child can benefit from constant modeling by typically developing peers. Thus, even

assuming the CDC would provide a marginally better environment for focused instruction and independence-building, the Court cannot conclude these benefits are so weighty as to displace the IDEA's "strong preference in favor of mainstreaming." *See Roncker*, 700 F.2d at 1063.

Accordingly, the Court concludes L.H. does not fall within *Roncker*'s second category of students for whom mainstreaming is inappropriate.

### 3. Was L.H. too disruptive for the general-education classroom?

The final category of students for whom a mainstream placement is inappropriate are those who, in *Roncker*'s words, are "a disruptive force in the non-segregated setting." *Id.* HCDE does not argue L.H. falls within this category, and for good reason. Although L.H. apparently did have some behavior issues at Normal Park, there is no indication his behavior was so disruptive as to require a separate placement. In fact, demonstrating respect for his peers' personal space was one of the few goals from the 2012–2013 IEP that L.H. actually met. (*See* DP Ex. 6 at 00214.)

Additionally, L.H.'s teachers testified his behavior was much better once they started modifying his instruction to address his current levels of performance. This testimony was corroborated by L.H.'s teachers at TMS, who testified that while L.H.'s behavior was not perfect, he was generally friendly, respectful, and well-behaved. The Court agrees with the ALJ that the correlation between being allowed to work at his own level and pace and improved behavior is not coincidental. (*See* T.R. 1 at 9 n.7.) Because mainstreaming under the IDEA generally allows for students to work at their current levels of performance while remaining in the regular-education environment, *see* section IV.B.1.b.i *supra*, there is no reason to believe L.H. will exhibit substantial behavioral issues going forward. The Court finds L.H. would not be a disruptive force in the general-education environment, and thus does not fall within *Roncker*'s final category of students for whom mainstreaming is inappropriate.

**4.      HCDE's proposed placement was inappropriate.**

As set forth above, the Court concludes L.H. does not fall within any of the categories of students who cannot be successfully mainstreamed. He is not a student who could not benefit from being in the regular-education setting; the non-portable benefits of a non-mainstream setting do not far outweigh the benefits of the regular-education setting; and he is undisputedly not too disruptive for the regular-education setting. Therefore, under the standard set forth by the Sixth Circuit Court of Appeals in *Roncker*, HCDE's proposal to remove L.H. from a fully mainstreamed setting and provide him with academic instruction in a separate CDC classroom was inappropriate.

It is worth setting forth the extent to which the Court agrees with HCDE's position. The Court does not find L.H. is not intellectually disabled, or that, at this point, he can master the general-education curriculum, even given special-education supports and services. To the contrary, the Court credits Dr. Kabot's testimony that L.H. has an intellectual disability in the mild-to-moderate range. The Court credits the assessment of HCDE's teachers and experts that L.H. was and is substantially behind his typically developing peers on his acquisition of a number of fundamental skills. The Court agrees L.H. could not keep up with the rigor and pace of the third-grade general-education curriculum, and credits the ALJ's conclusion that placing L.H. in regular-education classroom and attempting to teach him material well above his ability would only lead to frustration for L.H. and his teachers.

By and large, the Court agrees almost entirely with HCDE's witnesses' factual conclusions; the only issues on which the Court does *not* concur with the opinions of HCDE's educators are the proper standard for gauging a child's eligibility for mainstreaming, and HCDE's application of that standard to L.H. HCDE teachers and staff adhered to a standard that was more exacting than the IDEA requires, and as a result, their conclusion L.H. could not be

fully mainstreamed and required a more restrictive placement contravenes the "very strong congressional preference" in favor of mainstreaming embodied in the IDEA's least-restrictive-environment mandate. *See Roncker*, 700 F.2d at 1063.

### C. Reimbursement for Plaintiffs' Private Placement

Having found the 2013–2014 IEP proposed a placement that was more restrictive than necessary for L.H., the Court must determine whether Plaintiffs are entitled to retroactive reimbursement for the cost of enrolling L.H. at TMS. As noted above, reimbursement is appropriate when the placement proposed by the school district violates the IDEA and the private placement chosen by the parents "is reasonably calculated to enable the child to receive educational benefits," *Deal I*, 392 F.3d at 855, and is "an education otherwise proper under [the] IDEA," *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–13 (1985). Private placement is not proper under the IDEA "when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003). Because reimbursement is an equitable remedy for the failure to comply with the IDEA, "a private school placement must be consistent with the purposes of the IDEA." *Id.*

Plaintiffs contend the fact L.H. has passed from grade to grade at TMS and his relatively high standardized test scores indicate the placement is reasonably calculated to lead to an educational benefit for L.H. The Court agrees L.H. has made some academic progress at TMS. Other than certain basic skills, discussed below, he appears to have progressed roughly one grade level in decoding, reading comprehension, and math. He also appears to be doing well behaviorally and socially, and the setting is certainly less restrictive than the CDC placement proposed by HCDE.

This evidence notwithstanding, the Court concludes TMS is not an appropriate placement for L.H. The Court's reimbursement analysis does not turn on whether L.H. made progress while at TMS, but rather on whether the decision to place L.H. at TMS was, at the time, proper under the IDEA and reasonably calculated to enable L.H. to receive educational benefits. The Court concludes placement at TMS does not meet these standards for two primary reasons. First, the weight of evidence indicates L.H. needs systematic, intensive instruction on a number of "building-block" skills, and the Montessori instructional approach is not designed to provide such instruction. Second, the Court finds the Montessori instructional approach is not sufficiently structured for L.H.'s individualized needs.

L.H.'s need for systematic, intensive instruction on a number of "building-block" skills was reiterated throughout the record, as well as in testimony before the Court. When asked about L.H.'s unique educational needs, Ms. Hope testified he needed "frequent repetition of basic prerequisite skills" and "intense one-on-one instruction." (DP Tr. at 86.) Ms. Manley testified L.H. needs instruction focused on "breaking down larger concepts into the smaller components, [and] filling in the gaps that are missing and the skills that he needs in order to move forward." (DP Tr. at 443.) Ms. Kendrick believed L.H. "requires a highly structured learning environment." (DP Tr. at 493.) Ms. Levine opined L.H. "needs a lot of prerequisite skills." (DP Tr. at 569.)

Dr. Kabot testified at the due-process hearing that L.H. "needs a lot of what I'll call systematic instruction," which Dr. Kabot defined as "breaking skills down into smaller components," the careful use of prompting and reinforcements to elicit performance of the skill, and then data-collection and analysis to gauge the child's progress and guide further instruction. (DP Tr. at 746–47.) Dr. Kabot opined L.H. needed "very intentional instruction" in basic vocabulary and math concepts, along with frequent revisiting of learned concepts to ensure he

internalizes these basic skills. (*Id.* at 749.) Dr. Kabot substantially restated these opinions in her testimony before this Court, testifying L.H. needs systematic instruction on basic language, reading, and vocabulary skills, among other things. The Court also heard testimony from Ms. Rosenow and Ms. Johns at the supplemental hearing. Ms. Rosenow opined that, based on her evaluation of L.H. and on the results of the Connecticut evaluation, L.H. needed direct instruction in phonics to strengthen his word-decoding skills. Ms. Johns testified that, according to her assessment of L.H. in the fall of 2015, he needed instruction in a number of foundational concepts, such as basic addition, story problems, skip-counting, two-digit numbers, one-to-one number correspondence, and so on, to enable him to make progress in the area of mathematics.

This testimony regarding L.H.'s need for focused pedagogical attention on foundational skills is corroborated by the assessments given to L.H. in the summer and fall of 2015. These assessments show L.H. has yet to develop basic math skills such as one-to-one number correspondence (*see* Def.'s Ex. 31 at 2–4); he needs to build a better understanding of certain basic phonemic and phonics concepts (*see* Def.'s Ex. 41 at 1–3); and he has some fairly severe language deficiencies (*see* Def.'s Ex. 28 at 10–12). These are essentially the same weaknesses he was noted to have at Normal Park. (*See, e.g.*, T.R. 1 at 5; DP Tr. at 448–49 (lack of one-to-one number correspondence); DP Ex. 6 at 00222 (fourth-quarter IEP progress report noting no progress toward second-grade phonemic awareness goal); Def.'s Ex. 28 at 1 (low language assessment scores from Normal Park).) This indicates to the Court that L.H. had made very little, if any, progress in these key areas in the two years he had been at TMS at the time of the assessments.

Evidence of academic progress—or the lack thereof—is not alone enough to determine whether a private placement is appropriate for reimbursement. *Berger*, 348 F.3d at 522 & n.6. L.H.'s lack of progress toward these building-block skills is therefore not the end of the question.

Rather, it points to the underlying problem: the undisputed fact that TMS offers little in the way of systematic instruction. Dr. Kabot testified that during her observations of L.H. at TMS, direct, systematic instruction was either absent or poorly implemented, and there was very little emphasis on data collection or systematic reinforcement. Likewise, although Dr. Whitbread did not observe L.H. at TMS, she characterized the Montessori instructional approach as being more of a child-discovery method of learning, and thus stated she would not expect to see a lot of systematic instruction. Absent a systematic approach to supplying L.H. with the building-block skills he lacks, the Court does not see how placement at TMS is calculated to provide L.H. with a meaningful educational benefit.

The second reason TMS does not appear to be an appropriate placement for L.H. is that the Montessori instructional approach, while likely beneficial for many children, is not sufficiently structured for L.H. The Montessori Method gives children a great deal of freedom to structure their own education, but this approach requires a certain level of independence and self-motivation on the child's part. Children choose which lessons to work on, and when to work on them, and go to their teachers for instruction when they need it. This approach seems to be a poor fit for L.H., who, at the end of second grade, relied heavily on adult prompting and was unable to work independently for five minutes. (*See* DP Ex. 6 at 00214–00215.)

In fact, there is substantial evidence L.H. has had a great deal of difficulty marshalling the level of self-control necessary to succeed in this environment. Dr. Kabot testified at the due-process hearing L.H. "needs a lot of teacher-directed instruction" and "more structure." (DP Tr. at 747–48.) She opined L.H. seemed to be struggling with Montessori's flexible, child-led instructional techniques, and lacked internal motivation to complete non-preferred tasks. (*Id.* at 747–48, 752–53.) In her report, prepared after observing L.H. at TMS in October 2013, Dr. Kabot noted L.H. was engaged in task-avoidance activities for more than half of the observation

period. (DP Ex. 26 at 6.) After two more days of observation in September of 2015, Dr. Kabot reported that of the approximately six hours of instructional time she observed, L.H. spent over two hours transitioning between one activity to the next, and was only able to complete work when an aide or teacher was working with him. (Def.'s Ex. 28 at 9, 12.) Even Mr. Jamie Watts, L.H.'s third-grade teacher at TMS, testified at the due-process hearing L.H. was "off-task" about half of the time. (*See* DP Tr. at 61; T.R. 1 at 8.) In sum, it appears TMS is not conducive to providing L.H. with an educational benefit, given his demonstrated lack of independence and need for a more structured learning environment.

Having found TMS an otherwise inappropriate placement for L.H., the Court next considers whether TMS's mainstream environment itself renders placement at TMS proper under the IDEA. There can be no doubt mainstreaming is beneficial for L.H. In fact, the Court specifically found L.H. "could receive a benefit from inclusion in the general education environment"—a finding "supported by ample evidence, including expert testimony regarding the benefits students with Down syndrome typically realize from mainstreaming and testimony regarding L.H.'s actual progress during the years he was mainstreamed at Normal Park." *See* Section IV(B)(1), *supra*. The Court also recognizes children with Down syndrome receive social and behavioral benefits associated with "modeling" in mainstream classrooms. (*See* Ex. 45, Meece Aff. at 25 ("Inclusion with typically developing peers clearly enhances the social and communication skills of children with Down syndrome.")) The question the Court must answer is whether a mainstream educational environment that is otherwise inappropriate for a child with Down syndrome is proper under the IDEA.

The preference for mainstreaming in the IDEA is clear. *See McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 671–72 (6th Cir. 2003) (describing the IDEA's least-restrictive-environment requirement as a "mandate favoring mainstreaming"); *Roncker*, 700 F.2d at 1063

("The [IDEA] does not require mainstreaming in every case but its requirement that mainstreaming be provided to the *maximum* extent appropriate indicates a very strong congressional preference."). The value of mainstreaming, however, must be viewed as secondary to the primary goals of the IDEA in terms of facilitating the best possible education for children with disabilities. *See Berger*, 348 F.3d at 523. For this reason, parents are not "entitled to reimbursement just because the private placement is less restrictive than the public school placement." *See id.* at 522.

In *Berger*, the Sixth Circuit denied reimbursement for a hearing-impaired student's placement at a private school which did not provide valuable special-education services such as tutoring or speech and language therapy. The parents argued the placement was appropriate because the private school was quiet and had smaller class sizes. *Id.* Despite these advantages, the Sixth Circuit found the placement was not "proper under the IDEA" because the private school lacked special-education services necessary for the student's development.

Extending this rationale to L.H.'s placement at TMS, an educational environment that is otherwise inappropriate for L.H. cannot be considered "proper under the IDEA" merely because it is a mainstream environment. Given the mismatch between the Montessori approach and L.H.'s need for focused, systematic instruction in language and other basic skills, combined with the difficulty he has working independently in low-structure environments, the Court does not find placement at TMS to be proper under the IDEA. Accordingly, the Court holds Plaintiffs are not entitled to reimbursement for the costs of placing L.H. at TMS.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes Plaintiffs have established by a preponderance of the evidence that the placement proposed in L.H.'s 2013–2014 was not L.H.'s least-restrictive environment.  Because the private placement chosen by L.H.'s parents lacks several critical qualities necessary for L.H. to receive an educational benefit, however, the Court concludes Plaintiffs are not entitled to reimbursement for the costs associated with the placement.

**An appropriate Order shall enter.**


**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**